**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **WAKILII BROWN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **1:21-cv-00504-LSC** |
| | ) | |
| | ) | |
| **JOHN Q. HAMM,** | ) | |
| **Commissioner, Alabama** | ) | |
| **Department of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OF OPINION

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Wakilii Brown ("Brown"), a death row inmate at Holman Correctional Facility in Atmore, Alabama. Brown challenges the validity of his 2008 convictions on three counts of capital murder for the deaths of Dotty Jemison and Cherea Jemison and sentence of death in the Circuit Court of Talladega County, Alabama. Upon thorough consideration of the entire record and the briefs submitted by the parties, the Court finds that Brown's petition for habeas relief is due to be denied.

## I.      FACTS OF THE CRIME

The Alabama Court of Criminal Appeals ("ACCA") summarized the facts of this case in its opinion on direct appeal, quoting from the trial court's sentencing order, as follows:

Dotty Jemison lived at 449 Marion Avenue in the Pinecrest area of Sylacauga. Sometime in 2000, Cherea Jemison, Dotty's daughter, moved in with Dotty Jemison. Cherea was accompanied by her three children, [F.S.], [T.S.] and [K.S.]. Sometime in the Fall of 2000, the defendant also moved in with Dotty Jemison. The defendant had a dating relationship with Cherea Jemison and was the father of [T.S. and K.S.].

On Friday, March 9, 2001, the defendant did some work with Michael Pope. Michael Pope and Aletha Pope, Michael's wife, paid him for work done and gave him a ride to another location. That was the last time that Michael Pope saw the defendant.

Saturday, March 10, 2001, was Cherea Jemison's birthday. Family members tried to call the residence at 449 Marion but there was no answer.

On the same day, the defendant went to the Alabama Trust Bank in Sylacauga to cash a check on Dotty Jemison's account. The teller, Aletha Pope, told him that she could not cash it because it was on an account on First Federal Bank. The defendant left and came back. He then wanted to cash a check from Cherea Jemison's account (State's Exhibit # 38 is the check from Cherea's account, dated 3/10/01 for $200). The defendant told Aletha Pope that the baby, [K.S.], was sick and had an upper respiratory problem and was at Children's Hospital in Birmingham. Roxanne Womack, an employee of Children's Hospital in Birmingham, testified that they had no record of a [K.S.] in March of 2001.

On the same date, a check from the account of Dotty Jemison was cashed by Jennifer Weed, a teller at First Federal Bank. The check was sent from the third drive-through lane, at First Federal Bank in Sylacauga by a black male driving a blue car. (State's Exhibit # 42 is a check for $200 on Dotty's account).

On Sunday, March 11, 2001, neither Dotty Jemison [n]or Cherea Jemison was at church services at the Rising Star Church in Sylacauga. The pastor and family tried to call the residence at 449 Marion, but did not get an answer.

On the same date, an anonymous call was placed to Sylacauga Police Department at 5:31 p.m. stating that there was a problem at 449 Marion Ave. Officer Doug Kemp was dispatched to 449 Marion Avenue for a welfare check. No one answered the door and he left the residence. Later that night, at 9:36 p.m., a second caller identified himself as Mr. Adam Murrell and stated that there could be dead bodies in the house. Police officers were again dispatched to 449 Marion Ave. Investigator Mike Smith of Sylacauga Police Department made entrance into the residence through a window and found two bodies. One body of a black female was found in an unlocked bedroom covered with two blankets. She appeared to be dead. The second body was found in a locked bedroom. It was a black female whose ankles and wrists were bound with duct tape and green tape.

Rozell Lohman, from the Alabama Department of Forensic Sciences, testified that a latent print of value has 9 points or better. He identified the latent prints on [the] inside of a cardboard cylinder that was found next to the body of Dotty Jemison. Latent # 1 is the left thumb of the defendant. Latent # 2 is the left index finger of the defendant. No other latents of value were found.

Dr. Joseph Embry of the Birmingham Department of Forensic Sciences performed the autopsies of Cherea Jemison and Dotty Jemison. He testified that Cherea Jemison had a wound in the midline of her face, lacerations deep to the bone, fractured nasal bones and blood under the skin of her eye lid. She also had a laceration in her left ear. Her head was shaved to observe her other wounds. State's Exhibit # 4 shows the right side of her head and depicts 10 lacerations in her scalp, above her right ear, back of her head and upper part of her right ear. Dr. Embry testified that the lacerations appear to be caused by a blunt object. State's Exhibit # 5 shows the upper right side of her head and lacerations to the top of her head. State's Exhibit # 11 shows two lacerations behind her left ear, which overlies a large basal skull fracture. There were defensive wounds on her hands, suffered from defending off blows. State's Exhibit # 14 shows blue bruising and swelling in the ring and little finger of her left hand. Dr. Embry testified that the rigor indicated that it was thirty-six to forty-eight hours after death. The rigor was consistent in Dotty and Cherea Jemison.

Dr. Embry also testified that Dotty Jemison was bound at the ankles, wrists and was gagged with silver duct tape. There was also green tape on her ankles. State's Exhibit # 27 depicts four lacerations to the right side of Dotty Jamison's head and behind her right ear. There was a pattern injury on the top front of Dotty Jemison's head that was consistent with the claw end of a hammer. State's Exhibit # 21 depicts the right ring finger was completely fractured. State's exhibit # 23 shows bruising and swelling between the thumb and forefinger. Dr. Embry testified that Dotty Jemison died as a result of blunt force trauma to the head and that the wounds to Dotty Jemison and Cherea Jemison are similar.

On Monday, March 12, 200[1], a stand off began with the defendant and the Cleveland Crisis Intervention team. Sgt. Larry Hughes testified that he was the Assistant to the Commander of the Crisis Intervention Team in Cleveland, Ohio and that the defendant was barricaded in 405 East 152nd Street in Cleveland. The stand off with the police lasted for over 24 hours and the defendant only surrendered after being gassed with several canisters of a chemical agent. Sgt. Hughes testified that he was aware of the BOLO for a blue Mazda 626, which was the property of Cherea Jemison and that it was located within close proximity to the barricaded residence. (State's Exhibit 21). This was the same blue Mazda 626 automobile that was given to Cherea Jemison by Reverend Henry Sanders.

[T.S.], [F.S.], and [K.S.], the children of Cherea Jemison, were taken from the defendant's mother's residence in Cleveland, Ohio and placed in the custody of social services. At the trial of this case, [T.S.] testified that in 2001 she was four years of age and lived with her mom, Cherea, Wakilii [the defendant], [T.S.], [F.S.] and Ambo (Dotty Jemison). [T.S.] testified that she called the defendant dad when he wasn't fussing and Wakilii when he was fussing. She testified that the last time she saw her Mom, Cherea Jemison, was in the hallway of their home. [T.S.] testified that Cherea was in the hallway fussing with the defendant and that is what woke [T.S.] up. Her two brothers, [F.S.] and [K.S.], were asleep. [T.S.] looked out of her bedroom door and saw her mother, Cherea Jemison, lying on the floor, with blood on her chest. She was lying on her back with her head closest to [T.S.]'s bedroom door. The defendant was standing over her. Cherea's eyes were closed and she didn't say anything. [T.S.] ran back to bed, scared and went to sleep.

*Brown v. State,* 74 So. 3d 984, 993–95 (Ala. Crim. App. 2010) (quoting R. 92–97)

(quotation marks and footnote omitted). The ACCA also summarized the following

additional facts from the evidence presented at the trial:

> In addition, Michael Earl Pope testified that Brown worked for him; that, on Friday, March 9, 2001, Brown was working for him as a painter at a house on Settlement Road; that, around 3:00 p.m., it started raining; that he picked up the painters, took them to his house, and paid them; that he gave Brown $50; that Brown asked him for more money; that he did not have any more money, so he had to wait until his wife got off work; that his wife, Aletha Pope, worked at Alabama Trust Bank in Sylacauga; that he picked up Aletha after she got off work; that Brown rode with him; that Aletha gave Brown $10; that he went to a gas station and cashed a $20 check; that he gave the $20 to Brown; that he dropped Brown off on Hammett Street; and that was the last time he saw Brown.
>
> Aletha Pope testified that, in March 2001, she was a teller at Alabama Trust Bank; that she knew Cherea because she was a customer at the bank and because they were both members at the same church; that she knew Dotty from church; and that she knew Brown from church and because he worked for her husband.
>
> Aletha testified that, on March 9, 2001, Brown came with her husband to pick her up from the bank; that her husband asked her if she had any money to give Brown; that she told him she only had $10, and she gave that to Brown; that they stopped at a gas station, and her husband went inside; that they dropped Brown off on Hammett Street; and that they did not see him again that night. She also testified that, on Saturday, March 10, 2001, Brown came into the bank and wanted to cash a check on Dotty's account; that she told him she could not cash the check because it was on a First Federal Bank account, but he could take it to First Federal Bank; that Brown left, but he came back later; that, when he came back, he cashed a $200 check on Cherea's account; that Brown also wanted her to telephone her husband to see if he would pay him; that Brown told her that the baby, K.S., had an upper respiratory problem and that they had taken him to the Children's Hospital in Birmingham; that she telephoned her husband and told him that Brown wanted his money; that he told her to take the money from their account and give it to him; and that she took $100 from their account and gave it to Brown. Finally, Aletha

testified that she did not see Dotty, Cherea, or the children in church the next day.

Vaunzcea Jemison testified that, in March 2001, she lived in Cleveland, Ohio; that Dotty was her mother, and Cherea was her sister; that, on Friday, March 9, 2001, she traveled to Birmingham for her brother's wedding; that she was planning to visit her mother and sister; that she left Cleveland on an airplane at 5:00 p.m. and arrived in Birmingham at 10:30 p.m.; that, around 11:00 p.m., she telephoned Dotty and Cherea's house, but no one answered the telephone; that she tried to telephone them several times on Saturday, March 10, 2001, but was not able to reach them; that she went back to Cleveland on Sunday, March 11, 2001; that she tried to contact Dotty and Cherea several times on Sunday, but she was not able to contact them; that she talked to them at least three times a week on the telephone; that it was unusual that she was not able to contact them on Friday, Saturday, or Sunday; that Dotty and Cherea knew she was going to be in Alabama that weekend; and that, around 11:00 p.m. on Sunday, March 11, 2001, she learned that Dotty and Cherea had been killed.

Manuel Smith III testified that he was the pastor at Rising Star Missionary Baptist Church in Sylacauga; that Dotty was the sister of his wife, Shirley; that Dotty and Cherea attended his church; that he last saw or talked to Dotty and Cherea on the Sunday before their bodies were discovered; that he did not talk to them during the week; that, on Saturday evening, he had heard that K.S. was sick; that he had tried to telephone Dotty and Cherea on Saturday evening, but he did not get an answer; and that Dotty, Cherea, and the children were not at church on Sunday. He later learned about the murders from a church member and subsequently identified the bodies of Dotty and Cherea.

Investigator Jeff Mobbs of the Sylacauga Police Department testified that, around 10:56 p.m. and 10:57 p.m. on March 11, 2001, he was notified about a situation at 449 Marion Avenue; that he arrived at the scene around 11:05 p.m., and he and the other officers present conferred about the situation; that, shortly thereafter, he and another investigator entered the residence and found bodies in the residence; that he and the other investigator left the residence; and that he called dispatch and requested additional information. He also testified that, based on the information he received from dispatch, he telephoned Adam Murrell; that, after he talked with Murrell, he telephoned a Cleveland, Ohio, telephone number he had received from Murrell; that the person he talked to was a female who identified herself as Betty Washington;

that that was between 11:00 p.m. and 11:30 p.m. on March 11, 2001; and that, at some point, officers developed Brown as a suspect.

Adam Murrell testified that he lived in Hope Hull, Alabama; that Brown was his nephew, but he did not know him personally; that Betty Washington was his sister; that, on the evening of March 11, 2001, Washington telephoned him from Cleveland; that Washington asked him to telephone the Sylacauga Police Department to find out what was going on; that he ultimately telephoned the police department; and that he initially told them that something bad had happened "up there" and that they needed to get in touch with someone to go out to the house. He also testified that, when he telephoned the police department, he told them that something bad had happened and that he could not remember saying anything about somebody being killed. Murrell further testified regarding the sequence of telephone calls between him and Washington and between him and law enforcement authorities.

During the State's case-in-chief, the State asked to call Betty Washington as a court witness. The State asserted that Washington was Brown's aunt; that she had been uncooperative with the State; that they had to bring her to Alabama pursuant to an out-of-state witness subpoena; and that she had told one of the assistant district attorneys that she would come and testify truthfully, but they would hear that when she took the witness stand. Over the defense's objection, the trial court allowed Washington to be called as a court witness.

Betty Washington testified that Brown was her great-nephew; that Brown's mother, Linda Brown, was her niece; that Murrell was her brother; that she and Linda both lived in Cleveland, Ohio; and that, at the time of trial, she and Linda lived in the same duplex. She also testified that, in March 2001, she lived about ten or fifteen minutes from Linda; that she and Linda had a good relationship and would talk on the telephone and visit one another; that she did not associate with her nephews; that she would see Brown, he would respect her and speak to her, and that was it; that, in March 2001, she knew Cherea, but she was not associated with her; that she did not know Dotty; that she knew that Cherea and Dotty lived in Sylacauga, but did not know where; and that she had not ever been to their house.

Washington testified that, at some time on Sunday, March 11, 2001, she telephoned Murrell and told him that Brown was in Cleveland and that there were some rumors. However, the State instructed her not to get into the

substance of the rumors. She then testified that she told Murrell to try to find out about what was happening; that she did not ask Murrell to telephone the Sylacauga Police Department; that she did not tell Murrell that there might be someone dead at the house; that she did not tell Murrell that Cherea and her mother were dead in the house; and that she did not know they were dead. She also reviewed telephone records and testified regarding the sequence of telephone calls between her and Murrell and Murrell and law enforcement officers.

Subsequently, the following occurred:

[PROSECUTOR GIDDENS:] Do you remember—and you've given a statement in this case, hadn't you?

[WASHINGTON:] Huh?

[PROSECUTOR GIDDENS:] You've talked to Jeff Mobbs and you've talked to other police officers?

[WASHINGTON:] Uh-huh.

[PROSECUTOR GIDDENS:] Did Wakilii Brown in Cleveland tell you this or this in substance—
. . . .

[PROSECUTOR GIDDENS:] Did Wakilii Brown in Cleveland, Ohio, tell you this or this in substance, that he had done something bad, very bad?

[WASHINGTON:] No.

[PROSECUTOR GIDDENS:] He did not tell you that?

[WASHINGTON:] No.

[PROSECUTOR GIDDENS:] That's all I have. I reserve the right to recall.

[WASHINGTON:] I didn't even see Wakilii.

(R. 639–41.)

> After the defense completed its cross-examination of Washington, the State recalled Mobbs. Mobbs testified that, when he talked to Washington on the telephone, she told him that "she had been told by her nephew that he had done something wrong to them girls up there, he had hurt them girls, and that we needed to go in that house and check and see what's going on." (R. 646.) He also testified that, at the end of their conversation, Washington told him not to tell anyone about where he had gotten that information.

*Id.* at 995–98 (quotation marks omitted).

## II.   PROCEDURAL HISTORY

On March 11, 2001, Dotty and Cherea Jemison were found dead in their home in Sylacauga. Brown was indicted on June 28, 2001. Brown's trial began February 25, 2008. Brown was convicted by a jury of three counts of capital murder: two counts of murder committed during the course of a robbery under § 13A-5-40(a)(2), and one count murder of two or more persons committed by one act or pursuant to one scheme or course of conduct under § 13A-5-40(a)(10) of the Code of Alabama (1975). After a sentencing hearing, the jury recommended Brown be sentenced to death by a 10-2 vote. On May 5, 2008, the trial court agreed with the jury's recommendation and sentenced Brown to death.

Brown timely appealed his conviction to the ACCA on May 11, 2008. On June 25, 2010, the ACCA issued a decision affirming Brown's conviction and death sentence. *Brown*, 74 So. 3d at 984 (modified on September 17, 2010).

Brown petitioned the Alabama Supreme Court for review, and the Court granted certiorari on three issues: the admission of child witness testimony; alleged prosecutorial misconduct; and the trial court's jury instruction defining reasonable doubt and on capital murder-robbery. *Ex parte Brown*, 74 So. 3d 1042 (Ala. 2011). The Alabama Supreme Court affirmed on those issues. *Id.* at 1053.

Brown petitioned the Supreme Court of the United States for writ of certiorari, and that petition was denied on January 9, 2012. *Brown v. Alabama*, 565 U.S. 1111 (2012).

Brown timely filed a state postconviction petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure on July 18, 2012, which he amended three times. On October 14, 2014, the circuit court dismissed the claims raised in Brown's third amended petition as precluded and/or insufficiently pleaded except for his claim that jurors failed to truthfully respond to questions during voir dire. Vol. 6, Tab #R-55. Thereafter, in December 2015, Brown filed a fourth amended petition, but the circuit court struck it in January 2018 because it attempted to relitigate claims that had already been dismissed. *See* Vol. 24, Tab #R-56; Vol. 25, Tab #R-59. After holding an evidentiary hearing on Brown's juror misconduct claim on May 1, 2018, the circuit court denied postconviction relief on that claim and entered a final judgment on postconviction relief in December 2018. Vol. 32, Tab #R-69.

Brown timely filed his notice of appeal on January 29, 2019. On January 31,

2020, the ACCA issued an unpublished opinion affirming the circuit court's rulings

in all respects. *See Brown v. State*, No. CR-18-0416, slip op. at 55 (Ala.  Crim. App.

Jan. 31, 2020); Vol. 32, Tab #R-69. Brown timely petitioned the Alabama Supreme

Court for review of his Rule 32 petition on April 17, 2020. On October 23, 2020, the

Alabama Supreme Court denied the petition for writ of certiorari. Vol. 33, Tab #R-

72.

Brown filed the instant petition for a writ of habeas corpus on April 9, 2021.

The petition is his first habeas petition, and it is timely.

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-

Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v.

Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Pursuant to § 2254(a),

a federal district court is prohibited from entertaining a petition for writ of habeas

corpus "in behalf of a person in custody pursuant to the judgment of a State court"

unless the petition alleges "he is in custody in violation of the Constitution or laws

or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's

review of habeas claims is limited to federal constitutional questions. Claims

pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a

"state's interpretation of its own laws or rules" do not provide a basis for federal

habeas corpus relief under § 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325–26 (11th Cir. 2010) (quotation marks and citations omitted).

## A.     Exhaustion of State Remedies and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). This means that "'[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358–59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the rule. *Id*. The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)).

Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state

courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5–6 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted). If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).
>
> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted—i.e., the petitioner never presented the claim to the state court—a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519–20 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

### B.    Overcoming Procedural Default

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (citations and internal quotation marks omitted).

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. *Id.* at 750. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (internal quotation marks, brackets, and citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Finally, a petitioner may also escape a procedural default bar if he "can demonstrate a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537 (1986) (quoting *Carrier*, 477 U.S. at 496), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995) (emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

## C.   AEDPA Review of State Court Decisions Under § 2254(d) and (e)

When a constitutional claim upon which a petitioner seeks relief under § 2254 is not procedurally defaulted but has instead been adjudicated on the merits in state courts, this Court is still restricted in its ability to grant relief on those claims by § 2254(d). The AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation omitted). To grant habeas relief on a claim, this Court must not only find that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010) (quoting § 2254(d)). The burden of showing that an issue falls within § 2254(d)(1) or (d)(2) is upon the petitioner. *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). Section 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses have independent meanings. *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis.") (citation omitted). A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citation omitted). On the other hand, to determine whether a state court's decision is an "unreasonable application" of clearly established Federal law, the Supreme Court has stated:

The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be

granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and quotation marks omitted) (emphasis in original); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant habeas relief under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Harrington*, 562 U.S. at 103). As the Supreme Court has stated, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward,* 592 F.3d at 1155–56 (alterations in original) (quoting § 2254(e)(1)).

### D. The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Additionally, because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citation omitted). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts). The burden of proof is on the habeas petitioner "to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (citation omitted); *see also Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective assistance of counsel is insufficient; a petition must allege specific errors in counsel's performance and facts showing prejudice).

### E. The General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the following two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

Because *Strickland*'s preceding two-part test is clearly framed in the conjunctive, a petitioner bears the burden of proving both "deficient performance" and "prejudice" by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, [ ] or vice versa.").

In order to establish deficient performance, a habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. That reasonableness is judged against "prevailing professional norms." *Id*. Moreover, under *Strickland*, lower federal courts must be "highly deferential" in their scrutiny of counsel's performance. *Id.* at 689. As the *Strickland* Court outlined:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* (citations and quotation marks omitted).

Simply put, a habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Chandler*, 218 F.3d at 1315. The reasonableness of counsel's

performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689).

To satisfy the prejudice prong, a habeas petition "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation marks omitted). Further, the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. Therefore, "when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695).

Because *Strickland* and § 2254(d) both mandate standards that are "'highly deferential'", "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id*. at 101. This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

## IV.   DISCUSSION OF BROWN'S CLAIMS

### A.   Brown's claim that the State withheld impeachment evidence in violation of *Giglio v. United States*, 405 U.S. 150 (1972)

Brown's first claim is that the State withheld evidence from him that he could have used to impeach the testimony of Tatiyana Smith (described in the quoted

section above as "T.S."), who was Cherea Jemison's daughter and who testified for the State at trial, in violation of *Giglio v. United States*, 405 U.S. 150 (1972). Specifically, Brown asserts that the State did not turn over notes and recordings from meetings that occurred between the prosecutor and Tatiyana leading up to his trial. According to Brown, because Tatiyana's testimony at trial concerning what she saw the night of the murders differed from what she told child services authorities two days after the murders, any notes or recordings from her meetings with the prosecutor could have been used by Brown to impeach her testimony at trial with her own prior conflicting statements. Brown asserts that the notes would also have shown that Tatiyana informed the prosecutor at these pretrial meetings that she had no recollection of what occurred the night of the murders, but that the prosecutor coached her to testify differently. Brown insists that the State has never produced any such notes or recordings.

Before proceeding further with this claim, the Court must consider two arguments made by Respondent as to why the Court should not reach the merits of this claim. First, Respondent argues that this claim fails to comply with Rule 2(c) of the Rules Governing Habeas Corpus Cases and should therefore be dismissed because Brown failed to mention 28 U.S.C. § 2254(d) or plead how he is due relief on this claim under § 2254(d) in his petition. Specifically, Respondent argues that Brown does not cite § 2254(d), identify the state courts' adjudication of this claim,

or plead how the state courts' denial of relief "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).[1]

It is true that "habeas corpus petitions must meet heightened pleading requirements." *McFarland*, 512 U.S. at 856. The Supreme Court explained in *Mayle*, 545 U.S. at 649:

> In ordinary civil proceedings, the governing Rule, Rule 8 of the Federal Rules of Civil Procedure, requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2). Rule 2(c) of the Rules Governing Habeas Corpus Cases requires a more detailed statement. The habeas rule instructs the petitioner to "specify all the grounds for relief available to [him]" and to "state the facts supporting each ground."

But here, Brown's petition sufficiently apprises this Court that he is making the argument that the state courts' decisions on his *Giglio* claim were contrary to or an unreasonable application of Federal law or based on an unreasonable determination of the facts under § 2254(d). *See* Petition for Habeas Relief, Doc. 1 at ¶ 7 ("the judgment of the [ACCA] refusing to set aside Mr. Brown's conviction was both

---

[1]    Respondent raises the same argument with respect to seven others of Brown's claims: Brown's Claims B, E, F, G, H, I, J, and K. *See* Doc. 27 at 18 ("Here, Brown has not specified a ground for relief under § 2254(d) for these claims or even cited § 2254(d) in sections III.A – III.B and III.E – III.K of his petition."). The Court will address each argument separately within its discussion of each claim.

contrary to, and an unreasonable application of, clearly established Federal law as embodied in *Giglio*"); *see also* ¶¶ 67–75, 84–89. The Court finds that Brown has satisfied Rule 2(c) with regard to this claim, and it is sufficiently pled.

Second, Respondent argues that the claim is procedurally defaulted from this Court's review because it was procedurally barred in state court based on Brown's failure to comply with state procedural rules. In support, Respondent notes that when Brown attempted to raise this claim in his Third Amended Rule 32 Petition, the circuit court found it was barred by Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure because Brown could have, but did not, raise his *Giglio* claim at trial or on direct appeal. *See* Vol. 24, Tab #R-55 at 1245–46. The circuit court reasoned that Brown was aware of the facts underlying this claim during his trial because Brown's defense counsel questioned Tatiyana about the fact that she met with prosecutors, in her words, "a lot," prior to Brown's trial. *Id*. at 1246. The circuit court thus found that Brown was "on notice to raise any *Bradly/Giglio* claim if Brown was not provided with notes or recordings of these statements (if they existed) as he alleges in his Rule 32 petition." *Id*. This dismissal based on Rules 32.2(a)(3) and (5) was affirmed by the ACCA on appeal. Vol. 32, Tab #R-69 at 28.

Respondent is correct that a claim is barred from federal habeas review if it was procedurally barred in state court under an independent and adequate state procedural ground. *See Brownlee v. Haley*, 306 F.3d 1043, 1065–66 (11th Cir. 2002)

(holding Rule 32.2(a) of the Alabama Rules of Criminal Procedure is an independent and adequate state law ground and that a claim raised in a Rule 32 petition and abandoned on appeal is defaulted); *see also Mason*, 605 F.3d at 1121. However, the circuit court considering Brown's Third Amended Rule 32 Petition also considered Brown's *Giglio* claim on its merits, finding that the claim failed to state a material issue, was facially meritless under Rule 32.7(d), and was insufficiently pleaded under Rule 32.6(b) of the Alabama Rules of Criminal Procedure. *See* Vol. 24, Tab #R-55 at 1246–48. The circuit court ruled that "there was no *Brady* violation because the information [Brown] seeks was not suppressed and was available to him." *Id*. at 1246. The circuit court further found that the claim was "entirely speculative in nature" because "Brown fails to plead any specific facts about what information these alleged statements given by T.S. or F.J. contain or how this information would have been different than her testimony at trial or her 2001 statement to police." *Id*. at 1247. Thus, the circuit court did not rest its ruling on Brown's purported failure to comply with Rule 32.2(a) alone. And, when Brown raised this claim again before the ACCA on appeal, *see* Vol. 30, Tab #R-65 at 35–44, the ACCA also affirmed the circuit court's ruling that the claim was insufficiently pleaded, finding that Brown had failed to "assert any specific inconsistencies between T.S.'s pretrial statements and her trial testimony." Vol. 32, Tab #R-69 at 29. As such, the state court's decision did not "rest entirely on state law grounds" but was "intertwined with an

interpretation of federal law" because it also examined the substantive aspect of the circuit court's merits ruling on the claim. *See Ward*, 592 F.3d at 1156–57. As such, Brown's *Giglio* claim is not procedurally defaulted from this Court's review under the adequate and independent state law ground doctrine.

Instead, the state courts' rulings constitute an evaluation of the merits of Brown's federal constitutional claim, in turn triggering the usual inquiry of whether a federal habeas petitioner has satisfied the requirements of § 2254(d)(1)–(2) for preserved claims.[2] As noted, Brown exhausted this claim in his Rule 32 proceedings. *See* Vol. 21, Tab #R-52 at 96–103 (Third Amended Rule 32 Petition); Vol. 30, Tab #R-65 at 35–44 (brief to ACCA); Vol. 33, Tab #R-71, at 29–30 (certiorari petition to Alabama Supreme Court, in which Brown argued that the ACCA's ruling "affirming the dismissal of Mr. Brown's *Giglio* claim conflicts with . . . United States Supreme Court Precedent," was issued "in violation of [Mr. Brown's] constitutional rights under *Giglio*," and "contravened clear . . . federal law). The ACCA, which issued the last reasoned state court opinion, in its decision affirming the circuit court's denial of Brown's Third Amended Rule 32 Petition, explained in detail why Brown was not entitled to relief, as follows:

---

[2]      Because a state court's finding that a claim is insufficiently pleaded under Rules 32.3 and Rule 32.6(b) of the Alabama Rules of Criminal Procedure requires an evaluation of the merits of the underlying federal claim, it is considered a ruling on the merits. *Boyd v. Comm'r, Alabama Dep't of Corr.*, 697 F. 3d 1320, 1331 (11th Cir. 2012). As such, 28 U.S.C. § 2254(d)(1)-(2) applies to this Court's review of the claim.

Brown asserts that the circuit court erred in dismissing his claim that the State violated *Giglio v. United States*, 405 U.S. 150 (1972), and *Brady v. Maryland*, 373 U.S. 83 (1963), by suppressing statements made by his children during their meetings with prosecutors and law-enforcement officers in preparation for trial.

"A *Brady* violation occurs where: (1) the prosecution suppresses evidence; (2) the evidence is favorable to the defendant and (3) material to the issues at trial. *Stano v. Dugger*, 901 F.2d 898, 899 (11th Cir. 1990); *Delap v. Dugger*, 890 F.2d 285 (11th Cir. 1989); *United States v. Blasco*, 702 F.2d 1315, 1327 (11th Cir.), cert. denied, 464 U.S. 914, 104 S. Ct. 275, 276, 78 L. Ed. 2d 256 (1983); *Ex parte Kennedy*, 472 So. 2d 1106, 1110 (Ala.), cert. denied, 474 U.S. 975, 106 S. Ct. 340, 88 L. Ed. 2d 325 (1985). The Supreme Court of the United States in *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985) (plurality opinion by Blackmun, J.), defined the standard of materiality required to show a *Brady* violation as follows: 'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' *See also Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987); *Stano v. Dugger*, 901 F.2d at 899; *Delap v. Dugger*, 890 F.2d at 299; *Coral v. State*, 628 So. 2d 954 (Ala. Cr. App. 1992); *Thompson v. State*, 581 So. 2d 1216 (Ala. Cr. App. 1991), cert. denied, 502 U.S. 1030, 112 S. Ct. 868, 116 L. Ed. 2d 774 (1992).

"The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes. *United States v. Bagley*; *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Ex parte Womack*[, 435 So. 2d 766 (Ala. 1983)]. 'When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within the general rule.' *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766 (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state's witness."

*Williams v. State*, 710 So. 2d 1276, 1296–97 (Ala. Crim. App. 1996).

In Claim IV(C) of Brown's third amended petition, he pleaded that prosecutors and law-enforcement officers met with T.S. and F.S. on several occasions in Talladega and Sylacauga prior to trial.[FN]4 Brown pleaded that the children's statements made during these meetings, which were recorded or otherwise memorialized, were not provided to him by the State in violation of *Giglio* and *Brady*. Brown asserted in his petition that T.S. "made statements that were materially different from the statements she made on March 13, 2001, and from her testimony at trial." (C. 794.) With respect to F.S., Brown pleaded: "To the extent [F.S.] also made statements to prosecutors that were inconsistent with [T.S.]'s trial testimony, such statements would also have been favorable." (C. 794.) Brown asserted that the allegedly inconsistent statements were material because T.S., as the only eyewitness to the murders, was a critical witness for the State. The circuit court dismissed this claim as being procedurally barred by Rules 32.2(a)(3) and 32.2(a)(5), Ala. R. Crim. P., without merit, and insufficiently pleaded.

> [FN]4 Law-enforcement officers met with T.S. and F.S. a few days after the murders of Cherea and Dotty Jemison on March 13, 2001, in Cleveland, Ohio. During her March 13 statement, T.S., in contrast to her testimony at trial, did not describe any memory of events that occurred during the murder of her mother and grandmother. During F.S.'s March 13 statement, F.S. stated that on the night of the murders he was awakened by the sound of the doorbell, that he heard his mother answer the door, and that he did not hear his mother fighting with his father that night. F.S. did not testify at trial. The March 13 statements were provided to Brown prior to trial.

In dismissing this claim, the circuit court specifically noted that defense counsel had questioned T.S. at trial about her pretrial meetings with the prosecutor. T.S. admitted that she had met with the prosecutor "[a] lot" and that they had discussed her testimony. (Trial R. 389-90.) In other words, defense counsel was clearly aware of T.S.'s pretrial meetings with the prosecutor "and was on notice to raise any *Brady/Giglio* claim if Brown was not provided with notes or recordings of these statements (if any existed) as he alleges in his Rule 32 petition." (C. 1035.) Based on T.S.'s cross-examination, the circuit court found that Brown's claim was procedurally barred by Rules 32.2(a)(3) and 32.2(a)(5), Ala. R. Crim. P., and without merit.

Brown, citing *Ex parte Beckworth*, 190 So. 3d 571 (Ala. 2013), counters on appeal that the circuit court's application of the procedural bars was erroneous because this claim alleges a constitutional violation, arising under Rule 32.1(a), Ala. R. Crim. P., and thus he did not have to raise this claim at trial or on appeal. However, *Beckworth* held only that a petitioner has no burden to plead facts in his petition negating the preclusions in Rules 32.2(a)(3) and 32.2(a)(5) in order to sufficiently plead a constitutional claim under Rule 32.1(a). *Id.* at 575. In fact, *Beckworth* explicitly recognized that the preclusive bars of Rules 32.2(a)(3) and 32.2(a)(5), would be applicable to a claim arising under Rule 32.1(a) if that claim could have been raised at trial or on appeal. *Id.* at 574 (quoting *Ex parte Pierce*, 851 So. 2d 606, 614 (Ala. 2000); *see Mashburn v. State*, 148 So. 3d 1094, 1119 n.5 (Ala. Crim. App. 2013).

The circuit court also found the claim to be insufficiently pleaded because Brown failed to allege any specific facts regarding the content of T.S.'s and F.S.'s pretrial statements or how the pretrial statements differed from the testimony given at trial. Brown asserts on appeal that the circuit court imposed too high a burden of pleading. This Court disagrees. Brown's entire claim with respect to T.S. is premised on an allegation that her pretrial statements were materially different from trial testimony. This, however, is a conclusion, and "[c]onclusions unsupported by specific facts will not satisfy the requirements of Rule 32.3 and Rule 32.6(b)." *Hyde v. State*, 950 So. 2d 344, 356 (Ala. Crim. App. 2006). Brown's third amended petition fails to assert any specific inconsistencies between T.S.'s pretrial statements and her trial testimony, making it impossible to assess the materiality of the statements that were allegedly suppressed. Likewise, Brown's claim with respect to F.S. -- "To the extent [F.S.] also made statements to prosecutors that were inconsistent with [T.S.]'s trial testimony, such statements would also have been favorable" -- is clearly speculative and does not contain specific facts sufficient to satisfy Brown's burden of pleading. *Id.*

Brown's claim is procedurally barred by Rules 32.2(a)(3) and 32.2(a)(5) and insufficiently pleaded. Therefore, the circuit court did not err in dismissing it. *See* Rule 32.7(d), Ala. R. Crim. P.

Vol. 32, Tab #R-69, at 27–30.

Brown has not demonstrated that the ACCA's decision rejecting his *Giglio* claim is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court in *Giglio* or based upon an unreasonable determination of the evidence presented. In *Brady v. Maryland*, the Supreme Court of the United States held that "the suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In *Giglio*, the Supreme Court made clear that the *Brady* rule applied to favorable impeachment evidence as well as exculpatory evidence. 405 U.S. at 154. *Giglio* claims have three requirements: "[1] The evidence at issue must be favorable to the accused because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

The ACCA applied *Giglio*, concluding that, assuming that the evidence was actually withheld by the State, the withholding did not cause Brown prejudice because Brown did not identify any major differences between Tatiyana's 2001 statements and her 2008 trial testimony that he could have used to impeach her testimony. Although Brown argues that Tatiyana's trial testimony was starkly different from the statements that both she and her older brother Fred had given to

police in their March 2001 interviews conducted two days after the murders, a comparison of the statements shows that not to be the case.

More specifically, the transcript of four-year-old Tatiyana's March 2001 interview, conducted two days after the murders, begins with the questioner asking Tatiyana to repeat what she had apparently already told him before recording began, which was to describe the events that occurred right before Brown drove her and her siblings to Cleveland on the morning after the murders. *See* Doc. 28-18 at 107 ("And, do you remember you was telling me that—while ago that—that you got up and you was playing. Did—is that what you said? And then you went in there and—and hunted for your Mommy. Did you do that? Tell me about that again."). Tatiyana responds that she doesn't want to tell him about that again. *Id*. The questioner asks her two more times, and two more times she responds that she does not want to tell him "the rest." *Id*. Tatiyana does eventually describe some events from the morning after the murders were committed: that she tried to wake her mother up; that her mother didn't say anything to her; that her grandmother also didn't say anything to her; that they were both "at home on the floor;" that their "head was hurting [sic];" and that both her mother and grandmother had pajamas on. *Id*. at 107–09. Tatiyana also said that when she asked Brown why her mother was sick, he told her to get in the car, sit down, put her seatbelt on, and not to come out again; and that she saw blood "everywhere" and in the hallway of the house but not in the kitchen or living

33

room. *Id*. at 110. She says that Brown then drove she and her brothers to Cleveland. *Id*.

In his March 13, 2001, interview, Tatiyana's older brother Fred, then seven at the time, said that on Saturday morning when he woke up, he did not see his mother, but that Brown told him that he had woken her up and told her that they were going to Cleveland and that she had gone back to sleep. Doc. 28-18 at 119. Fred also said that Brown drove him and his siblings to several banks that morning before leaving for Cleveland, stated that Brown took his mother's car, and said that they drove straight to Cleveland without stopping. *Id.* at 126. Fred also said that on Friday night, his mother had baked a cake, that he heard the doorbell ring and his mother answer the door at one point after he went to bed, but he said that he did not hear any "fussing" that night. *Id.* at 127.

At trial seven years later, the State called Tatiyana as its second witness. The trial court conducted a brief colloquy in the presence of the jury concerning her capacity to understand the oath and her obligation to testify truthfully. R. at 373–75. Specifically, the court asked her whether she attended Sunday School and church, whether she had learned there about the importance of telling the truth and knowing the difference between right and wrong, and whether she would tell the truth if the court permitted her to testify. *Id*. Following this exchange, the trial court certified Tatiyana as competent to testify after Brown's counsel stated that they had no

objection. *Id*. at 375. Tatiyana testified that in 2001, she was four years old; that at that time she lived with her mother, her grandmother, whom she called Ambo, her two brothers, and Brown, whom she called her dad when he "wasn't fussing," but whom she called Wakilii "when he was mean." *Id*. at 377. She stated that the last time she saw her mother, Tatiyana was in her room at night, and that she was woken up by the sounds of her mother and Brown "fussing" in the hallway. *Id*. at 379. Tatiyana testified that "they were both screaming," and that when she looked out of her bedroom, she saw her mother "laying on her back" "in the hallway" with her eyes closed and blood "on her chest." *Id.* at 380–81. Tatiyana testified that she saw Brown standing over her mother in the hallway. *Id.* at 380–81. She said that Brown never saw her, that she ran back into her room and went to sleep, and that she did not remember waking up or going to Cleveland the next morning. *Id.* at 384.

On cross examination, when asked by Brown's defense counsel about the next morning, Tatiyana confirmed that she did not remember Brown telling her to put on clothes or get in the car to go to Cleveland the next morning, and she acknowledged that she talked with the prosecutor "a lot" before coming to court and that she talked with the prosecutor about what she was going to say. *Id.* at 385–88. The State did not call Fred to testify at trial.

Brown focuses on the fact that Tatiyana's March 2001 interview contains only statements regarding what happened on Saturday morning after Tatiyana woke up

and Brown drove Tatiyana and her brothers to Cleveland but says nothing about the events of Friday night that she testified about at trial. However, as the beginning of the March 2001 transcript indicates, Tatiyana did not want to talk about some events that occurred. In any event, Tatiyana's two statements do not conflict with each other in any respect but instead, one provides details from the night of the murders and the other provides details about the following morning. Thus, the ACCA's conclusion that, if there were indeed notes from Tatiyana's pretrial interviews that the State had provided to Brown's counsel to enable Brown's counsel to cross examine Tatiyana with at trial, such cross examination would not have led to a different result than Brown's conviction, because the two statements were not materially different. Under the strictures of the § 2254(d) review that this Court must undertake, it cannot be said that the ACCA's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

The final aspect of this claim that this Court must address is Brown's argument that he should be allowed to take discovery and be granted an evidentiary hearing on this claim based on new evidence that he tried, unsuccessfully, to present to the Rule 32 courts. Brown states that in 2015, Tatiyana turned 18 and became available to his postconviction counsel for an interview, whereas she was not previously available for such due to her minor status. Brown states that in the

summer of 2015, his postconviction counsel conducted two interviews with Tatiyana in which she told them about the pretrial meetings with prosecutors in the year before the trial, and that at the first such meeting she had informed prosecutors that she did not recall the events of her mother's death but that prosecutors nonetheless continued to meet with her and, in the process, to suggest to her a version of events to which she ultimately testified at trial that did not in fact represent her personal knowledge. The Court notes that Brown's counsel does not provide a declaration or affidavit from Tatiyana stating this but merely includes this information in his reply brief in support of his habeas petition and in his separately-filed motion for an evidentiary hearing. In any event, Brown argues that he believes that if granted an evidentiary hearing on this claim, Tatiyana would testify that she informed prosecutors that she had no recollection of what actually happened the night of the murders but that prosecutors engaged in interviewing tactics that suggested memories to Tatiyana that she did not actually have.

Discovery and an evidentiary hearing are not warranted because any expansion upon Brown's *Giglio* claim based upon this information is procedurally barred from this Court's review because it was dismissed on adequate and independent state law procedural grounds in Brown's Rule 32 proceedings. Brown alleged all of this information in his Fourth Amended Rule 32 Petition before the circuit court on December 28, 2015. Vol. 24 at 1355, 1356, 1383; Vol. 25 at 1449–

50. However, the circuit court had already dismissed his Third Amended Rule 32 Petition on October 14, 2014, and so, in January 2018, the circuit court dismissed Brown's fourth attempt under Rule 32.7(d) of the Alabama Rules of Criminal Procedure. *See* Vol. 25 at 1577. The circuit court explained that Brown's fourth attempt "is virtually identical to Brown's third amended petition that was previously dismissed . . . Brown's fourth amended petition does not raise any new substantive claims, but simply realleges the same previously dismissed claims while adding a few new sentences or paragraphs to certain claims." *Id.* Indeed, Brown had already raised his *Giglio* claim in his Third Amended Rule 32 Petition based upon the fact that these pretrial meetings had occurred with Tatiyana and prosecutors, and the circuit court found that his attempt to add additional allegations stemming from what Tatiyana apparently told counsel in the summer of 2015 did not raise a new substantive claim. Thus, because a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim," *Ward*, 592 F.3d at 1156, any expansion of this claim based upon Tatiyana's interview with Brown's postconviction counsel in the summer of 2015 is procedurally barred in this Court.

Brown responds that he can demonstrate cause and prejudice to excuse the procedural default, and he argues further that a miscarriage of justice would occur if he is not able to present this claim *de novo*. Brown argues that he was prejudiced by

the *Giglio* violation because Tatiyana was the only eyewitness that presented testimony that directly connected Brown to the crimes. Brown emphasizes that no murder weapon was introduced and there was no DNA evidence linking Brown to the murders. Brown also argues that insofar as the "fundamental miscarriage of justice" standard requires a credible showing of "actual innocence," that he maintains his innocence of the murders.

The Court finds that Brown has not met this rigorous standard to excuse the procedural default. Assuming solely for the purposes of argument that cause for the default could be demonstrated by a showing that "the factual or legal basis for a claim [i.e., Tatiyana's 2015 interview with postconviction counsel] was not reasonably available to counsel," *see McCleskey*, 499 U.S. at 494, as for prejudice, Brown must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions," *Frady*, 456 U.S. at 170. That cannot be shown here. Brown's counsel *did* cross examine Tatiyana on the topic of her pretrial meetings with the prosecutor and elicited from her that she met with prosecutors "a lot." R. at 389. And contrary to Brown's protestations, evidence of his guilt was overwhelming. The jury heard evidence that Brown had been trying to get money from Michael Pope on the evening of March 9; that on the morning of March 10 he cashed checks on the victims' accounts and lied to Aletha Pope about

his child being sick and at Children's Hospital in Birmingham; that he then drove Cherea's car to Cleveland with the children; that Adam Murrell telephoned the Sylacauga Police Department with information that he had received from Brown's aunt in Cleveland that Cherea and Dotty may have been killed in their residence; and that Brown's fingerprints were on the roll of green tape that had been used to secure Dotty Jemison. The jury also heard that Brown was subsequently located in Cleveland where he was involved in a 24-hour standoff with law enforcement officers. Viewing the record as a whole, it is clear that the jury would still have returned a verdict of guilty even if Brown's trial counsel had been able to cross examine Tatiyana further on her pretrial meetings with prosecutors. For the same reasons, Brown has not demonstrated "a sufficient probability that [this Court's] failure to review his federal claim will result in a fundamental miscarriage of justice," *Edwards*, 529 U.S. at 451, because he is "actually innocent," *Smith*, 477 U.S. at 537. Habeas relief is not warranted on Brown's *Giglio* claim.

## B.    Brown's claim that he was denied effective assistance of counsel during the guilt phase of his trial

Brown's second claim is that his trial counsel failed to provide effective assistance at the guilt phase. He divides this claim into six subclaims, as follows:

(1) trial counsel failed to investigate the testimony of Tatiyana Smith (although within this claim he also complains about counsel's failure to investigate the testimony of her brother, Fred Smith; their failure to interview social workers in

Cleveland regarding anything they might have learned from Fred and Tatiyana after they were taken into custody; and their failure to limit or exclude Tatiyana's testimony at trial);

(2) trial counsel failed to present two kinds of expert testimony: (a) testimony regarding the unreliability of child witness testimony, including by Dr. Marianne Rosenzweig, a clinical and forensic psychologist, and Dr. Karen Salekin, a clinical psychologist, and (b) testimony from a forensic or crime scene expert, such as Dr. William T. Gaut, which would have educated the jury about the potential unreliability of the State's fingerprint evidence and inconsistencies between Tatiyana's eyewitness testimony and physical and forensic evidence at the scene;

(3) trial counsel failed to file a motion *in limine* to exclude Tatiyana as a witness, or request that the vior dire of Tatiyana be conducted outside the presence of the jury, or cross examine Tatiyana effectively, or explain in closing argument the ways in which Tatiyana's testimony was inconsistent with the forensic evidence, or seek a mistrial after the fact based upon the admission of Tatiyana's testimony, or seek limiting jury instructions regarding the dangers of child testimony;

(4) trial counsel failed to investigate or present at trial alternative explanations regarding the crimes, including (a) a non-incriminating reason for Brown's "flight" to Cleveland on Saturday following the crimes, and (b) an alternative theory of the murders, which would have been supported by Fred's March 2001 interview in which he stated that someone rang the doorbell on Friday night, that someone other than Brown had come to the house on the night that the Jemisons were murdered;

(5) trial counsel affirmatively harmed Brown's defense by opening the door to hearsay evidence regarding allegations of prior instances of violence by Brown against Cherea Jemison; and

(6) the cumulative impact of these failures prejudiced Brown.

Petition for Habeas Relief, Doc. 1, at 29–75.

Before addressing these claims, the Court must again consider two arguments

made by Respondent as to why the Court should not reach the merits. First,

Respondent argues that this claim fails to comply with Rule 2(c) of the Rules

Governing Habeas Corpus Cases and should therefore be dismissed because Brown

failed to mention 28 U.S.C. § 2254(d) or plead how he is due relief on this claim

under § 2254(d) in his petition. Specifically, Respondent argues that Brown does not

cite § 2254(d), identify the state courts' adjudication of this claim, or plead how the

state courts' denial of relief "(1) resulted in a decision that was contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or (2) resulted in a decision

that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceedings." 28 U.S.C. § 2254(d). Respondent is again

incorrect, as Brown indeed pleads that he is due relief pursuant to § 2254(d). *See*

Petition for Habeas Relief, Doc. 1 at ¶ 206.

Next, Respondent argues that this claim is procedurally defaulted from this

Court's review because, although Brown raised it in his Third Amended Rule 32

Petition, and again on appeal before the ACCA, he did not fairly present this claim

to the Alabama Supreme Court in his petition for writ of certiorari on postconviction

review. More specifically, Respondent contends that in his certiorari petition, Brown

merely argued that the ACCA's decision on his ineffective assistance claim (both

guilt and penalty phases) conflicted with prior state court precedent regarding the

pleading standards that govern Rule 32 petitions, but that he did not present this

claim as an independent constitutional ineffectiveness claim to the Alabama Supreme Court.

If Respondent is correct, Brown's claim is procedurally defaulted due to his failure to exhaust because a habeas petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt*, 348 F.3d at 1358–59 (quoting *O'Sullivan*, 526 U.S. at 845). In order to fairly present a federal claim, a petitioner must make the state court aware that the petitioner raises a federal issue, and it is not enough that "all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Snowden*, 135 F.3d at 735 (quotation omitted). The Supreme Court has explained that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). However, "a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Id.*

This, however, "does not require a petitioner to fully address the merits of a federal claim in order to fairly present the claim to a state court.  Rather, a petitioner may satisfy *Baldwin* by making the state court *aware* that the petitioner raises a federal issue." *Dieter v. Florida*, 759 F. App'x 885, 890 (11th Cir. 2019) (emphasis added).

Brown's petition for a writ of certiorari in the Alabama Supreme Court stated as follows with respect to his ineffective assistance of counsel claim:

> III.  THE COURT OF CRIMINAL APPEALS' RULINGS AFFIRMING THE SUMMARY DISMISSAL OF MR. BROWN'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS IGNORE THIS COURT'S PRECEDENTS AND *STRICKLAND V. WASHINGTON*
>
> The Court of Criminal Appeals affirmed the summary dismissal of Mr. Brown's ineffective assistance of counsel claims, on the ground that they were not sufficiently pled to entitle him to an evidentiary hearing. *See* Ex. A at 39, 41, 42, 51 & 52. This ruling directly conflicts with this Court's standards for when a Rule 32 petitioner is entitled to an evidentiary hearing. Mr. Brown's ineffective assistance of counsel claims as pled in his Third Amended Petition allege facts that, if true, entitle him to relief under Alabama and federal law, *see Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Bryant v. State*, 181 So. 3d 1087, 1110–11 (Ala.  Crim. App. 2011). Under this Court's precedent, he is entitled to an evidentiary hearing on these claims, and accordingly this Court should grant review.

Vol. 33, Tab #R-71, at 44. Brown then provided 20 pages of argument, including calling the following specific instances of ineffective assistance to the attention of the Alabama Supreme Court (by citing the Alabama Supreme Court to those sections of his habeas petition): trial counsel's failure to investigate Tatiyana's testimony; trial counsel's failure to retain expert witnesses on child testimony; trial counsel's

failure to investigate Fred Smith's testimony; trial counsel's failure to try to mitigate or exclude Tatiyana's testimony; and trial counsel's failure to provide the jury with an explanation as to why Brown went to Cleveland or of "other exculpatory evidence." Vol. 33, Tab #R-72, at 46–48, 51 n.12. Brown also argued that the ACCA erred in failing to conduct an analysis of whether the cumulative effects of the errors prejudiced him. *See id.* at 53–56.

With the exception of the subclaims about trial counsel's opening the door to hearsay about prior acts of violence against Cherea and failure to retain a crime scene expert, both addressed *infra*, the Court finds that Brown fairly presented these federal constitutional ineffectiveness claims to the Alabama Supreme Court. Yes, Brown's certiorari petition argued that the lower Alabama courts unfairly required him to prove, rather than merely plead, his ineffectiveness claim in violation of the Alabama Rules of Criminal Procedure. Brown points out that he crafted his certiorari petition in such a fashion because the Alabama Supreme Court grants petitions "only when there are special and important reasons for the issuance of the writ," Ala. R. App. P. 39(a). But Brown's certiorari petition highlighted—albeit in cursory fashion—several discrete instances of alleged attorney error and referred to the lower courts' decisions being in violation of *Strickland*, and this was sufficient to constitute "fair presentation." *See Roberts v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1086, 1090 (11th Cir. 2012) (finding fair presentation and no procedural default

where habeas petitioner "cited to *Strickland* and to the circuit's law that defense counsel has a duty to thoroughly investigate the State's evidence and plausible defense theories."); *Ogle v. Johnson*, 488 F.3d 1364, 1369 (11th Cir. 2007) (finding fair presentation and no procedural default where petition made "several claims of ineffective assistance of counsel through his direct testimony, the examination of his post-trial attorney, the entry of his *pro se* memorandum into evidence, and the filing of a post-hearing brief.").

The Court turns to the merits of these six subclaims of ineffective assistance of counsel. The Court notes that Brown's claims contain overlapping and often repetitive allegations throughout. To better address the claims, the Court has reorganized and consolidated the six subclaims into four subclaims. The Court has also done so to more easily track the ACCA's decision on postconviction review because, although Brown alleged six subclaims in his Third Amended Rule 32 Petition, he consolidated them into three arguments before the ACCA on postconviction appeal: 1) counsel failed to investigate and prepare a response to Tatiyana's testimony, 2) counsel failed to investigate Fred Smith as another potential key witness to the murders and develop facts to explain to the jury why Brown had gone to Cleveland within days after the killings, and 3) the cumulative effects of these failings prejudiced him. Additionally, within his third "cumulative effects" argument, Brown included allegations about counsel erroneously opening the door

to incriminating hearsay evidence that Brown had been violent to Cherea on prior

occasions. *See* Vol. 30, Tab #R-65, at 44–76.

> **1.    Brown's subclaims about counsel's alleged failures with regard to Tatiyana's testimony**

Brown argues that his trial counsel should have investigated and interviewed

Tatiana, and that had they investigated, they would have been prepared to cross

examine her to demonstrate that her testimony may have been influenced by

prosecutors, to showcase inconsistences between her two statements, and to

demonstrate inconsistencies between her statement and the State's forensic evidence

from the crime scene. Relatedly, Brown also argues that his trial counsel should have

interviewed social workers in Cleveland regarding anything they might have learned

from Fred and Tatiyana after they were taken into custody by child services,

including specifically one social worker, Ms. Barbara Burris, who was present

before and during the 2001 interviews of Tatiyana and Fred. Brown also argues that

trial counsel should have sought to exclude Tatiyana's testimony altogether, or

obtained a limiting jury instruction regarding child testimony, or further cross

examined her on the inconsistences between her testimony and her March 2001

interview as well as inconsistences between her recollection of events and the State's

crime scene evidence. Relatedly, he argues that his trial counsel should have retained

a forensic or crime scene evidence expert to enable them to cross examine Tatiyana

on such issues. And, Brown argues that counsel should have retained expert

witnesses on the reliability of child testimony and states that at least two specific expert witnesses were available at the time of trial and could have provided such testimony.

Brown exhausted most of these allegations during his Rule 32 proceedings. Vol. 21, Tab #R-52 at 19–84 (Third Amended Rule 32 Petition); Vol. 30, Tab #R-65 at 44–64 (brief to the ACCA); Vol. 33, Tab #R-71, at 40–59 (petition for certiorari to the Alabama Supreme Court).[3] The ACCA, which issued the last reasoned state court opinion, affirmed the circuit court's rejection of these claims, explaining as follows:

> Brown pleaded that trial counsel were ineffective for failing to investigate and to prepare adequately for the testimony of T.S. Brown asserted that trial counsel should have attempted to interview T.S. prior to trial and that, because T.S. repeatedly met with the State, there is no reason to believe that trial counsel would have been unable to interview T.S. had an attempt been made. Brown pleaded that had T.S. been interviewed, trial counsel could have confirmed and explored T.S.'s statement of March 13, 2001, in which T.S. did not describe any memory of events that occurred during the murder of her mother and grandmother. On the other hand, trial counsel could have received responses from T.S. similar to her trial testimony, which implicated Brown, and trial counsel would have been better prepared to exclude or to limit T.S.'s trial testimony, to impeach T.S.'s testimony, and to seek appropriate expert testimony regarding child witnesses. Brown also pleaded that trial counsel should have contacted Barbara Burris, a social worker in Cleveland, and

---

[3]     Brown did not argue that counsel should have retained a crime scene expert in his petition for certiorari to the Alabama Supreme Court. He simply did not "call[ this] specific instance[] of ineffective assistance to the attention of the [Alabama Supreme] court." *Ogle*, 488 F.3d at 1369. As such, his allegations about the crime scene expert have not been exhausted and are thus procedurally defaulted from this Court's review, since any attempt by Brown to return to state court to exhaust such a claim would be barred by Alabama's procedural rules governing Rule 32 proceedings.

Cleveland law-enforcement officers, who interacted with T.S. after the murders and may have been able to provide evidence related to the case. Brown asserted that trial counsel should have attempted to determine what T.S. was sharing with the State and how T.S.'s recollection of the murders was changing. Brown further asserted that trial counsel were deficient for failing to retain an expert in the field of child forensic psychology, who could have explained to the jury why child witness testimony may be unreliable, especially under the circumstances presented in this case. Brown identified Dr. Marianne Rosenzweig and Dr. Karen Salekin as experts who were willing and available to give such testimony. The circuit court dismissed this claim as being insufficiently pleaded and without merit.

Much of Brown's allegations regarding trial counsel's failure to interview and to adequately prepare for T.S.'s testimony lacks sufficient specificity to survive summary dismissal. For instance, Brown pleaded that trial counsel should have interviewed T.S. -- an assertion which the pleadings reveal to be wholly speculative, *see Nichols v. State*, 624 So. 2d 1325, 1326-27 (Ala. 1992) (recognizing that a witness may refuse to be interviewed) -- but failed to plead specifically what he would have learned from the interview. *See Van Pelt v. State*, 202 So. 3d 707, 727 (Ala. Crim. App. 2015) (claim held to be insufficiently pleaded where petitioner failed to state what information counsel would have learned from interview and how the information would have aided his defense). Instead, Brown offered generalized possibilities of what could have been learned, and then asserted that trial counsel could have used that information to be better prepared to limit, to exclude, or to impeach T.S.'s testimony.

Additionally, Brown's claims about limiting or excluding T.S.'s testimony are without merit. Brown asserts that trial counsel should have moved to exclude T.S.'s testimony because she was an unreliable child witness, possibly tainted by her family and/or pretrial interviews. However, this Court on direct appeal held that T.S. was competent to testify, despite her alleged unreliability. This Court recognized that "T.S.'s age at the time of the murders, the length of time between the murders and the trial, and the reliability of T.S.'s memory were considerations that went to the weight of her testimony rather than its admissibility." *Brown v. State*, 74 So. 3d 984, 1006 (Ala. Crim. App. 2010). In other words, this Court has already considered the factors Brown now asserts could have been used to exclude T.S.'s testimony and held T.S. was properly found to be competent to testify. Trial counsel cannot be held ineffective for failing to raise a meritless motion. *Jackson v. State*, 133

So. 3d 420, 453 (Ala. Crim. App. 2009). Brown also pleaded that trial counsel should have taken T.S. on voir dire to question her about the reliability of her testimony and then raised an objection. Yet, Brown failed to plead what additional questions should have been asked or what answers trial counsel would have received from T.S. that would have supported an objection. Brown pleaded that trial counsel should have asked the trial court to conduct its voir dire with T.S. outside the presence of the jury, but failed to assert any prejudice that resulted from the trial court's conducting voir dire in the presence of the jury.

Further, Brown failed to plead how the result of his trial would have been different had trial counsel prepared differently. Trial counsel was prepared for T.S.'s testimony, highlighting for the jury T.S.'s apparent inability to remember many facts from the time around the murders and T.S.'s many pretrial meetings with the prosecutor. As the circuit court found, "the fact that T.S. was a young girl who had trouble remembering certain events was clear to the jury." (C. 1169.)

Brown's brief claim regarding Burris and Cleveland law enforcement officers is likewise insufficiently pleaded. Brown failed to plead any specific information trial counsel would have learned, or even if Burris or the officers possessed any information relevant to the case. *See Van Pelt*, 202 So. 3d at 727.

The circuit court also found Brown's claim regarding trial counsel's alleged failure to interview and to adequately prepare for T.S.'s testimony to be without merit:

"In regard to Brown's claim that his counsel was not prepared to impeach or address T.S.'s testimony at trial, this claim is facially meritless. Even accepting Brown's allegations as true that trial counsel did not meet with T.S. prior to trial, the record establishes that trial counsel was well prepared for T.S.'s testimony and effectively challenged her testimony during trial.

"Moreover, this Court personally observed trial counsel's performance in regard to T.S.'s testimony and was able to witness trial counsel's efforts to challenge the credibility of T.S.'s testimony -- based on the fact that the events happened many years before when T.S. was young, that she could not recall other contemporaneous events, and

that she had met with prosecutors many times before trial -- while at the same time not giving the appearance of intimidating T.S. or being rude to an eleven-year-old witness in front of the jury. Trial counsel faced a difficult challenge in cross-examining T.S. An obvious concern in examining T.S. involved not giving the impression to the jury that counsel was berating an eleven-year-[old] child whose mother was the victim of a murder. As the Alabama Supreme Court noted, '[t]he record clearly shows that the trial court and counsel for both sides were trying to ease T.S.'s nerves when she was testifying; common sense dictates that a jury would recognize that fact.' *Ex parte Brown*, 74 So. 3d at 1046. Here, the record indicates that trial counsel was able to effectively elicit helpful information during T.S.'s cross-examination that called into question her memory of events while still appearing sympathetic to T.S.

"On cross-examination, trial counsel challenged the credibility of T.S.'s testimony by eliciting the fact that the events T.S. testified to occurred when she was four years old. [(Trial R. 385.)] Trial counsel then asked a series of questions which challenged T.S.'s credibility by eliciting the fact that she could not recall other facts such as how long T.S. lived in the house and whether T.S. remembered moving from Cleveland to Sylacauga. [(Trial R. 386.)] Trial counsel then challenged T.S.'s testimony in comparison to the forensic evidence in the case by asking T.S. whether she saw her mother in the bedroom on the night of the murder -- the location Cherea Jemison's body was found. [(Trial R. 386.)] Trial counsel then questioned T.S. about other contemporaneous events that she could no longer recall such as the fact that she traveled to Cleveland with Brown and her younger brother and that Brown told her to put on clothes and get in the car. [(Trial R. 387-388.)] Finally, trial counsel questioned T.S. on the fact that she had talked with the prosecutor 'a lot' prior to her testimony at trial. [(Trial R. 389.)]

"Based on the testimony elicited during cross examination, trial counsel was able to effectively highlight the problems with T.S.'s testimony during closing arguments. Trial counsel noted that T.S. was four years old when the murder occurred and that seven years had passed until trial. [(Trial R. 945.)] Trial counsel reminded the jury that T.S. could not remember any other events other than the fact that she heard her mother fussing and saw her mother lying in the hallway. [Trial R. 945-46.)] Trial counsel also emphasized that T.S. had talked

about the case many times with the prosecution and that T.S.'s testimony was inconsistent with the physical evidence in the case. [(Trial R. 946-47.)] Based on all of this evidence, trial counsel argued that 'I submit to you that she was at too tender of an age to remember what she testified to.' [(Trial R. 946.)]

"Accordingly, even accepting as true Brown's allegations, Brown's claim that his trial counsel was not prepared to impeach or counter T.S.'s testimony is without merit. Simply the fact that trial counsel could have met with T.S. prior to trial to potentially uncover more inconsistencies in her statement to impeach her at trial, even if true, does not establish ineffective assistance of counsel."

(C. 1170-73.) *See also* (C. 1197-1206).

With respect to Brown's claim that trial counsel should have retained an expert in the field of child-forensic psychology, the circuit court also found this claim to be without merit:

"First, even accepting his allegations as true, Brown has failed to plead a claim that could establish prejudice under *Strickland*. Brown's claim is nothing but a bare, generalized allegation. Although Brown provides the names of two experts he contends could have testified, the testimony he contends these experts could have provided consists of nothing but generic facts about a child's memory that are not outside the everyday knowledge of lay jurors.

"For example, Brown contends that his two experts could have testified that young children may not be able to 'truly register' observations, that young children's memories erode over time, that young children are susceptible to distortion of memories, and that young children are susceptible to suggestion from adults. [(C. 735-36.)] But, even assuming these facts as true, such basic concepts about a young child's memory are not profound or remarkable. These are generic, common-sense concepts about children that are within the everyday knowledge of lay jurors.

"The simple fact that young children may have trouble remembering certain events accurately is not a surprising or unknown concept. To be sure, trial counsel established this point during his cross-examination

of T.S. by effectively highlighting the inaccuracies and inconsistencies of T.S.'s testimony. Specifically, trial counsel challenged the credibility of T.S.'s testimony by eliciting the fact that the events T.S. testified to occurred when she was four years old, that T.S. could not recall certain facts about when she moved to Sylacauga or other contemporaneous events around the time of the murders, and that T.S. had met with the police 'a lot.' [(Trial R. 385-89.)]

"The expert testimony Brown contends should have been presented would not have provided any additional, compelling information to the jury, beyond what trial counsel already demonstrated and what would be commonly understood as basic characteristics of children. Notably, although he cites various law review articles, Brown does not allege any additional, specific scientific analysis but simply provides basic, generalized statements about a child's memory. [(C. 735-36.)]

"Moreover, Brown's allegation that such testimony would have been 'highly-relevant' is off point. Simply because evidence may have been relevant, even if true, does not establish prejudice under *Strickland*. Even assuming as true that such testimony was relevant, Brown fails to plead how this additional evidence would have been of such a compelling, significant nature that, if true, 'there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' *Strickland*, 466 U.S. at 695. Thus, even accepting his allegations as true, Brown's claim is meritless on its face because he cannot show that there is a reasonable probability that that outcome of the guilt phase would have been different had he presented this expert testimony.

"Second, even accepting his allegations as true, Brown has failed to plead a claim that could show that his trial counsel was deficient for failing to present this testimony. Simply alleging that research and testimony of this nature is 'widely accepted' [(C. 737)], even if true, does not show that trial counsel was unreasonable for failing to present this testimony, particularly where such testimony would not have added anything substantively different, but would have only provided well-known, generic comments about children's memories.

"Moreover, Brown failed to cite any controlling authority holding that a defense counsel is required to retain and utilize experts when a

child witness is called. To the contrary, the Alabama Court of Criminal Appeals has recognized that there is no absolute duty to retain an expert, holding that '[t]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.' *Davis v. State*, 44 So. 3d 1118, 1136 (Ala. Crim. App. 2009) (holding that the circuit court correctly denied the claim that trial counsel was ineffective for failing to retain an eyewitness-identification expert to impeach the credibility of a prosecution witness).

"Furthermore, even accepting his allegations as true, Brown has failed to plead a claim that would show deficient performance where the record demonstrates that trial counsel had a specific plan in addressing T.S.'s testimony. As noted above, the record establishes that trial counsel was well prepared for T.S.'s testimony and that counsel achieved the difficult task during cross-examination of highlighting to the jury T.S.'s difficulty remembering certain details while not giving the impression of being over-bearing to a young witness. Given that trial counsel 'is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,' even assuming his allegations as true, Brown has failed to plead a claim that could that his trial counsel was deficient."

(C. 1274-78.)

This Court agrees with the analysis of the circuit court and adopts it as part of this memorandum opinion. Brown's claim is insufficiently pleaded and without merit. As such, the circuit court did not err in dismissing the claim. *See* Rule 32.7(d), Ala. R. Crim. P.

Vol. 32, Tab #R-69, at 31–39.

In support of his argument that the ACCA's determination was contrary to or an unreasonable application of clearly established Federal law or an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d), Brown relies upon law review articles discussing the dangers of relying upon child testimony, the declaration of an

outside attorney who opines that Brown's trial counsel's performance was deficient, standards for lawyers handling death penalty cases promulgated by the American Bar Association, and Supreme Court cases discussing the duty of counsel to investigate all lines of defense in a criminal case. Brown has not met his burden.

Brown's reliance on the declaration of an attorney, who was not trial counsel, as evidence of ineffectiveness, is misplaced. "The reasonableness of a counsel's performance is an objective inquiry." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000); *see also Strickland*, 466 U.S. at 689 ("Even the best criminal defense attorneys would not defend a particular client in the same way."). Additionally, the ABA Guidelines "can be useful as 'guides' to what reasonableness entails, but only to the extent that they describe the professional norms prevailing when the representation took place." *Anderson v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 881, 904 (11th Cir. 2014) (quoting *Bobby v. Van Hook*, 558 U.S. 4, at 7 (2009)); *see also Dill v. Allen*, 488 F.3d 1344, 1362 n.48 (11th Cir. 2007) (recognizing that the Supreme Court "has deemed the Guidelines useful in specific situations"). Here, the ACCA reasonably concluded that Brown merely speculated as to what counsel could have learned had they interviewed Tatiyana or had they interviewed Cleveland social workers; that counsel could not have successfully moved to exclude her as a witness because the trial court found her competent to testify and because her memory or lack thereof went to the weight to be given to her testimony, not its

admissibility; and that Brown failed to assert what prejudice resulted from the trial court's conducting Tatiyana's voir dire in the presence of the jury. The ACCA also noted that Brown's counsel did question her about her inability to remember some things from seven years earlier when she was only four years old, noting that counsel was tasked with the difficult job of asking questions without appearing to berate a child witness. Brown hasn't offered any Federal authority indicating that counsel's performance under the particular circumstances of this case violated *Strickland*.

Further, *Kennedy v. Louisiana*, 554 U.S. 407 (2008), cited by Brown in support of his argument that his counsel should have retained experts on child testimony, is not analogous, as the Court there held that the Eighth Amendment barred Louisiana from imposing the death penalty for the rape of a child where the crime did not result, and was not intended to result, in the victim's death. *Id*. at 419. The Court noted that "the problem of unreliable, induced, and even imagined child testimony means there is a 'special risk of wrongful execution'" in some child rape cases. *Id*. at 443 (citing *Atkins v. Virginia*, 536 U.S. 304 (2002)). The Court nowhere held that children cannot be relied upon to testify in other types of cases. Here, the ACCA reasonably concluded that Brown had not shown prejudice by his counsel's failure to put on an expert who would have done nothing more than opine on a topic of common knowledge: that young children may have trouble remembering certain events and can be susceptible to suggestion from adults. Brown has not put forth any

Federal authority for the proposition that counsel is required to utilize an expert any time a child witness is called.

Brown also relies upon *Rompilla* for the tenet that counsel has a duty "to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction," 545 U.S. at 387, and *Wiggins* for the axiom that counsel's decisions that are not supported by adequate investigation cannot be strategic and should not be afforded such deference under *Strickland*. 539 U.S. at 521–22. Because each of those cases contains different factual scenarios from these presented here, Brown hasn't shown that the ACCA's decision contravened them or that habeas relief is otherwise warranted on these subclaims.

### 2. Brown's subclaims about counsel's alleged failures with regard to alternative theories as to his innocence and the murders

In this subclaim, Brown argues that his trial counsel failed to investigate or present at trial an alternative and non-incriminating reason why Brown would have driven to Cleveland with the children immediately after the murders. Brown argues that his counsel failed to explore the explanation that Brown fled Sylacauga because, due to Brown's contentious relationship with Pastor Manuel Smith, who was Cherea's father, he would be viewed in the local community as a suspect in the murders or because Brown believed that he could identify the killer through his own

investigation in Cleveland. Brown also argues that his trial counsel failed to investigate alternative theories for the murders, including a theory that someone else entered the house on Friday night and killed the Jemisons. Brown says that this theory would have been supported by Fred Smith's 2001 interview in which he stated that someone rang the doorbell on Friday night.

As noted, Brown exhausted this subclaim in his Rule 32 proceedings. Vol. 21, Tab #R-52 at 19–84 (Third Amended Rule 32 Petition); Vol. 30, Tab #R-65 at 44–64 (brief to the ACCA); Vol. 33, Tab #R-71, at 40–59 (petition for certiorari to the Alabama Supreme Court). The ACCA, which issued the last reasoned state court opinion, affirmed the circuit court's rejection of the claim, explaining the following about Brown's flight to Cleveland:

> Brown pleaded in his third amended petition that trial counsel were ineffective for failing to investigate or to explain why Brown went to Ohio after the murders. Brown asserted that trial counsel should have presented evidence indicating that he left Sylacauga because he was viewed as an outsider and that he went to Cleveland in an effort to find Cherea and Dotty Jemison's real killer. Brown pleaded that this evidence would have provided non-incriminating reasons to explain his leaving Sylacauga immediately after the murders.

> In support of this claim, Brown pleaded that he was viewed as an outsider in Sylacauga and that he had a strained relationship with Pastor Manuel Smith, whom Brown characterized as a community leader. Brown identified in his petition several people who were aware of the relationship between himself and Pastor Smith and "each of whom, had they been asked, might have provided detail regarding the contempt that Pastor Smith had for Brown." (C. 763.) Brown also pleaded that interviews with his family members in Cleveland would have confirmed that Brown felt like an outsider in Sylacauga.

Brown pleaded that trial counsel were ineffective for failing to explore the possibility that Brown discovered the bodies of Cherea and Dotty Jemison and that he went to Cleveland to identify their murderer through his own investigation. Brown identified in his petition family members who could have confirmed that Brown was seeking help in finding the Jemisons' killer. The circuit court dismissed this claim as being insufficiently pleaded and without merit.

Brown's petition identified individuals who he alleged were aware of his relationship with Pastor Smith, but he pleaded only that these individuals might have provided details about Pastor Smith's contempt for him. Further, Brown failed to plead how evidence regarding his feeling as though he was an outsider would be admissible. *See Beckworth v. State*, 190 So. 3d 527, 556 (Ala. Crim. App. 2009), rev'd on other grounds, *Ex parte Beckworth*, 190 So. 3d 571 (Ala. 2013). As the circuit court correctly found, "[a]ny testimony from potential witnesses in Cleveland about statements Brown made to them would have been inadmissible hearsay." (C. 1214.) Similarly, had trial counsel interviewed Brown's family members in Cleveland about whether Brown "came to them in the hours following the discovery of Cherea Jemison's and Dotty Jemison's bodies looking for help or looking to find the person who had killed the women" (C. 764), these interviews would have yielded only inadmissible hearsay testimony. Consequently, Brown has failed to plead sufficient facts to indicate how he was prejudiced by trial counsel's failure to investigate and to present this alternate defense. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Brown's claim is insufficiently pleaded. As such, the circuit court did not err in dismissing the claim. *See* Rule 32.7(d), Ala. R. Crim. P.

Vol. 32, Tab #R-69, at 41–42. And to the extent Brown argues that his counsel should have further investigated Fred Smith, insofar as it would have helped them offer alternative theories for the murders, the ACCA also rejected that claim as follows:

Brown pleaded in his third amended petition that trial counsel were ineffective for failing to investigate and to prepare adequately for the testimony of F.S. Brown asserted that this failure deprived him of a critical opportunity to present evidence supporting his claim that someone else committed the murder, to contradict the unreliable testimony offered by T.S., and to otherwise mount an effective defense.

Brown pleaded that had trial counsel interviewed F.S., they could have confirmed what F.S. had told law-enforcement officers on March 13, 2001, in Cleveland -- that he had heard a doorbell ring on the night of the murders. Brown asserted that had this testimony been offered at trial, it would have supported an alternate defense for Brown that someone else had committed the murders and would have contradicted T.S.'s testimony. Brown further asserted that if F.S. had confirmed his March 13, 2001, statement, trial counsel could have followed up with other questions for F.S. that might help him recall other details relevant to the defense. As he did with respect to T.S., Brown pleaded that trial counsel should have contacted Burris and Cleveland law-enforcement officers, who had interacted with F.S. after the murders and may have been able to provide evidence related to the case. The circuit court dismissed this claim as being insufficiently pleaded and without merit.

Any claim related to trial counsel's failing to prepare adequately for F.S.'s testimony is without merit as F.S. did not testify. Further, Brown's claim that interviewing F.S. could have led to additional, relevant details is insufficiently pleaded as Brown failed to plead what those additional details would be. *See Van Pelt*, 202 So. 3d at 727.

Brown's claim that F.S. should have been called to testify is without merit as his proposed testimony -- that he had heard a doorbell ring on the night of the murders -- does not support an alternate defense. As the circuit court found, "there is no reasonable probability that the jury would have found reasonable doubt based simply on [F.S.'s] testifying that he heard a doorbell ring. This fact alone does not suggest anything, let alone that, as Brown contends, someone else came into the house that night." (C. 1176.) The circuit court also recognized the inconsistency of Brown's claim inasmuch as it relied on a child witness to give speculative testimony while alleging that another child witness's testimony was unreliable. Further, the circuit court found that Brown's claim about presenting evidence of the ringing doorbell was meritless because F.S.'s statement on March 13, 2001, suggested that it was Brown who rang the doorbell:

"More importantly, Brown's allegation that [F.S.] would have testified that Brown 'would not have rung the doorbell' [(C. 769),] is refuted by [F.S.]'s 2001 statement in which he stated that 'Sometimes I heard the doorbell ring when he -- when he -- when he come in,' . . . Thus, [F.S.]'s statements concerning who rang the doorbell appear to refer to Brown, not some other unidentified suspect. "The conclusion that Brown rang the doorbell is further confirmed by [F.S.]'s explanation in his 2001 statement about Brown's nightly habits. [F.S.] explained in his statement that 'he stayed out a -- he stayed out long -- he -- sometimes he come in at 1:00 o'clock in the morning.' . . . [F.S.] then confirmed that he heard his mother go to the door and let Brown in and that 'My momma went over there and went to open the door and went back to sleep.' . . . [F.S.]'s statements, even if assumed as true as Brown suggests, confirm that Brown was the person who entered the Jemison home that evening, and in the very least do not exclude him as the perpetrator. Brown has failed to plead any specific facts that, if true, would show that this alleged evidence would not have been incriminating to Brown, as opposed to providing an alternative theory of the crime."

(C. 1220-21.)

Brown's claim that if F.S. had confirmed his March 13, 2001, statement, trial counsel could have followed up with other questions for F.S. that might help him recall other details relevant to the defense is insufficiently pleaded because Brown failed to plead specific facts regarding what trial counsel could have learned. *See Van Pelt*, 202 So. 3d at 727.

Again, as with Brown's claim with respect to T.S., Brown's brief claim regarding Burris and Cleveland law enforcement officers is insufficiently pleaded. Brown failed to plead any specific information trial counsel would have learned, or even if Burris or the officers possessed any information relevant to the case. *See Id*.

Brown's claim is insufficiently pleaded and without merit. As such, the circuit court did not err in dismissing the claim. *See* Rule 32.7(d), Ala. R. Crim. P.

Vol. 32, Tab #R-69, at 39–41.

As with the previous subclaim, in support of his argument that the ACCA's determination was contrary to or an unreasonable application of clearly established Federal law or an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d), Brown relies upon the declaration of an outside attorney who opines that his trial counsel's performance was deficient, standards for lawyers handling death penalty cases promulgated by the American Bar Association, and Supreme Court cases discussing the duty of counsel to investigate all lines of defense in a criminal case, such as *Rompilla, supra*. For the same reasons discussed in the previous subsection, Brown has not met his burden. The ACCA reasonably concluded that evidence about how Brown was viewed in the community would likely have been inadmissible, and the fact that Fred heard a doorbell ring on the night of the murders did not support an alternate defense. Thus, the ACCA reasonably determined that prejudice had not been shown. Brown has not demonstrated that "the state court's application of the *Strickland* standard was unreasonable," which is a higher burden than merely demonstrating that "defense counsel's performance fell below *Strickland*'s standard." *Harrington*, 562 U.S. at 101. Habeas relief is not warranted on this subclaim.

> **3.** **Brown's subclaim that his trial counsel harmed his defense by opening the door to hearsay testimony about Brown's prior acts of violence against Cherea**

Here, Brown claims that trial counsel erred in its cross examination of Pastor Smith when they asked him about his March 2001 statement to police where he had stated that Cherea had mentioned to his wife, but not to him, that Brown had been violent to Cherea in the past. The trial court ruled that this question "opened the door" to allow the State to present hearsay evidence in the form of what Pastor Brown's wife told him about prior acts of violence by Brown.

As noted, although Brown raised this claim in his Third Amended Rule 32 Petition as its own ineffective assistance of counsel subclaim, Vol. 21, Tab #R-52, at 77–81, before the ACCA on appeal from the circuit court's dismissal of his petition, he did not delineate it as a separate claim but included it within his claim that the "cumulative effects" of the ineffective assistance of counsel claims that he had alleged prejudiced him. *See* Vol. 30, Tab #R-65, at 72–76. Specifically, Brown argued the following within his "cumulative effects" claim in his brief to the ACCA:

> The cumulative prejudice analysis must also consider Mr. Brown's allegations that trial counsel was ineffective in opening the door to allow the admission of unsupported and highly prejudicial hearsay evidence that Mr. Brown had been violent to Cherea Jemison on prior occasions. In cross-examining Pastor Smith, the victim's father, trial counsel inexplicably asked the witness to clarify his statement to police in 2001 that Cherea Smith had not mentioned to him any prior instances of violence by Mr. Brown. In response, Pastor Smith answered that Cherea had mentioned such prior acts to his wife but not to him. (C. 708). On redirect, the State asked Pastor Smith to testify to statements that Cherea had purportedly made to his wife, clearly hearsay, about alleged instances of prior violence. Over defense objections, the court permitted the questions on the ground that trial counsel had "opened the door" with his cross-examination. (C. 708–09). Pastor Smith then testified to the jury that Cherea had told his wife that Mr. Brown had been violent

toward her on "many occasions." (C. 708–09). In its closing, the State emphasized this testimony, arguing that the jury should consider this hearsay as evidence "that Mr. Brown was violent," and lamenting that Mr. Brown had not been arrested on prior occasions for "slapping her" and for "kicking her." (C. 709–10).

The Rule 32 Petition alleges that trial counsel's opening the door to this prior-bad-acts evidence fell below minimally reasonable standards of representation because it allowed the jury to hear unsupported, highly inflammatory hearsay evidence that prejudiced Mr. Brown. (C. 773–74). The Circuit Court ruled that Mr. Brown did not adequately allege that this error by trial counsel resulted in any prejudice to Mr. Brown, a finding that the Circuit Court supported by characterizing the testimony as "relatively minor" and by noting that trial counsel for Mr. Brown "adequately minimized" the effect of the testimony in his own closing. (C. 1229).

The Circuit Court's ruling on this point cannot be squared with Mr. Brown's allegations (C. 772 ("[t]rial [c]ounsel also committed a highly prejudicial mistake by 'opening the door' in cross-examining the State's lead witness, Pastor Smith, to allow the State to present devastating hearsay evidence regarding alleged past violence by Mr. Brown against Cherea Jemison.")). Nor can it be squared with Alabama law, which recognizes evidence of prior bad acts as so inherently prejudicial that it is subject to a heightened admissibility standard, *see* Ala. R. Evid. 404(b) (barring evidence of a criminal defendant's prior bad acts except in certain limited situations where it is offered for a purpose other than to reflect on the defendant's character or propensity for violence); *see also Ex parte Drinkard*, 777 So. 2d 295, 302 (Ala. 2000) ("[T]he exclusionary rule prevents the State from using evidence of a defendant's prior [or subsequent] bad acts to prove the defendant's bad character and, thereby, protects the defendant's right to a fair trial."); *Ex parte Vaughn*, 869 So. 2d 1090, 1098-99 (Ala. 2002) (explaining that admission of prior bad acts evidence risked prejudice to the defendant). The State's use of this testimony in closing to characterize Mr. Brown as a serial abuser is precisely the prejudice against which this rule is meant to protect.

*Id*. And while the ACCA addressed Brown's "cumulative effects" claim in its

opinion, it did not specifically address Brown's subclaim about counsel's opening

the door to hearsay evidence, perhaps because Brown did not specify this subclaim separately. *See* Vol. 32, Tab #R-69, at 51–52.

Then, Brown did not specifically raise this subclaim in his petition for a writ of certiorari before the Alabama Supreme Court. Although he mentions within the facts section of his certiorari petition that his counsel "opened the door" to hearsay evidence by questioning one of the State's witnesses, *see* Vol. 33, Tab #R-72, at 4–5, the argument section of his brief is silent on this issue. Brown had to present each of the specific instances of ineffective assistance that he now asserts in his federal petition "such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." *McNair*, 416 F.3d at 1302 (internal quotation marks omitted). He has not done so with regard to this claim, and it is procedurally defaulted from this Court's review because any attempt by Brown to return to state court to exhaust this claim would be barred by Alabama's procedural rules governing Rule 32 proceedings.

### 4. Brown's subclaim that the cumulative effects of the aforementioned alleged failures constituted ineffective assistance of counsel

In this subclaim, Brown argues that the cumulative impact of the aforementioned alleged failures resulted in representation that was constitutionally deficient and prejudiced him.

As noted, Brown exhausted this subclaim in his Rule 32 proceedings. Vol. 21, Tab #R-52 at 19–84 (Third Amended Rule 32 Petition); Vol. 30, Tab #R-65 at 70–74 (brief to the ACCA); Vol. 33, Tab #R-71, at 53–56 (petition for certiorari to the Alabama Supreme Court). The ACCA, which issued the last reasoned state court opinion, affirmed the circuit court's denial of this cumulative effects claim, stating:

> In Claim IV(A)(7) of his third amended petition, Brown asserted that the cumulative effect of all of his trial counsel's ineffectiveness entitled him to a new trial. The circuit court dismissed this claim as being insufficiently pleaded and without merit.

> "As this Court explained in *Taylor v. State*, 157 So. 3d 131 (Ala. Crim. App. 2010):

>> "'Taylor also contends that the allegations offered in support of a claim of ineffective assistance of counsel must be considered cumulatively, and he cites *Williams v. Taylor*, 529 U.S. 362 [120 S. Ct. 1495, 146 L. Ed. 2d 389] (2000). However, this Court has noted: "Other states and federal courts are not in agreement as to whether the 'cumulative effect' analysis applies to *Strickland* claims'; this Court has also stated: "We can find no case where Alabama appellate courts have applied the cumulative-effect analysis to claims of ineffective assistance of counsel." *Brooks v. State*, 929 So. 2d 491, 514 (Ala. Crim. App. 2005), quoted in *Scott v. State*, [Ms. CR–06–2233, March 26, 2010] ___ So. 3d ___, ___ (Ala. Crim. App. 2010); *see also McNabb v. State*, 991 So. 2d 313, 332 (Ala. Crim. App. 2007); and *Hunt v. State*, 940 So. 2d 1041, 1071 (Ala. Crim. App. 2005). More to the point, however, is the fact that even when a cumulative-effect analysis is considered, only claims that are properly pleaded and not otherwise due to be summarily dismissed are considered in that analysis. A cumulative-effect analysis does not eliminate the pleading requirements established in Rule 32, Ala. R. Crim. P. An analysis of claims of ineffective assistance of counsel, including a cumulative-effect analysis, is performed only on properly pleaded claims that are not summarily dismissed for

>> pleading deficiencies or on procedural grounds. Therefore, even if a cumulative-effect analysis were required by Alabama law, that factor would not eliminate Taylor's obligation to plead each claim of ineffective assistance of counsel in compliance with the directives of Rule 32.'"
>
> "157 So. 3d at 140 (emphasis added)."

*Bryant v. State*, 181 So. 3d 1087, 1104 (Ala. Crim. App. 2011).

>> Brown has not asserted any claims of ineffective assistance of counsel that are meritorious on their face. Consequently, he has not raised any claims that could be considered in a cumulative-effect analysis. Brown's claim that trial counsel's cumulative errors entitled him to a new trial is without merit. As such, the circuit court did not err in dismissing this claim. *See* Rule 32.7(d), Ala. R. Crim. P.

Vol. 32, Tab #R-69, at 51–52.

Brown has not demonstrated that he is due relief under § 2254(d). "The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation omitted). However, "[w]ithout harmful errors, there can be no cumulative effect compelling reversal." *United States v. Barshov*, 733 F.2d 842, 852 (11th Cir. 1984); *see also United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) ("Where there is no error or only a single error, there can be no cumulative error."). Here, the ACCA was not unreasonable in its conclusion that since Brown's individual claims of error were meritless, and the supposed errors, even considered in the aggregate, did not affect his substantial

rights or undermine confidence in the state proceedings. Therefore, Brown is not entitled to relief on his guilt phase ineffective assistance of counsel claim.

**C.**   **Brown's claim that his death sentence violated the Eighth Amendment because the trial court failed to consider numerous non-statutory mitigating factors**

Brown's third claim is that the trial court did not consider the following eight non-statutory mitigating circumstances at the penalty phase of his trial: (a) Brown's low level intelligence and history of poor education and school performance; (b) the alcohol abuse of Brown's mother during pregnancy; (c) Brown's head injury as an infant; (d) Brown's history of substance abuse; (e) the marital status of Brown's parents and his father's absence throughout Brown's childhood; (f) the fact that Brown was shuttled as a teenager through group homes and foster homes for four years; (g) Brown's good behavior while imprisoned; and (h) the plea of mercy from Brown's family and members of the victims' families. Brown bases his claim that the trial court did not consider these circumstances on the trial court's finding in its sentencing order that "there are no non-statutory mitigating circumstances." R. at 86.

Brown exhausted this claim on direct appeal. Vol. 11, Tab #R- at 89–101; Vol. 14, at 60–66. The ACCA ruled that Brown was due no relief on this claim, citing record excerpts from the trial court's sentencing order that the ACCA found

established that the trial court did in fact consider the mitigating evidence offered

during the penalty phase, as follows:

> Brown's seventh argument is that the trial court erred when it did not consider numerous nonstatutory mitigating factors about which he presented evidence. Because he raises this argument for the first time on appeal, we review it for plain error. *See* Rule 45A, Ala. R. App. P.

> "The [trial] court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance," *Calhoun v. State*, 932 So. 2d 923, 975 (Ala. Crim. App. 2005), even if that evidence is from an expert.

>> "'[A] factfinder is not bound by expert testimony "even if all of the witnesses are presented by only one side."' *Ellis v. State*, 570 So. 2d 744, 752 (Ala. Cr. App. 1990). 'In Alabama, opinion testimony of an expert witness is binding upon a jury only when such testimony concerns a subject which is exclusively within the knowledge of experts and the testimony is uncontroverted.' *Jefferson County v. Sulzby*, 468 So. 2d 112, 116 (Ala. 1985). 'An expert's opinion, however, is not conclusive on the trial court, even though uncontroverted. *See Kroger Co. v. Millsap*, 280 Ala. 531, 196 So. 2d 380 (1967). Rather, a trial court must look to the entire evidence and its own observations in deciding factual issues.' *Williams v. City of Northport*, 557 So. 2d 1272, 1273 (Ala. Civ. App. 1989), cert. denied, 498 U.S. 822, 111 S. Ct. 71, 112 L.Ed.2d 45 (1990). 'Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.' *Harrell v. State*, 470 So. 2d 1303, 1308 (Ala. Cr. App. 1984), affirmed, 470 So. 2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S. Ct. 269, 88 L.Ed.2d 276 (1985)."

*Carroll v. State*, 599 So. 2d 1253, 1272 (Ala. Crim. App. 1992). "'While *Lockett* [*v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L.Ed.2d 973 (1978),] and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.' *Bankhead v. State*, 585 So. 2d 97, 108 (Ala. Cr. App. 1989)." *Ex parte Slaton*, 680 So. 2d 909, 924 (Ala. 1996). Finally, although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is

proven and the weight it will give that circumstance. *See Williams v. State*, 710 So. 2d 1276 (Ala.  Crim. App. 1996), aff'd, 710 So. 2d 1350 (Ala. 1997).

In its "Consideration, Findings and Determination of Sentence as Required by Title 13A, Chapter 5, Section 47(b) of the 1975 Code of Alabama as Amended," the trial court stated:

> This Court has considered the aggravating and mitigating circumstances and the other factors allowed pursuant to the provisions of Title 13A, Chapter 5, Section 40, *et seq*., relative to sentence determination. Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the presentence investigation report and any evidence submitted in connection with it, the trial court will enter herein specific written findings concerning the existence or non-existence of each aggravating circumstance enumerated in Title 13A, Chapter 5, Section 49 of the 1975 Code of Alabama, as amended, each mitigating circumstance enumerated in Title 13A, Chapter 5, Section 51 of the 1975 Code of Alabama, as amended, and any additional mitigating circumstances offered pursuant to Title 13A, Chapter 5, Section 52 of the 1975 Code of Alabama, as amended. In addition, the trial court will enter separate written findings of fact summarizing the crime and the Defendant's participation in said crime.
> . . . .

> The Court has made a diligent search under the provisions of Title 13A, Chapter 5, Section 52, 1975 Code of Alabama, as amended, of the evidence offered by the Defendant, and the aspects of the presentence investigation report favorable to the Defendant on mitigation to determine if there is any aspect of the Defendant's character or record, or any circumstance of the offense for which he has been convicted that would constitute mitigating circumstance, and finds that there is only one mitigating circumstance and that is the statutory mitigating circumstance found hereinabove. The Court finds that there are no non-statutory mitigating circumstances in this case.

(C.R. 82–86.) In its "Findings of Fact in Regard to Punishment Phase of the Trial," the trial court stated:

At the punishment phase of the trial of the defendant, the State offered no additional evidence of aggravating circumstances as enumerated in Section 13A–5–49 of the Code of Alabama and relied upon the evidence presented during the guilt phase of the trial as to aggravating circumstances. The defendant offered evidence of mitigating circumstances as provided in Section 13A–5–51 of the Code of Alabama and 13A–5–52 of the Code of Alabama. John R. Goff, PhD a neuropsychologist and Marianne G. Rosenzweig, PhD a forensic and clinical psychologist testified on behalf of [Brown]. Further the defendant offered evidence of mitigating circumstances from his mother, Linda Brown and his [a]unt, Jacqueline Heard.

The State of Alabama relied upon the evidence presented during the guilt phase of the trial as to aggravating circumstances. Evidence during the guilt phase and the sentencing phase of the trial provided evidence of one statutory mitigating circumstance as provided by law. The Court finds from the evidence presented during the guilt phase of the trial and the sentencing phase that there are no non-statutory mitigating circumstances.

At the conclusion of the sentence hearing, the jury returned a verdict recommending that the defendant be punished by death. The vote was 10 for death and two for life without parole.

The Court finds that the conduct of the defendant constituted a brutal, aggravated, merciless and intentional killing of Dotty Jemison and Cherea Jemison, and that the sentence recommendation of the jury as to the punishment of death to be imposed was fully justified by the facts and circumstances of the case and the aggravating circumstances outweighed the mitigating circumstance proved by the defendant.

(C.R. 98–99.) These excerpts show that the trial court complied with *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny in considering the mitigating evidence Brown presented during the penalty phase hearing. The fact that the trial court did not find the nonstatutory mitigating circumstances Brown offered does not establish that it did not properly consider such evidence. Rather, it simply establishes that the trial court exercised the discretion afforded to it in that regard. Therefore, we do not find that there was any error, much less plain error, in this regard.

*Brown*, 74 So. 3d at 1028–30.

Brown argues that the ACCA's ruling was both contrary to and an unreasonable application of clearly established United States Supreme Court precedent, specifically citing *Williams*, 529 U.S. at 412–13, and *Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982). Brown has not met his Section 2254(d) burden. As required by *Lockett v. Ohio*, 438 U.S. 586 (1978), the trial court considered the non-statutory mitigating evidence that was presented. *See Brown*, 74 So. 3d at 1028–30; *see also Saffle v. Parks*, 494 U.S. 484, 489 (1990) (quoting *Eddings*, 455 U.S. at 104 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence."); *Jones v. Mississippi*, 141 S. Ct. 1307, 1320 (2021) ("A sentencing explanation is not necessary to ensure that the sentencer in death penalty cases considers the relevant mitigating circumstances."). Brown also directs the Court to Supreme Court cases in which certain circumstances were found to constitute non-statutory mitigating circumstances at other defendants' sentencings, such as *Williams*, 529 U.S. at 395–96 (recognizing that the defendant's two years in the custody of social services constituted a mitigating circumstance): *Tennard v. Dretke*, 542 U.S. 274, 288 (2004) ("evidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death"); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (evidence that the defendant "had been a well-behaved and well-adjusted prisoner" was mitigating); and

*Rompilla*, 545 U.S. at 391 (recognizing as mitigating evidence the use by the defendant's mother of alcohol during pregnancy). The fact that these circumstances were discussed in other cases or even found in other cases to constitute a mitigating circumstance does not mean that the trial court did not consider the mitigation evidence offered. Brown is due no relief on this claim.

### D. Brown's claim that his counsel rendered ineffective assistance during the penalty phase

Brown's fourth claim is that his trial counsel failed to provide effective assistance at the penalty phase by failing to investigate and present mitigating evidence. Although Brown's trial counsel presented two experts and two family members as witnesses in support of mitigation at sentencing, Brown contends his counsel should have done more. Brown argues that his trial counsel did not gather sufficient institutional records, such as medical, educational, criminal, and employment records, and did not develop a complete medical, social, educational, employment, or family history. Brown also contends that his trial counsel did not provide adequate instruction and support to the expert witnesses for their evaluations of Brown.

Before addressing the merits, the Court must consider Respondent's argument that this claim should be denied because Brown failed to mention 28 U.S.C. § 2254(d) or plead how he is due relief on this claim under § 2254(d) in his petition. As with section III.B., *supra*, Respondent is incorrect, and Brown's petition indeed

argues that he is due relief under § 2254(d). *See* Petition for Habeas Relief, Doc. 1 at ¶ 266.

Next, the Court will address Respondent's argument that this claim is procedurally defaulted from this Court's review because, although Brown raised it in his Third Amended Rule 32 Petition, and again on appeal before the ACCA on postconviction review, he did not fairly present this claim to the Alabama Supreme Court in his petition for writ of certiorari on postconviction review. For the reasons explained in section III.B., *supra*, the Court finds that Brown fairly presented his federal constitutional ineffectiveness claim before the Alabama Supreme Court, and it is thus not procedurally defaulted.

Finding that this claim is not procedurally defaulted, the Court now turns to the merits. Because Brown fully exhausted this claim through his Rule 32 proceedings, *see* Vol. 21, Tab #R-52 at 84–96 (Third Amended Rule 32 Petition); Vol. 30, Tab #R-65 at 64–76 (brief to the ACCA); Vol. 33, Tab #R-71, at 40–59 (petition for certiorari to the Alabama Supreme Court), the Court must examine whether the last reasoned state court opinion is contrary to, or an unreasonable application of, Federal law, or based upon an unreasonable application of the facts. The Court thus looks to the ACCA's opinion, in which it affirmed the circuit court's dismissal of Brown's Third Amended Rule 32 Petition. The ACCA wrote as follows:

> In Claim IV(B) of his third amended petition, Brown asserted various claims of ineffective assistance of counsel during the penalty phase. Brown

alleged in his petition that trial counsel failed to gather adequate institutional records, failed to prepare his expert witnesses, and failed to develop an adequate personal history. Brown pleaded that trial counsel's presentation of mitigation evidence was deficient because it failed to present adequately the abuse and neglect suffered by Brown.

> "'While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, "this duty only requires a reasonable investigation." *Singleton v. Thigpen*, 847 F.2d 668, 669 (11th Cir. (Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S. Ct. 822, 102 L. Ed. 2d 812 (1989) (emphasis added). *See Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066; *Morrison v. State*, 551 So. 2d 435 (Ala. Cr. App. 1989), cert. denied, 495 U.S. 911, 110 S. Ct. 1938, 109 L. Ed. 2d 301 (1990). Counsel's obligation is to conduct a "substantial investigation into each of the plausible lines of defense." *Strickland*, 466 U.S. at 681, 104 S. Ct. at 2061 (emphasis added). "A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made." *Id*., 466 U.S. at 686, 104 S. Ct. at 2063.

>> "'"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."'

> "*Jones v. State*, 753 So. 2d 1174, 1191 (Ala. Crim. App. 1999).

>> "'"[T]he scope of the duty to investigate mitigation evidence is substantially affected by the defendant's actions, statements, and instructions. As the Supreme Court explained in *Strickland*, the issue of what investigation decisions are reasonable 'depends critically' on the defendant's instructions . . . ." *Cummings v. Secretary, Dep't of Corr*., 588 F.3d 1331, 1357 (11th Cir. 2009)." *Cummings v. Secretary, Dep't of Corr*., 588 F.3d 1331, 1357 (11th Cir. 2009).'

"*James v. State*, 61 So. 3d 357, 364 (Ala.  Crim. App. 2010)."

*Washington v. State*, 95 So. 3d 26, 40-41 (Ala.  Crim. App. 2012). Further,

> "'As an initial matter, we "must recognize that trial counsel is afforded broad authority in determining what evidence will be offered in mitigation." *State v. Frazier* (1991), 61 Ohio St. 3d 247, 255, 574 N.E.2d 483. We also reiterate that post-conviction proceedings were designed to redress denials or infringements of basic constitutional rights and were not intended as an avenue for simply retrying the case. [*Laugesen*] *v. State*, [(1967), 11 Ohio Misc. 10, 227 N.E.2d 663] *supra*; *State v. Lott*, [(Nov. 3, 1994), Cuyahoga App. Nos. 66388, 66389, 66390] *supra*. Further, the failure to present evidence which is merely cumulative to that which was presented at trial is, generally speaking, not indicative of ineffective assistance of trial counsel. *State v. Combs* (1994), 100 Ohio App. 3d 90, 105, 652 N.E.2d 205.'

"*Jells v. Mitchell*, 538 F.3d 478, 489 (6th Cir. 2008).

> "'"[C]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively." *Haliburton v. Sec'y for the Dep't of Corr.*, 342 F.3d 1233, 1243–44 (11th Cir. 2003) (quotation marks and citations omitted); *see Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1348–50 (11th Cir. 2005) (rejecting ineffective assistance claim where defendant's mother was only mitigation witness and counsel did not introduce evidence from hospital records in counsel's possession showing defendant's brain damage and mental retardation or call psychologist who evaluated defendant pre-trial as having dull normal intelligence); *Hubbard v. Haley*, 317 F.3d 1245, 1254 n.16, 1260 (11th Cir. 2003) (stating this Court has "consistently held that there is 'no absolute duty . . . to introduce mitigating or character evidence'" and rejecting claim that counsel were ineffective in failing to present hospital records showing defendant was in "borderline mentally retarded range")

(brackets omitted) (quoting *Chandler* [*v. United States*], 218 F.3d [1305] at 1319 [(11th Cir. 2000)]).'

"*Wood v. Allen*, 542 F.3d 1281, 1306 (11th Cir. 2008). 'The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy.' *Hill v. Mitchell*, 400 F.3d 308, 331 (6th Cir. 2005)."

*Dunaway v. State*, 198 So. 3d 530, 547 (Ala. Crim. App. 2009), rev'd on other grounds by *Dunaway v. State*, 198 So. 3d 567 (Ala. 2014).

"Although Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer[s] did in fact." *Chandler v. United States*, 218 F.3d 1305, 1320 (11th Cir. 2000). During the penalty phase, trial counsel presented the testimony of Dr. John Goff, Dr. Marianne Rosenzweig, Jacqueline Heard, and Linda Brown. Dr. Goff testified that, due to concerns of head trauma Brown had sustained as a child, he performed a neuropsychological evaluation. Dr. Goff stated that Brown's medical records indicated that he had sustained a skull fracture at 10 months old. Dr. Goff diagnosed Brown as suffering from attention deficit hyperactivity disorder ("ADHD") and a very significant learning disability, both of which he thought may be related to the head trauma. Dr. Goff testified that Brown was functionally illiterate and that he had significant memory deficits. Dr. Goff placed Brown's intelligence in the low-average range. Dr. Goff noted that Brown struggled in school with extreme hyperactivity and with interpersonal relationships. According to Dr. Goff, Brown's records indicated that he needed but failed to receive professional assistance as a child. Dr. Goff stated that medication may have yielded positive results and that medication was recommended to Brown's mother, but that she refused to place her son on medication.

Dr. Rosenzweig, who was the lead mitigation specialist, testified that in preparing for trial she met with Brown 3 times, reviewed the discovery related to the case, reviewed 15 years of medical records, reviewed prior psychological evaluations, and interviewed 7 people -- Linda Brown, Brown's mother; Jackie Heard, Brown's aunt; Bertie Richards, Brown's former stepmother; Atlas Richards, Brown's half-brother; Fannie Lewis, a family friend; and Munsey and Lavelle Heard, Brown's cousins. Dr. Rosenzweig used these sources to provide the jury with a picture of Brown's difficult childhood. Dr. Rosenzweig testified that Linda Brown was 18 years old when

she gave birth to Brown and that Brown's father, an alcoholic, rarely made contact with Brown during his childhood. Brown was raised in Cleveland in a neighborhood beset with gang activity. Linda Brown admitted to Dr. Rosenzweig that she was neglectful of Brown and that she struck him for misbehaving. Brown was exposed to alcohol and drug use as a child, and family members were concerned about the role models in Brown's life. Linda Brown said that as a child Brown was a "lovable pain," which reflected his affectionate yet hyperactive nature. Dr. Rosenzweig testified that Brown was generally well-behaved in structured environments and that he was remorseful when he had done something wrong. Yet, Brown's treatment records indicated a history of killing and mutilating animals. Brown struggled in school, which resulted in his being teased by classmates. Due to behavioral issues, Brown was sent to live with his father at the age of 13. This living arrangement lasted only a month or two, as Brown moved in with his aunt Jackie Heard because his father had humiliated him at school. Brown's stay at Heard's house was short-lived, too, again lasting only a month or two. According to Dr. Rosenzweig, Heard speculated that Brown did not like the discipline on which Heard insisted. Brown returned to live with his mother and his disciplinary problems continued. Within a few months, Cleveland's Department of Youth Services removed Brown from his mother's home at her request. Brown primarily lived either in group homes or foster homes until the age of 17. Brown briefly returned to his mother's home at the age of 15, but soon returned to State custody after disciplinary problems at school, such as truancy and fighting, and stealing a vehicle.

When Brown turned 17 and left the State's care, Brown returned home with a desire to be a hustler like his mother's brothers. Brown began drinking and smoking marijuana daily and his consumption of both increased over the years. Brown also smoked cigars that had been dipped in embalming fluid and experimented with crack cocaine. Brown twice received treatment for his alcohol and drug abuse; neither was effective. Through his early twenties, Brown was convicted of several crimes -- trafficking marijuana, receiving a stolen car, and possession of a controlled substance. Dr. Rosenzweig testified that Brown stated that he did not have any disciplinary infractions while incarcerated for those offenses. Dr. Rosenzweig also noted that Brown did not have any disciplinary infractions in almost seven years of pretrial incarceration for his capital-murder charges. In fact, Brown had been given a position of responsibility in the jail dormitory.

Brown met Cherea at the age of 20, and she was a positive influence on Brown. The relationship experienced difficulties through the years, mainly on account of Brown's infidelity. Dr. Rosenzweig testified that Brown and Cherea were viewed as good parents whose children were neat, clean, and well behaved. Cherea discouraged Brown's drinking, so he often drank in secret.

Dr. Rosenzweig's psychological testing of Brown indicated that he was suffering from depression and anxiety, and that he struggled with being impulsive. Dr. Rosenzweig stated that Brown had reasonably good control of his anger and that she believed Brown would be a good candidate for counseling. In light of the structured nature of prisons, Dr. Rosenzweig opined that Brown would not be a danger to others if given a sentence of life in prison without the possibility of parole.

Heard, Brown's aunt, testified that her brother denied paternity of Brown, but that she knew by looking at Brown that he was her nephew. Heard made Brown a part of their family, taking him on vacations and letting him spend the weekend with her and her two sons, who were close in age to Brown. Heard acknowledged Linda Brown's drinking and that Linda Brown was emotionally neglectful of Brown. Heard characterized Brown and Cherea as being a part of "a real loving family," who were "real sweet and kind to each other." (Trial R. 1177-78.) Heard stated that Brown was a good father and that, should his life be spared, Brown could make a positive impact on his family.

Linda Brown generally testified in accordance with the social history presented by Dr. Rosenzweig. Linda Brown admitted that she drank while pregnant with Brown and she also spoke of Brown's behavioral problems, which led to multiple stays in the care of the state. Brown conceded that she had been advised to place Brown on medication for his hyperactivity, but stated that she declined the medication for fear of its effects on Brown. Linda Brown read a statement to the jury; the statement included an apology to the victims' family and covered Brown's difficult childhood. In the statement, Linda Brown accepted accountability for Brown's childhood, stating that she could have done a "much better" job raising him. (Trial R. 1199.)

In Brown's petition, he pleaded that trial counsel were ineffective in the penalty phase for failing to investigate and to interview Linda Brown further. Brown pleaded that, had trial counsel asked, Linda Brown would have

testified to: neglect by relatives in Detroit who were entrusted with Brown at the time he fractured his skull; neglect by Linda Brown's boyfriend Lee Shephard, who was entrusted to care for Brown on occasion despite his being a drug dealer; abuse of Brown by Linda Brown's boyfriend "Speedy," who once struck Brown in the head with a hairbrush; her own neglect of Brown, and her frequent drinking, gambling, and drug use in the home; verbal and emotional abuse of Brown by Linda Brown and various boyfriends; Brown's grandmother's being convicted of aggravated assault; Brown's uncle's being murdered; Brown's being taught to fight at an early age; and Linda Brown's engaging in physical fights with her boyfriend Frederick Winston, including one occasion in which she threatened Winston with a knife. Brown asserted that trial counsel were ineffective because they failed to develop the extent to which Brown was neglected by his mother and the extent to which he was exposed to drug and alcohol abuse as a child.

Brown pleaded that trial counsel failed to develop evidence regarding his time in the care of the Cuyahoga County Department of Children and Family Services ("DCFS"). Brown asserted that witnesses from the DCFS could have been interviewed to give context to his time in its care.

Brown also pleaded that trial counsel failed to give adequate direction to Dr. Goff and to Dr. Rosenzweig or to adequately prepare for their direct examinations. With respect to Dr. Goff, Brown pleaded that trial counsel failed to elicit his opinions on the problems suffered in adulthood by those who grow up in emotionally chaotic settings, and failed to elicit testimony about Linda Brown's traumatic life, which affected her ability to care for Brown. With respect to Dr. Rosenzweig, Brown pleaded that trial counsel failed to elicit testimony about how Brown's substance abuse was mitigating, or about the effects of Linda Brown's drinking while pregnant with Brown. Brown also alleged that while Dr. Rosenzweig testified to his lack of trust and difficulty with interpersonal relationships, trial counsel failed to elicit testimony about the problems these issues caused. Brown asserted that trial counsel were ineffective in failing to address the effects of a lack of medication for ADHD, and in failing to explain how mutilating animals was mitigating. The circuit court dismissed this claim as being insufficiently pleaded and without merit.

As the circuit court found in its order of dismissal, much of the evidence Brown alleges trial counsel should have presented was already elicited during the penalty phase. Certainly, trial counsel offered evidence of a similar

character. Further, Brown did not plead the identity of any new witnesses. Instead, Brown pleaded that trial counsel should have elicited additional testimony from Linda Brown, Dr. Goff, and Dr. Rosenzweig, which, again, was similar in character to what was already presented. "Unpresented cumulative testimony does not establish that counsel was ineffective." *Boyd v. State*, 913 So. 2d 1113, 1139 (Ala.  Crim. App. 2003) (citation omitted); *see Daniel v. State*, 86 So. 3d 405, 429–30 (Ala.  Crim. App. 2011) ("'Although as an afterthought this [defendant's father] provided a more detailed account with regard to the abuse, this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.'" (quoting *Darling v. State*, 966 So. 2d 366, 377 (Fla. 2007))). Thus, Brown's assertion that trial counsel were ineffective for failing to present more evidence of a similar character to what was already presented is without merit.

Brown's claim that trial counsel were ineffective for failing to interview employees of the DCFS is insufficiently pleaded. Brown did not plead the names of any employees of the DCFS who could provide relevant information and failed to plead what testimony the unnamed employees would have offered. *See Van Pelt*, 202 So. 3d at 727.

Trial counsel presented evidence of Brown's head trauma, the neglect Brown experienced, Brown's exposure at an early age to alcohol and drugs, Brown's difficulty with interpersonal relationships, and instances of physical abuse suffered by Brown. Trial counsel paired that evidence with testimony that Brown was a good father, that he could maintain control of his anger, and that he was better suited to structured environments. In other words, trial counsel presented to the jury that, despite the neglect and mental deficiencies from which Brown had suffered, Brown was a good candidate for a sentence of life in prison without the possibility of parole. Trial counsel's strategy was a reasonable one and supported by ample evidence. Brown has failed to plead facts that, if true, would demonstrate otherwise.

Brown's claim is insufficiently pleaded and without merit. As such, the circuit court did not err in dismissing the claim. *See* Rule 32.7(d), Ala.  R. Crim. P.

Vol. 32, Tab #R, at 42–50.

Citing *Strickland*, 466 U.S. 668, *Rompilla*, 545 U.S. 374, *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams*, 529 U.S. 362, Brown argues that the ACCA's decision was both contrary to and an unreasonable application of Federal law. Brown also argues that the ACCA's decision was an unreasonable determination of the facts presented because it ignores that his trial counsel failed to undertake an investigation of Brown's social history and to adequately prepare key fact and expert witnesses. The Court disagrees. The ACCA's thorough and reasoned decision, as set forth above, is entitled to deference under § 2254(d).

It is well established with regard to ineffective assistance claims that defense counsel has "a duty to make reasonable investigations" of potential mitigating evidence or "to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 691). In any ineffectiveness case, an attorney's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. at 521–22 (quoting *Strickland*, 466 U.S. at 691). However, counsel's duty to investigate "does not necessarily require counsel to investigate every evidentiary lead." *Williams v. Allen*, 542 F.3d 1326, 1337 (11th Cir. 2008). "Under *Strickland*, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. (quotation marks and

citations omitted). *Compare Strickland*, 466 U.S. at 699 (stating that counsel's "decision not to seek more character or psychological evidence than was already in hand was . . . reasonable"), *with Porter v. McCollum*, 558 U.S. 30, 39-40 (2009) (noting that counsel "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service," and "[t]he decision not to investigate did not reflect reasonable professional judgment"). With regard to assessing prejudice flowing from counsel's performance, courts are required to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in re-weighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98. "That same standard applies—and will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 955 (2010). Again, where a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.

Here, Brown's counsel did not fail to investigate for mitigation purposes, but in fact retained two expert witnesses and had each testify at trial, as well as had two additional family members testify. Each witness either expressly or impliedly

acknowledged that Brown's circumstances in life were difficult. There is no reasonable probability that the jury would have recommended, or that the judge would have imposed, a non-death sentence if they had been confronted with some of the other examples of Brown's difficult upbringing that Brown asserts his counsel should have discovered and introduced. *See Robinson v. Moore*, 300 F.3d 1320, 1347 (11th Cir. 2002) ("While the additional mitigation witnesses procured by Robinson's [post-conviction] counsel could have presented the resentencing jury and trial judge with more details, or different examples, of these aspects of Robinson's life, these aspects of his life were nonetheless known to the resentencing jury and trial judge."); *Grayson v. Thompson*, 257 F.3d 1194, 1227-28 (11th Cir. 2001) ("Although the graphic picture of Grayson's home life painted at the state habeas proceedings was not presented at trial, the judge did not wholly disregard Grayson's unfortunate background in sentencing him to death. In light of the horrendous nature of this crime, we find no reasonable probability that the sentence would have been different if the judge and jury had possessed detailed information regarding Grayson's history."). Accordingly, the ACCA's conclusion that additional mitigation evidence would have been merely cumulative was reasonable.

For these same reasons, Brown's reference to these Supreme Court's decisions does not establish that habeas relief is warranted because each set of facts differs. For example, Brown's reliance upon *Rompilla* is to no avail because

*Rompilla* is a specific application of *Strickland* to materially different factual circumstances from those present in this case. Counsel in *Rompilla* were held to have conducted an inadequate investigation, despite having interviewed the defendant, five members of the defendant's family, and three mental-health experts, because counsel failed to examine the defendant's prior conviction for rape and assault, a "readily available" public document located "at the very courthouse where" the defendant's trial would be held. *See* 545 U.S. at 381–84. Counsel's failure to investigate the defendant's prior conviction was unreasonable because that conviction could serve as an "aggravator" under Pennsylvania's death-penalty law and counsel knew, as evidenced in a "plea letter" written by counsel, that prosecutors planned to seek the death penalty on the basis of that conviction. *Id*. at 383–84. Similarly, in *Wiggins*, the Court noted "powerful" abuse evidence including that Wiggins "experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother, . . . suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care, . . . spent [time] homeless, [and had] diminished mental capacities." 539 U.S. at 534–35.

"The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. [On § 2254(d) review, a] state court

must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. Accordingly, the state courts' conclusion that Brown's trial counsel's performance at the penalty phase was not deficient is not contrary to nor an unreasonable application of Supreme Court precedent.

### E.    Brown's claim that the trial court improperly admitted prejudicial hearsay evidence

Brown's fifth claim is that the trial court violated his right to a fair trial by allowing the testimony of several of the State's witnesses that he says contained hearsay that was prejudicial to him.

Brown challenges two separate areas of testimony. First, Brown challenges testimony concerning a confession to the crimes that Brown made to his aunt, Betty Washington, once he had traveled to Cleveland from Sylacauga the day after the murders. Brown challenges the States's calling of four witnesses in relation to this issue. First, the State called Melinda Blankenship, a police dispatcher in Sylacauga, whose testimony was designed to explain to the jury how police were first sent to the house where the murders had occurred. Ms. Blankenship testified that she received two phone calls on while on duty on March 11, 2001, at least one being from Adam Murrell, who was Brown's uncle but who did not know him personally. R. at 444–64. Ms. Blankenship testified that Mr. Murrell told her that Cherea "had possibly been killed" at 449 Marion Avenue, and that her mother "was supposed to

also be killed" there. *Id.* at 462–63. Then, the State called Mr. Murrell, who testified that his sister, Betty Washington, called him in Hope Hull, Alabama, from Cleveland, Ohio, on March 11, 2001, and she mentioned that something bad had happened in Sylacauga *Id.* at 615–16. Mr. Murrell said that Ms. Washington asked him to look into it, so he called the Sylacauga police department and told them that he thought something bad had happened at the house. *Id.* at 615. Then, the State called Ms. Washington, but she contradicted Mr. Murrell's testimony regarding their phone calls on March 11, denying that Brown had confessed to the crimes, and she also contradicted an earlier statement that she had given to Officer Jeff Mobbs regarding Brown's confession. *Id.* at 641. The State treated Ms. Washington as an adverse witness and impeached her credibility by showing her the previous statement she had made to Officer Mobbs. *Id.* at 646. The State also called Officer Mobbs, who testified that Ms. Washington told him that she had been told by Brown that "he had done something wrong to them girls up there." *Id.* at 646.

In addition to the testimony about his confession, Brown also challenges testimony by Pastor Smith suggesting that Brown had been violent towards Cherea in the past. Pastor Smith testified about a conversation he had had with his wife in which his wife told him that Brown had abused Cherea.

Before proceeding further with this claim, the Court must consider two arguments made by Respondent as to why the Court should not reach the merits of

this claim. First, Respondent argues that this claim fails to comply with Rule 2(c) of the Rules Governing Habeas Corpus Cases and should therefore be dismissed because Brown failed to mention 28 U.S.C. § 2254(d) in his petition or plead how he is due relief on this claim under § 2254(d).

With regard to the trial court's admission of testimony related to Brown's confession to his aunt, Brown's petition sufficiently apprised this Court that he is making an argument under § 2254(d). *See* Doc. 1 at ¶ 282 ("The [ACCA]'s decision on harmless error was contrary to and an unreasonable application of clearly established United States Supreme Court precedent . . . the admission of this improper confession evidence had a 'substantial and injurious effect or influence in determining the jury's verdict,' in violation of clearly-established federal law.") (citing *Williams*, 529 U.S. at 412–13, and quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Thus, the claim was sufficiently pled to this Court.

However, with regard to the trial court's admission of Pastor Smith's testimony related to prior acts of violence by Brown to Cherea, Brown devotes just two paragraphs to this claim and does not plead that the state courts' decisions on this claim were contrary to or an unreasonable application of Federal law or based on an unreasonable determination of the facts, under § 2254(d) and Rule 2(c). *See id.* at ¶¶ 288–89. Still, Brown argues that this evidence "had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* at ¶ 289 (quoting

*Brecht*, 507 U.S. at 607). And, these two paragraphs were placed within Brown's larger complaint about the admission of hearsay evidence—Brown's claim "E."—in which he in other places does reference § 2254(d). Ultimately, the Court believes that Brown's federal habeas counsel is well aware of what is required in order to adequately plead that a federal habeas claim should be reviewed under § 2254(d), especially considering that counsel for the most part adequately pleads as such for all of the other claims throughout Brown's 127-page habeas petition. Accordingly, the Court finds that the claim specifically as it relates to Pastor Brown's testimony is adequately pled and properly before this Court.

Second, Respondent argues that this claim is procedurally defaulted from review by this Court because it was "decided solely on state law grounds" during the direct appeal process, citing *Coleman*, 501 U.S. at 729. In *Coleman*, the Supreme Court held that courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Id*. Respondent's argument is misplaced, however, because the independent and adequate state law grounds doctrine does not apply here. *See Ward*, 592 F.3d at 1156–57. The adequate and independent state law grounds doctrine bars federal review "when a petitioner has failed to follow state procedural rules in raising a claim." *Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991). *See also Coleman*, 501 U.S. at 729–30 ("The

doctrine applies to bar federal habeas when state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."). Brown did not fail to follow state procedural rules here. Brown raised this claim, including the federal constitutional elements of it, on direct appeal. Indeed, he argued that the trial court's decision to admit the hearsay evidence "so infected the trial with unfairness" as to violate his rights under the Due Process clause. *See* Vol. 11, Tab #R-32, at 35 (brief to the ACCA). Although Brown's direct appeal brief also argued that the trial court's evidentiary rulings violated Alabama law and the Alabama Rules of Evidence, Brown included many citations to federal cases applying federal law in support of his constitutional claim, including *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), *Chapman v. California*, 386 U.S. 18 (1967), and *Riggins v. Nevada*, 504 U.S. 127 (1992). *See generally* Vol. 11, Tab #R-32, 24–45.

Nor did the ACCA, which issued the last reasoned opinion, "clearly and expressly state that it [was] relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Ward*, 592 F.3d at 1156–57. On direct appeal, the ACCA held that the evidence that Brown challenged either was not hearsay under the Alabama Rules of Evidence (because it was not offered for the truth of the matter asserted but was instead offered to show the *res gestae* of the case, to impeach a witness's inconsistent statement, to illustrate a witness's state of mind,

or to rebut incomplete testimony elicited by Brown's defense counsel) or, if it was hearsay, its admission by the trial court amounted to harmless error. *See Brown*, 74 So. 3d at 998–1005. The ACCA in large part cited to and applied the Alabama Rules of Evidence, but it also applied two federal cases: *United States v. Hasting*, 461 U.S. 499, 510, (1983) and *Chapman*, 386 U.S. at 705, relied upon by Brown in his direct appeal brief, in reasoning that any error was harmless. *See id.* Thus, the ACCA's discussion may have focused more on Alabama law than federal law, but what the ACCA did not do was rule that Brown's claim was due to be dismissed because he failed to follow Alabama procedural rules. *Contra Coleman*, 501 U.S. at 729–30.

Accordingly, this claim is not procedurally barred from this Court's review, and the Court will proceed to the merits of the claim. As noted, Brown exhausted this claim (both the argument about his confession evidence and the argument about Pastor's Smith's testimony) on direct appeal, Vol. 11, Tab #R-32, at 15–45 (brief to the ACCA); Vol. 14, at 23–44 (certiorari petition to the Alabama Supreme Court). The ACCA's analysis of this claim is as follows:

I.

Brown's first argument is that the trial court erroneously allowed the State to present inadmissible hearsay.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Rule 801(c), Ala. R. Evid.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Rule 403, Ala. R. Evid.

A.

Initially, Brown contends that the State presented inadmissible hearsay evidence regarding an alleged confession he made to Betty Washington.

1.

First, Brown asserts that the trial court erroneously allowed Melinda Blankenship, a dispatcher with the Sylacauga Police Department, to testify about two telephone calls she received from Adam Murrell. Specifically, he alleges that Blankenship's testimony was hearsay; that the statement was offered to show why Blankenship dispatched law enforcement officers to the residence; that Blankenship's reason for dispatching the officers was irrelevant to his guilt or innocence; that the State cross-examined Murrell about his statements to Blankenship and thus used them for the truth of the matter asserted at that point; and that the admission of Blankenship's testimony was unduly prejudicial and should have been excluded pursuant to Rule 403, Ala. R. Evid. Brown did not object to Blankenship's testimony regarding what Murrell told her during his two telephone calls. Therefore, we review his arguments in this regard for plain error. *See* Rule 45A, Ala. R. App. P.

Blankenship testified that she was on duty on March 11, 2001; that she received an anonymous call from a pay telephone regarding the residence at 449 Marion Avenue; that the anonymous caller said that he felt like something was wrong at the house and that he wanted someone to go to the residence and try to locate anyone or see if anything looked out of place at the house; that she dispatched Officer Doug Kemp to 449 Marion Avenue; that Kemp went to the scene and reported back to her around 5:30 p.m.; and that she did not send any other officers to the scene at that time. She also testified that, around 9:30 p.m., she received a telephone call from Adam Murrell; that, during the initial conversation, Murrell told her that he felt like there was

something wrong in Sylacauga, but he did not have an address; that Murrell said he thought he knew someone to call so he could get the address, that he would make a telephone call, and that he would call back; and that, based on the voices, Murrell was not the person who made the initial anonymous telephone call.

Blankenship also testified that Murrell called back a second time; that Murrell gave her his name and telephone number and told her he was calling from Hope Hull, Alabama; that Murrell gave her the address of 449 Marion Avenue; that Murrell told her that Cherea Jemison had possibly been killed and that "the girl's mother was supposed to been there also, she was supposed to also be killed"; and that, based on that information, she dispatched Sergeant Jimmy Parker to the address. (R. 463.)

Blankenship's testimony that Murrell told her that Cherea and her mother had possibly been killed at 449 Marion Avenue was not offered to show the truth of the asserted therein. Rather, it was offered to show why the officers went to the home and how they discovered the bodies of Dotty and Cherea. It was also offered to establish that Murrell had in fact made the statement, not to show that the substance of the statement was true. Therefore, Blankenship's testimony about what Murrell told her was not hearsay pursuant to Rule 801(c), Ala. R. Evid. Brown contends that the State used Murrell's statement to Blankenship as substantive evidence when it cross-examined Murrell. However, it appears that the State cross-examined Murrell to establish the fact that he had made the statement, not to show the truth of the matter asserted in the statement. Therefore, the State's questions regarding the statements he made to Blankenship did not constitute hearsay.

Moreover, the substance of Murrell's statement to Blankenship was that Cherea and Dotty had been killed at their home. Even if the State had attempted to introduce Murrell's statement to prove the truth of the matter therein, any such evidence was merely cumulative to subsequent testimony that law enforcement officers found Dotty's and Cherea's bodies in the home. Further, at no time during Blankenship's testimony did the State attempt to elicit any testimony that Murrell had made statements that Brown had done something or that Brown was the person who had killed the victims. In fact, during a bench conference, the State specifically asserted that, although Murrell had made such statements, those statements constituted hearsay, and it would not introduce any such statements. Thus, even if the State had used the statement as substantive evidence, error, if any, was harmless. *See* Rule

45, Ala. R. App. P. Finally, the danger of unfair prejudice did not substantially outweigh the probative value of Blankenship's testimony. Accordingly, we do not find that there was any plain error in this regard.

2.

Brown next asserts that the trial court erroneously allowed the State to read extensively from the unofficial transcript of Murrell's statement to law enforcement officers. Specifically, he alleges that the reading of the transcript "impermissibly introduced multiple levels of hearsay evidence" and was unquestionably prejudicial. (Brown's brief at p. 25.) Brown did not object when the prosecutor read portions of the transcript into evidence. Therefore, we review this argument for plain error. *See* Rule 45A, Ala. R. App. P.

At trial, Murrell testified that he had problems with his recollection because he had suffered four strokes. Also, he advised the court about his various other medical problems and about the fact that he could not read and write. Subsequently, outside the presence of the jury, Investigator Mike Smith read Murrell's statement aloud for Murrell. Then, in the presence of the jury, the prosecutor questioned Murrell about whether hearing his statement refreshed his recollection regarding the telephone calls he had made to the Sylacauga Police Department. Murrell again talked about his problems remembering things and about his various medical problems. After questioning Murrell about what he could and could not remember, the State read portions of the transcript to Murrell and asked him if he remembered various portions of the statement. Based on a review of the record, it is clear that the State was not attempting to introduce the transcript of Murrell's statement to law enforcement officers to prove the truth of the matter asserted therein. Rather, it appears that the State was attempting to refresh Murrell's recollection. However, the State was limited in its ability to do so based on Murrell's inability to recall coupled with the fact that he could not read. Accordingly, the prosecutor read small portions of the transcript and then asked Murrell about those specific portions. Therefore, the trial court did not err when it allowed the State to read portions of the transcript during its examination of Murrell. Furthermore, the danger of unfair prejudice did not substantially outweigh the probative value of the State's questions regarding the various portions of the transcript. See Rule 403, Ala. R. Evid. Therefore, the trial court did not err when it allowed the prosecutor to read portions of the transcript during its direct examination of Murrell.

Moreover, the contents of the transcript about which the State questioned Murrell dealt with the telephone calls between Murrell and Washington and Murrell and Blankenship. However, both Blankenship and Washington testified about the telephone calls. "[Evidence] that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred." *White v. State*, 650 So. 2d 538, 541 (Ala. Crim. App. 1994), overruled on other grounds, *Ex parte Rivers*, 669 So. 2d 239 (Ala. Crim. App. 1995). Because the portions of the transcript were cumulative to the testimony of Blankenship and Washington, error, if any, in the reading of the transcript was harmless. *See* Rule 45, Ala. R. App. P.

3.

Brown further asserts that, during its cross-examination of Washington, the State "strongly emphasized the hearsay evidence that it had elicited during the testimony of Ms. Blankenship and Mr. Murrell, in order to suggest that Mr. Murrell and Ms. Washington knew that the Jemisons were dead." (Brown's brief at p. 29.) During the State's direct examination of Washington, the following occurred:

"[PROSECUTOR:] Then y'all call later on that night, y'all talk for 20 minutes at 11:30. But you know what information he told Sylacauga Police Department after he talked to you?

"[WASHINGTON:] No.

"[PROSECUTOR:] That Dotty—that Cherea Jemison and her mother were dead—

"[WASHINGTON:] Well, I didn't tell him—

"[PROSECUTOR:] Over there at—

"[WASHINGTON:] I didn't tell him because I didn't know it myself.

"[PROSECUTOR:] Well, Mr. Murrell has been in this courtroom. And although he seemed very witty and funny—

"[WASHINGTON:] Uh-huh.

"[PROSECUTOR:]—he claims he's had four strokes and can't—

"[WASHINGTON:] He have.

"[PROSECUTOR:]—remember anything.

"[WASHINGTON:] He have. He ain't playing.

"[PROSECUTOR:]—but he remembered you telling him there were two people dead over there, and you're saying you didn't tell him that?

"[WASHINGTON:] I did not tell him that.

"[PROSECUTOR:] Then he calls you back. He tells them—

"[WASHINGTON:] Uh-huh.

"[PROSECUTOR:] 'Let me get some more information.' And he calls you. And the next information he relates to Sylacauga Police Department is Cherea Jemison and her mother have been killed in that house—

"[WASHINGTON:] Well, I don't—

"[PROSECUTOR:]—you did not tell him that?

"[WASHINGTON:] No. No, I did not."

(R. 637–39.) Brown specifically alleges that the State's assertions that Murrell said he remembered her telling him that two people were dead was false; that Murrell did not testify that Washington had told him that; that, if he had, such a statement would have been hearsay; that the other questions during the exchange were based on previously elicited hearsay; and that the prosecutor used the hearsay evidence to prove the truth of the matter asserted. However, Brown did not present these arguments to the trial court. Therefore, we review them for plain error. *See* Rule 45A, Ala. R. App. P.

The State did incorrectly assert that Murrell testified that he remembered Washington telling him two people were dead. However, the State presented evidence that Washington telephoned Murrell; that, based on that telephone call, Murrell telephoned the Sylacauga Police Department; and that Murrell gave Blankenship the address for Dotty and Cherea and said that they might be dead. Based on this evidence, the jury could have reasonably concluded that Washington had told Murrell that Dotty and Cherea were dead. Therefore, any error in the State's incorrect assertion was harmless. *See* Rule 45A, Ala. R. App. P. Further, contrary to Brown's assertions, the State's cross-examination of Washington regarding what Murrell told Blankenship did not amount to substantive evidence about the truth of the matter asserted therein. Moreover, as we noted in Part I.A.1., even if the State had attempted to introduce Murrell's statement as substantive evidence, it would have been cumulative to testimony that law enforcement officers had found the bodies of Dotty and Cherea in their residence. Therefore, we do not find that there was any plain error in this regard. *See* Rule 45A, Ala. R. App. P.

4.

Brown asserts that the trial court erroneously allowed Mobbs to testify about the statement Washington made to him. Specifically, he alleges that the State asserted that it was offering the statement to impeach Washington and that the State did not lay a proper foundation pursuant to Rule 613(b), Ala. R. Evid., for Mobbs's testimony regarding the statement.

> "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness has been confronted with the circumstances of the statement with sufficient particularity to enable the witness to identify the statement and is afforded an opportunity to admit or to deny having made it."

Rule 613(b), Ala. R. Evid.

During its cross-examination of Washington, the State asked Washington if Brown had told her he had done something very bad, and Washington said he had not. The State did not ask Washington any more questions. At no time did the State confront Washington with the statement she had made to Mobbs or give Washington an opportunity to admit or deny having made the statement. Therefore, the trial court erroneously allowed the State to present extrinsic evidence about Washington's statement to Mobbs.

*See* Rule 613(b), Ala. R. Evid.[FN]2 However, even without Washington's statement to Mobbs, the State presented overwhelming evidence of Brown's guilt.

> [FN]2 Brown also argues that the State improperly called Washington for the sole purpose of impeaching her with the statement she had made to Mobbs. However, because we find that the trial court erroneously admitted evidence about Washington's statement to Mobbs on other grounds, we need not address this argument separately.

The State presented evidence that Brown had been trying to get money from Michael Pope on the evening of March 9, 2001; that, on the morning of March 10, 2001, Brown went to Alabama Trust Bank in Sylacauga to cash a check on Dotty Jemison's account, but Aletha Pope told him she could not cash it because it was on a First Federal Bank account; that Brown left and came back with a $200 check on Cherea's account; that Pope cashed the check; and that, while he was there, Brown told Pope that K.S. was sick and was at Children's Hospital in Birmingham. However, Roxanne Womack, an employee of Children's Hospital in Birmingham, testified that they did not have a record of K.S. being in the hospital in March 2001.

The State also presented evidence that on March 9, 2001, Jennifer Weed, a teller at First Federal Bank, cashed a $200 check on Dotty's account; that the check was sent from the third drive-through lane; that the check was sent by a black male driving a blue car; and that Cherea owned a blue Mazda 626.

The State further presented evidence, that on March 9, 2001, Vaunzcea Jemison had traveled from Cleveland, Ohio, to Birmingham for a wedding; that Vaunzcea tried to telephone Dotty and Cherea around 11:00 p.m. on March 9, 2001, but she was not able to reach them; that Vaunzcea was also unable to reach them on Saturday or Sunday; that Dotty and Cherea knew that Vaunzcea was going to be in Alabama; and that Vaunzcea had had plans to visit Dotty and Cherea.

The State additionally presented evidence that Dotty and Cherea were not at church on Sunday, March 11, 2001; that Manuel Smith had tried to telephone Dotty and Cherea on Sunday; and that Smith was not able to reach them. Around 11:00 p.m. on March 11, 2001, Adam Murrell telephoned the

Sylacauga Police Department, gave them the address for Cherea and Dotty, and said that Cherea and her mother might have been killed there; that law enforcement officers went to the home, entered the residence, and found the bodies of Cherea and Dotty; that Dotty's ankles and hands were bound with duct tape and green "Christmas" tape; that a cardboard roll was attached to the green "Christmas" tape; and that Brown's fingerprints were on the cardboard roll.

Brown and Cherea's daughter, T.S., testified that, the last time she saw her mother, she had been sleeping in her room; that her mother and Brown were fussing and woke her up; that her mother and Brown were both screaming; that she got up and peeped out her door; that she saw her mother lying on the floor; that her mother's eyes were closed, and she had blood on her chest; that Brown was standing over her mother; and that she got back into bed and went to sleep.

The State presented evidence that Brown was subsequently located in Cleveland, Ohio; that Brown was involved in a standoff with Cleveland law enforcement officers; that the standoff lasted approximately twenty-four hours; and that Brown left the apartment in which he was located only after numerous canisters of a chemical agent had been fired into the apartment. Cherea's blue Mazda was located a short distance from the area where Brown had barricaded himself, and law enforcement officers found a checkbook that belonged to Cherea in the vehicle. Finally, F.S., T.S., and K.S. were also located in Cleveland.

Thus, the evidence as to Brown's guilt was overwhelming. After reviewing the entire record as a whole, "is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty" even without the admission of Washington's statement to Mobbs. *United States v. Hasting*, 461 U.S. 499, 510, 103 S. Ct. 1974, 76 L.Ed.2d 96 (1983). *See also Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967). Under these circumstances, any error in the admission of Washington's statement to Mobbs was harmless. *See* Rule 45, Ala. R. App. P.

5.

Brown further asserts that the State improperly referred to notes about Washington's statement to Mobbs. Specifically, he appears to allege that the State asserted that Mobbs had made the notes; that the notes were actually

created by an unidentified author; that the notes constituted inadmissible triple hearsay; and that the State improperly referred to the notes in the presence of the jury. Brown did not object to the State's references about the notes. Therefore, we review this issue for plain error. *See* Rule 45A, Ala. R. App. P.

In this case, the notes were not introduced into evidence. Rather, the State referred to the notes when the defense originally asserted that it did not have a copy of any statement Washington made to Mobbs. Also, the parties referred to the notes when the trial court was determining the admissibility of the statement. Therefore, the prosecutor's reference to the notes did not constitute inadmissible triple hearsay. Moreover, to the extent Brown is again challenging the admission of Washington's statement to Mobbs, as we found in Part I.A.4., any error in the admission of that statement was harmless. Therefore, Brown is not entitled to relief in this regard.

B.

Brown also contends that the trial court erroneously allowed Manuel Smith to testify about his alleged abuse of Cherea. Specifically, he asserts that the testimony about the abuse constituted inadmissible hearsay and improper character evidence pursuant to Rule 404(b), Ala. R. Evid. Brown did not raise his argument that the testimony constituted improper character evidence before the trial court. Therefore, we review that contention for plain error. *See* Rule 45A, Ala. R. App. P.

During defense counsel's cross-examination of Smith, the following occurred:

"[DEFENSE COUNSEL:] Do you recall giving a statement to Mike Smith back, it looks like the 21st of March of 2001, where you sat down and you were talking to Mike Smith?

"[SMITH:] I've talked to him on several occasions, yes, sir.

"[DEFENSE COUNSEL:] Well, this would have been right after the ladies were found in the house or shortly thereafter. And at the time, they asked you this or this in substance, something about Mr. Brown going back to Cleveland. You said he went back to Cleveland twice. He got some money. And you said Cherea was mad and talked to your wife. I guess that's Shirley. And they asked the question or Mike Smith asked

the question, 'Did she ever mention any kind of violence or anything?' And you said 'To me, no.' Do you recall that?

"[SMITH:] I'm sorry. Say it again, sir.

"[DEFENSE COUNSEL:] He asked you the question that 'she,' I'm taking that as Cherea, ever mentioned any kind of violence or anything, and you answered 'To me, no.' That's what you told Mike Smith?

"[SMITH:] She didn't.

"[DEFENSE COUNSEL:] And you then said, 'I'm sure she mentioned some stuff to my wife. She didn't mention it to me at all.' Is that right or wrong?

"[SMITH:] She didn't talk to me about the violence."

(R. 364–66.) Subsequently, during the State's redirect examination of Smith, the following occurred:

"[PROSECUTOR:] Pastor Smith, [defense counsel] was asking you whether Cherea had confided in you about any prior domestic violence, and you indicated that she had not. Had she confided that in your wife?

"[DEFENSE COUNSEL:] I object to that, Judge.

"[PROSECUTOR:] Judge, he's opened the door and asked the questions.

"[DEFENSE COUNSEL:] That would be hearsay, anything his wife—

"[PROSECUTOR:] He asked the question. We didn't go into it.

"THE COURT: You can answer the question. Go ahead.

"[SMITH:] Yes, ma'am.

"[PROSECUTOR:] On several occasions?

"[SMITH:] Many occasions."

(R. 368.)

>"When one party opens the door to otherwise inadmissible evidence, the doctrine of 'curative admissibility' provides the opposing party with 'the right to rebut such evidence with other illegal evidence.' McElroy's Alabama Evidence, § 14.01, p. 49 (5th ed. 1996). '[T]he law [i]s that even though a party introduces evidence that may be immaterial or illegal, his opponent has the right to rebut such evidence and this right is unconditional.' *Clark v. State*, 54 Ala. App. 183, 186, 306 So. 2d 51, 54 (1974). '"A party who has brought out evidence on a certain subject has no valid complaint as to the trial court's action in allowing his opponent or adversary to introduce evidence on the same subject."' *Hubbard v. State*, 471 So. 2d 497, 499 (Ala. Crim. App. 1984) (quoting *Brown v. State*, 392 So. 2d 1248, 1260 (Ala. Crim. App. 1980), cert. denied, 392 So. 2d 1266 (Ala. 1981))."

*Ex parte D.L.H.*, 806 So. 2d 1190, 1193 (Ala. 2001).

>In this case, during its direct examination, the State did not question Smith regarding any allegations of prior abuse Cherea may have made to him or to his wife. Rather, defense counsel raised this issue during its cross-examination of Smith and brought out Smith's statement to law enforcement officers that he was sure Cherea had mentioned prior abuse to his wife. On redirect, the State did not elicit any specific details regarding those allegations. Rather, the State merely clarified the testimony elicited by the defense. Based on its cross-examination of Smith, the defense opened the door to evidence regarding prior allegations of abuse the victim made to Smith's wife. Therefore, we do not find that there was any plain error in this regard. *See* Rule 45A, Ala. R. App. P.

*Brown*, 74 So. 3d at 998–1005.

When a state court has considered a habeas petitioner's federal claim on its merits, this Court's review would normally be subject to the restrictions found in § 2254(d), entailing a consideration of whether the decision was contrary to or an unreasonable determination of Federal law or otherwise an unreasonable

determination of the facts. However, the Court notes that here, the ACCA relied solely on Alabama law to reject Brown's allegations about 1) Ms. Blankenship's testimony, *see Brown*, 74 So. 3d at 998–99; 2) the State reading Mr. Murrell's statement to police into evidence, *see id.* at 999–1000; 3) the State's cross examination of Betty Washington, *see id.* at 100–01; and 4) Pastor Smith's testimony, *see id.* at 1003–05. With regard to those allegations, the ACCA appears to have overlooked or ignored Brown's argument that the evidentiary rulings violated his right to a fair trial and instead relied upon the Alabama Rules of Evidence and Alabama case law to rule solely that the testimony either was not hearsay, or, if it was, its admission was harmless error. The only two allegations about which the ACCA even referenced federal law were Brown's allegations that the trial court should not have allowed Officer Mobbs to testify about the statement Ms. Washington made to him and improperly referred to notes about Ms. Washington's statement to Mobbs. With regard to those allegations, the ACCA held that since the evidence of Brown's guilt was overwhelming, that it was clear beyond a reasonable doubt that the jury would still have returned a guilty verdict even without the evidence. *Id.* at 1003 (citing *Chapman*, 386 U.S. 18).

If all of Brown's hearsay allegations can be viewed in the aggregate, then it might be said that the ACCA addressed the federal constitutional element of Brown's hearsay claims, and this Court is thus limited to considering the claims with

some deference to the ACCA's decision, assessing it for reasonableness under the confines of § 2254(d). However, if one views each distinct claim of error separately, then, at least as to some of the federal claims, the ACCA did not address them, which leads to the question of whether this Court is obligated to address them *de novo*.

In *Johnson v. Williams*, the Supreme Court decided the problem that "arises when a defendant convicted in state court attempts to raise a federal claim, either on direct appeal or in a collateral state proceeding, and a state court rules against the defendant and issues an opinion that addresses some issues but does not expressly address the federal claim in question. 568 U.S. 289, 292-93 (2013). The Court asked the following question:

> If this defendant then raises the same claim in a federal habeas proceeding, should the federal court regard the claim as having been adjudicated on the merits by the state court and apply deference under § 2254(d)? Or may the federal court assume that the state court simply overlooked the federal claim and proceed to adjudicate the claim *de novo* . . . ?

*Id.* at 293. The Court held that when such clarity is lacking—e.g., where a state court "issues an opinion that addresses some issues but does not expressly address the federal claim in question," *id*., "a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted," *id*. at 301. When determining whether this presumption should hold regarding a particular claim, a federal court must remain mindful that "[a] judgment is normally said to have been rendered 'on the merits' only if it was

'delivered after the court . . . heard and evaluated the evidence and the parties' substantive arguments.'" *Id.* at 302 (citations omitted). Thus, if the circumstances indicate that a federal claim was "rejected" by the state court "as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter." *Id*. at 303. Likewise, if the state court responds to a claim of federal constitutional error using only state law, and that state law is "different from" or "less protective" than the applicable federal rule, "the presumption that the federal claim was adjudicated on the merits may be rebutted." *Id*. at 301. In such cases, "§ 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Id*. at 303. *Johnson* also recognizes the possibility that a state court decision expressed only in state law terms might nevertheless amount to a merits adjudication of a federal question "if the state-law rule subsumes the federal standard," *Johnson*, 568 U.S. at 301.

At least with regard to the court's admission of hearsay evidence pertaining to his confession, Brown does not ask this Court to review the claim *de novo* but merely argues that the ACCA's decision that any error was harmless was both contrary to and an unreasonable application of Federal law, specifically *Chapman*, 386 U.S. 18. *See* Petition for Habeas Relief, Doc. 1, at ¶ 287. Brown's argument lacks merit. The Supreme Court has identified two relevant definitions of a harmless error. In *Chapman*, a direct appeal case, the Supreme Court held that, "before a

federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. However, the Supreme Court subsequently held in *Brecht* that the *Chapman* harmless-error standard is not applicable to habeas cases. 507 U.S. at 623. Instead, the Court held that the standard for determining whether habeas relief must be granted is whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Id*. (quotation marks omitted); *see also Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." (citations omitted)).

Here, the ACCA, citing *Chapman*, held that since the other evidence against Brown was overwhelming, even if the confession evidence had not been admitted, it was clear beyond a reasonable doubt that the jury would still have returned a verdict of guilty. Under the circumstances of this case, the Court cannot say that the ACCA's conclusion was unreasonable. The question of guilt or innocence was not close in this case. Even without *all* of the testimony from the four witnesses that indicated that Brown had confessed to his aunt once he arrived in Cleveland, the jury

would still have heard Tatiyana's eyewitness testimony undoubtedly connecting Brown to the murders. The jury would have also still heard that Brown had been trying to get money from Michael Pope on the evening of March 9; that on the morning of March 10 he cashed checks on the victims' accounts and lied to Aletha Pope about his child being sick and at Children's Hospital in Birmingham; that he then drove Cherea's car to Cleveland with the children; that Brown's fingerprints were on the roll of green tape that had been used to secure Dotty Jemison; and that Brown was subsequently located in Cleveland where he was involved in a 24-hour standoff with law enforcement officers. Viewing the record as a whole, it is clear that the trial court's admission of the confession-related testimony did not "ha[ve] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623. Thus, the ACCA's harmless error analysis was not unreasonable.

With regard to Brown's allegation that the trial court erred in admitting hearsay testimony from Pastor Smith about Brown's prior acts of violence towards Cherea, Brown does not specify whether this Court should review this claim pursuant to § 2254(d) or *de novo*. As seen in the above-quoted section, the ACCA did not discuss the constitutional element of this allegation whatsoever, even though Brown framed it as a constitutional claim in his direct appeal brief (and in his petition for certiorari to the Alabama Supreme Court). Rather, the ACCA ruled that the trial

court properly allowed the hearsay testimony because Brown's counsel "opened the door" to it under Alabama evidence rules and case law. *See Brown*, 74 So. 3d at 1005. Assuming that this Court should consider this claim in the first instance, the Court still rejects the argument as meritless for the same reasons discussed above with regard to the confession evidence. Admission of the prior bad acts testimony was harmless because, even if it had not been admitted, the remaining evidence overwhelmingly pointed to Brown's guilt. Habeas relief is not warranted on this claim.

### F.   Brown's claim that the trial court erroneously admitted Tatiyana's testimony

Brown's sixth claim is that the trial court should not have permitted Tatiyana to testify without conducting an adequate inquiry into the reliability of her testimony outside the presence of the jury, and that the trial court further erred by bolstering her credibility by asking in front of the jury whether she went to Sunday school and church and whether she could tell right from wrong. Brown argues that in allowing her to testify, the trial court violated his rights to a fair trial and due process.

As with the preceding claim concerning hearsay testimony, before proceeding further with this claim, the Court must consider two arguments made by Respondent as to why the Court should not reach the merits of this claim. First, the Court must consider Respondent's argument that this claim fails to comply with Rule 2(c) of the

Rules Governing Habeas Corpus Cases and should therefore be dismissed because Brown failed to mention 28 U.S.C. § 2254(d) or plead how he is due relief on this claim under § 2254(d) in his petition. Respondent is correct that Brown does not plead in his petition that the state courts' decisions on this claim were contrary to or an unreasonable application of Federal law or based on an unreasonable determination of the facts, under § 2254(d) and Rule 2(c). *See generally id.* at ¶ 290–300. Still, Brown notes that he raised this claim on direct appeal and that the Alabama Supreme Court granted certiorari on this claim, *see id.*, and he references several Supreme Court cases that he contends address the special reliability concerns that arise with child testimony, including *Wheeler v. United States*, 159 U.S. 523 (1895), *Kennedy*, 554 U.S. at 443–44, *J.D.B. v. North Carolina*, 564 U.S. 261, 272 (2011), and *Roper v. Simmons*, 543 U.S. 551, 569 (2005). *See id.* at ¶¶ 291–92; *id.* at ¶ 292 ("This case illustrates the dangers the Supreme Court identified in *Kennedy*, where the court noted that academic studies had widely "concluded "conclude[d] that children are highly susceptible to suggestive questioning techniques like repetition, guided imagery, and selective reinforcement.") (quoting *Kennedy*, 554 U.S. at 443–44). Brown also relies upon cases that stand for the proposition that the admission of unreliable identification testimony can violate a defendant's due process rights. *See id.* at ¶ 299. Under the circumstances, the Court finds that Brown has adequately pled this claim.

Second, the Court must consider Respondent's argument that this claim is procedurally defaulted from review by this Court because it was decided solely on state law grounds by the ACCA on direct appeal, pursuant to *Coleman*, 501 U.S. at 729. For the same reasons discussed in the previous section regarding the hearsay testimony, the adequate and independent state law grounds doctrine does not apply to bar this claim, either. First, Brown sufficiently raised a federal constitutional claim on direct appeal, arguing—in addition to his arguments under Alabama law and the Alabama Rules of Evidence—that the trial court violated his due process rights and right to a fair trial by admitting Tatiyana's testimony. *See* Vol. 11, Tab #R-32, at 57 (direct appeal brief to the ACCA); Vol. 14, at 23–44 (certiorari petition to the Alabama Supreme Court). And neither the ACCA nor the Alabama Supreme Court, which took the issue upon certiorari review, "clearly and expressly state[d] that it [was] relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Ward*, 592 F.3d at 1156–57. Accordingly, the adequate and independent state law grounds doctrine does not bar this Court from reviewing Brown's claim on the merits.

The last reasoned state court opinion to address this claim was authored by the Alabama Supreme Court. That court wrote the following:

I. Admissibility of testimony of a child witness.

Brown contends that Alabama courts have not squarely discussed the procedures necessary to address the substantial risk of prejudice presented by

the admission of testimony from a child witness. First, Brown contends that this Court should adopt a per se rule that, when a trial court examines a child witness to determine the child's understanding of the duty to testify truthfully, the examination must be conducted outside the presence of the jury. Second, Brown maintains that a trial court, in addition to determining whether a child witness understands the duty to testify truthfully, must also determine whether the child's testimony is reliable. Additionally, Brown argues that the trial court erred in his case in conducting the voir dire of the child witness in the presence of the jury and then in admitting her testimony.

*A. Rule 603, Ala. R. Evid., determination for the admissibility of a child witness's testimony.*

Brown urges this Court to adopt a per se rule requiring that a trial court's examination of a child witness to determine whether the child understands the duty to testify truthfully must occur outside the presence of the jury. Rule 603, Ala. R. Evid., provides:

> "Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness's conscience and impress the witness's mind with the duty to do so."

According to Brown, the trial court's examination of the child witness should occur outside the presence of the jury to prevent the trial court from invading the jury's exclusive role of determining the credibility of the witness. The Nebraska Supreme Court, when confronted with this issue, stated:

> "In his fifth assignment of error, Fleming asserts, without authority, that the district court erred in conducting F.K.'s and A.S.'s competence examinations before the jury. The State argues that there was no error, as child witnesses are presumed competent, and there is no requirement that such hearings be held out of the presence of the jury.
>
> "This issue has been considered in several jurisdictions. For example, the Pennsylvania Supreme Court has adopted a per se rule that child witnesses are to be examined for competence outside the presence of the jury. The court noted that

"'[e]ven with a cautionary instruction . . . permitting the competency proceedings to take place in the presence of the jury inevitably permeates into the veracity determination assigned exclusively to the jury. Particularly in cases such as this where credibility is the central issue, the likely impact of conducting the competency proceedings in the presence of the jury cannot be diminished.'

"The Colorado Supreme Court specifically rejected this per se rule in *People v. Wittrein*[, 221 P.3d 1076, 1081 (Colo. 2009) ]. Instead, that court concluded that while it was

"'the better approach [to examine outside the presence of the jury], any prejudice . . . does not rise to the level of reversible error. The prosecutor asked [the child victim] simple questions that directly related to her ability to be truthful and to relate facts to the jury. The jury was not told the purpose of the testimony and was excused before the judge ruled on . . . competency.'

"Similarly, the New Mexico Court of Appeals noted in *State v. Manlove*[, 79 N.M. 189, 441 P.2d 229 (N.M. Ct. App. 1968) (superseded by state evidence rule on other grounds as stated in *State v. Hueglin*, 130 N.M. 54, 16 P.3d 1113 (N.M. Ct. App. 2000)) ], that it was not error for the trial court judge to inquire into the competence of a child witness in the presence of the jury. The *Manlove* court noted that such decisions were in the sound discretion of the trial court, though the court did 'feel that generally the better practice would be to conduct this examination outside the presence of the jury.' [79 N.M. at 193, 441 P.2d at 233.]

"Still other jurisdictions have concluded that it was not error, or in some instances was even preferable, to have the competency proceedings take place in the presence of the jury. These jurisdictions argue that this type of questioning 'assists the jurors in evaluating independently the child's qualifications as a witness.' [*Brown v. United States*, 388 A.2d 451, 458 (D.C. 1978).] The Wisconsin Supreme Court has also noted that where there was no objection and the jury was instructed that it was the sole judge of the credibility of the witnesses, as well as the weight and effect of the witnesses, it was not error to hold proceedings in the presence of the jury. [*Collier v. State*, 30 Wis. 2d 101, 140 N.W.2d 252 (1966).]

> "We believe that the best practice is for any hearings on the competency of child witnesses to take place outside the presence of the jury. However, the failure of the trial court to do so is not necessarily reversible error. Instead, an appellate court must consider whether the defendant was prejudiced by the trial court's actions."

*Nebraska v. Fleming*, 280 Neb. 967, 975, 792 N.W.2d 147, 155–56 (2010) (footnotes omitted).

Like the Nebraska Supreme Court, we decline to establish a per se rule requiring a trial court's examination of a child witness to determine the child's understanding of the duty to testify truthfully to be conducted outside the presence of the jury. Although it may be the better practice to conduct such an examination outside the presence of the jury to avoid a risk of invading the province of the jury with regard to determining the credibility of a child witness, the fact that the examination occurs in the presence of the jury does not automatically create prejudice and require reversal. To establish reversible error in this regard, a defendant must show that he or she was prejudiced by the trial court's actions.

In this case, Brown contends that he was prejudiced when the trial court examined T.S., the child witness, to determine her understanding of her duty to testify truthfully in the presence of the jury because, he says, "the trial court improperly invaded the province of the jury and bolstered T.S.'s credibility." The record establishes that, at the close of the examination, the trial court asked T.S., "If I permit you to testify, will you tell the truth?" After T.S. responded "yes, sir," and neither the State nor Brown objected, the trial court administered the oath to T.S. and admitted her testimony. According to Brown, "[t]his exchange conveyed to the jury in unequivocal fashion that the trial court believed that [T.S.] would tell the truth." (Brown's brief, at p. 43.) Because there was no objection on this basis at trial, we review Brown's argument for plain error.

Initially, we note that the trial court's examination of T.S. adequately established that she understood her role as a witness at a trial and understood that the court expected her to tell the truth when she testified. See Rule 603, Ala. R. Evid. At the conclusion of the examination, the trial court did not make an affirmative, explicit finding that T.S. would testify truthfully; instead, after

administering the oath, it simply allowed the State to begin its direct examination. Additionally, when instructing the jury, the trial court stated:

"[I]t's the jury's exclusive function to decide the facts of the case. As the trial judge, I have absolutely nothing to do with your decision as to the facts. It is my duty to rule on the admissibility of the evidence and charge you as to the law. It is your duty to take the evidence that's been allowed in the case, disregard any evidence excluded by the court, and take the allowed evidence and decide what the facts are in the case. You decide what actually happened on the occasion testified about and complained about. And when you've decided these facts, then you apply the law as I give it to you in my charge and thereby arrive at your verdict.

"Now, as I've said, you are the trier of facts. You decide what actually happened from the testimony from the witness stand and from the exhibits introduced into evidence.

". . .

"It's the duty of the jury to reconcile all of the testimony in the case and make it all speak the truth, if you can do so. If you cannot, of course, [it] is a matter of discretion with the jury what testimony you will believe and what testimony you will disregard. There is no presumption that a witness while testifying is telling the truth. The credibility of a witness while testifying in a case is a decision of the jury. You have a right to take all the testimony in the case, reject what you think is untrue, and consider only that part which you think is true. That applies to the testimony of all witnesses in the case. If you think a witness has told the truth as to some matters and that his or her testimony is inaccurate or untrue as to other matters, then you have the right in your decision to believe that which you can find to be true and disregard that which you think is untrue. If you find that any witness in this case has willfully or corruptly testified falsely as to a material matter, then the law gives you the right in your discretion to disregard that witness's entire testimony.

"You also have the right to consider any interest, bias, friendship or relationship, or any other cause that might in your judgment cause a witness to depart from the truth. All of these things are for you to

consider. When you sit in the jury box, you're just called upon to do like you do elsewhere, and that's to use your common sense. Therefore, you have the right not only to listen to the witnesses, but you can consider the manner and demeanor of the witnesses when they testify from the witness stand and determine just what weight you will give a particular witness's testimony."

(Emphasis added.)

The record does not establish that the trial court committed plain error when it conducted its examination of T.S. in the presence of the jury to determine whether she understood her duty to testify truthfully. The trial court did not make an affirmative, explicit finding that T.S. would testify truthfully; it simply allowed counsel to begin direct examination after its examination of T.S. Nor did the trial court state before the jury that it believed that T.S. would tell the truth. *Cf. People v. Rush*, 250 Ill.App.3d 530, 535–36, 190 Ill. Dec. 1, 620 N.E.2d 1262, 1266 (1993) (holding that a new trial was necessary because the trial court invaded the province of the jury when in the presence of the jury the trial court stated, "I know you were telling the truth"). In this case, neither the trial court's words nor its actions created the impression that it found T.S.'s testimony credible. Therefore, we cannot conclude that the trial court bolstered T.S.'s credibility.

Moreover, the jury was instructed that it was the sole judge of the credibility of the witnesses, as well as the weight and effect to give the witnesses' testimony. None of the trial court's statements during its examination of T.S. can be considered "'calculated to control the jury in its consideration of the weight to be given to testimony.'" *Dixon v. State*, 448 So. 2d 457, 459 (Ala. Crim. App. 1984) (quoting *Richardson v. State*, 403 So. 2d 293, 295 (Ala. Crim. App. 1981)). Hence, we cannot conclude that, when the trial court conducted its examination of T.S. in the presence of the jury, the trial court invaded the province of the jury and that Brown was prejudiced. For these reasons, we conclude that plain error did not occur when the trial court examined T.S. in the presence of the jury to determine that she understood her duty to testify truthfully.

As a part of this issue, Brown contends that, by calling T.S. "sweetheart" and allowing her to testify after she indicated that she would tell the truth, the trial court signaled to the jury that it favored T.S. and conveyed to the jury that it believed T.S. was a credible witness. After reviewing the exchange

between T.S. and the trial court, we conclude that Brown is overreading the trial court's words and actions. We agree with the Court of Criminal Appeals that a fairer assessment of the trial court's words and actions is that the trial court was trying to ease T.S.'s nerves. Indeed, Brown's counsel complimented T.S.'s attire and referred to her as "hon." The record clearly shows that the trial court and counsel for both sides were trying to ease T.S.'s nerves when she was testifying; common sense dictates that a jury would recognize that fact.

### B. Determination of the reliability of a child witness's testimony.

Brown also urges this Court to require that a trial court, when determining a child witness's understanding of the duty to testify truthfully, also determine the reliability of the child witness's testimony.

Rule 601, Ala. R. Evid., provides that "[e]very person is competent to be a witness except as otherwise provided in these rules." The Advisory Committee's notes to that rule explain:

> "The starting point for applying Rule 601 is that all witnesses are competent except as otherwise provided under other Alabama Rules of Evidence . . . . [Rule 601] acknowledges the prevailing sentiment that very few persons are incapable of giving testimony useful to the trier of fact and that the historic grounds of incompetency—mental incapacity, conviction, etc.—should go to the credibility of the witness and the weight the trier of fact gives to the witness's testimony. *See* H. Weihofen, Testimonial Competence and Credibility, 34 Geo. Wash. L. Rev. 53 (1965); E. Cleary, McCormick on Evidence § 71 (3d ed. 1984) (referring to rules of incompetency as 'serious obstructions to the ascertainment of truth'); C. Mueller & L. Kirkpatrick, 3 Federal Evidence § 232 (2d ed. 1994); Comment, The Mentally Deficient Witness: The Death of Incompetency, 14 Law & Psychol. Rev. 106 (1990).

> ". . . .

> "While Rule 601 imposes no requirement of testimonial competency, it provides that incompetency may arise 'as otherwise provided in these rules.' Both academic writings and judicial opinions suggest that this provision vests in the trial court the discretion to

preclude a witness from testifying in extraordinary circumstances when the witness possesses some significant testimonial deficiency. That discretion is said to arise when the witness's deficiency renders the testimony inadmissible because of its being irrelevant (Rule 401) or too prejudicial (Rule 403), or when the witness is without personal knowledge (Rule 602) or is unable to understand the obligation to tell the truth (Rule 603). *See, e.g., United States v. Ramirez*, 871 F.2d 582 (6th Cir.), cert. denied, 493 U.S. 841 (1989); *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984); *United States v. Lightly*, 677 F.2d 1027 (4th Cir. 1982); *State v. Fulton*, 742 P. 2d 1208 (Utah 1987) cert. denied, 484 U.S. 1044 (1988). *See also* J. Weinstein & M. Berger Weinstein's Evidence ¶ 601 [04], at 601–27 (1990)., It should be noted, however, that the suggestion of these authorities exceeds their reality in terms of witnesses actually excluded by the courts. Indeed, as one author has observed, an analysis of the decided cases reveals that the application of Rule 601 is 'closer to an irrebuttable presumption of competency for every witness.' Comment, The Mentally Deficient Witness: The Death of Incompetency, 14 Law & Psychol. Rev. 106, 114 (1990). The beginning premise remains: *all witnesses are competent and any testimonial deficiency goes to weight rather than admissibility. See* F. Weissenberger, Weissenberger's Federal Evidence § 601.2, at 181 (1987); 3 D. Louisell & C. Mueller, Federal Evidence § 252 (1979). *Compare United States v. Van Meerbeke*, 548 F.2d 415 (2d Cir. 1976), *cert. denied*, 430 U.S. 974 (1977)."

(Emphasis added.)

The effect of the adoption of Rule 601, Ala. R. Evid., has been explained as follows:

"Under pre-rules Alabama law, a witness was competent to testify if the witness understood the significance of the oath and was able to observe, recollect, and narrate what had occurred or what the witness had sensed. If competency was questioned, the burden of proving that the proffered witness was competent was on the proponent. However, under Rule 601 every witness is deemed competent unless otherwise provided by the rules, which shifts the burden to the opponent who must prove a witness to be incompetent. This shift occurs even if Rule 601 is read as a declaration of competency per se, because even under this broad interpretation the rule is limited by other applicable rules.

"Pre-rules Alabama law allowed finding a witness incompetent due to drunkenness, infancy, insanity, or a conviction for perjury. Although these same witnesses are now presumed competent under Rule 601, some may not be permitted to testify because of several other factors, such as those previously discussed relating to Rules 401 through 403 and 601 through 605. A person who is an infant or mentally impaired may still be disqualified to testify as a witness under the rules. The principal difference is that the burden of proof has been shifted. The rules provide that a witness is competent and will be allowed to testify, unless the opponent can establish a basis for disqualification under one of the rules of evidence. On the other hand, common law required the proponent to prove the witness's competency. In either event, the issue of competency is decided by the trial judge."

Joseph A. Colquitt & Charles W. Gamble, From Incompetency to Weight and Credibility: The Next Step in an Historic Trend, 47 Ala. L. Rev. 145, 172–73 (Fall 1995) (footnotes omitted).

Thus, the adoption of Rule 601, Ala. R. Evid., created in essence a presumption of competency for every witness, and it is the burden of the opponent to challenge the admissibility of the witness's testimony on grounds other than Rule 601, Ala. R Evid. *See, e.g.*, Rule 602, Ala. R. Evid., and Rule 403, Ala. R. Evid.

Brown recognizes that under Rule 601, Ala. R. Evid., all witnesses, including children, are competent to testify. He further recognizes the trial court's duty to determine a child witness's ability to tell the truth. *See* Rule 603, Ala. R. Evid. Brown maintains, however, that, in addition to determining whether a child witness understands his or her responsibility to tell the truth when testifying, the trial court should also determine the reliability of the child witness's testimony. Brown reasons that, because of a child's age, the child witness may be unable to "truly register" the occurrence he or she observed or the child's memory may have eroded over time, may be distorted or a false creation, or may have been influenced by the suggestion of adults. According to Brown, because the child witness believes his or her testimony to be true, despite its being the result of imagination, distortion, or suggestion, the admission of the child witness's testimony without an examination to determine its reliability presents a substantial risk that the testimony will unfairly prejudice the defendant and will mislead the jury.

We decline Brown's invitation to require a trial court to conduct an examination to determine the reliability of a child witness's testimony. The concerns raised by Brown regarding a child witness's testimony are adequately addressed by our Rules of Evidence. Rule 602, Ala. R. Evid., provides that a witness's testimony may be excluded if the witness lacks personal knowledge of the matter. Rule 403, Ala. R. Evid., provides that testimony may be held inadmissible if the probative value of the testimony is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury. If a party has concerns about the reliability of a child witness's testimony, then the party must present his or her concerns in an objection for the trial court based on the Rules of Evidence. Indeed, a trial court's analysis, conducted after a properly presented Rule 403, Ala. R. Evid., objection, adequately balances concerns regarding the probative value of the child witness's testimony against unfair prejudice resulting from the frailty of a child's memories, the tendency of a child to form false memories that he or she believes to be true, and a child's susceptibility to suggestion that may taint the child's memory.[FN]1 Hence, Brown's concerns about the admissibility of a child witness's testimony based on the reliability of the testimony are adequately addressed by our present rules and procedures. *See also Utah v. Fulton*, 742 P.2d 1208, 1218 (Utah 1987) (addressing the effect of Rule 601, Utah R. Evid., which is identical to Rule 601, Ala. R. Evid., on the admissibility of a child's testimony and concluding "that Rule 403[, Utah R. Evid.,] adequately protects a defendant's right to a fair trial and gives him or her an opportunity to raise concerns [with regard to the reliability of a child's testimony] that prior to our adoption of Rule 601, might have been addressed in a competency hearing").

> [Footnote]1 Because we conclude that a Rule 403 analysis will adequately address a party's concerns about the reliability of a witness's testimony and satisfy the Due Process Clause, we decline Brown's invitation to apply the test for determining the reliability of eyewitness testimony set forth by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972), to a determination of the reliability of a child witness's testimony.

In this case, Brown contends that plain error occurred in the admission of T.S.'s testimony because, he says, she lacked personal knowledge of Cherea's death, *see* Rule 602, Ala. R. Evid., and because the probative value of her

testimony was substantially outweighed by the danger of unfair prejudice and of misleading the jury. *See* Rule 403, Ala. R. Evid.

The record establishes that, at the time of Brown's trial, T.S., who was Cherea and Brown's daughter, was 11 years old. She testified that she was 4 years old the last time she saw Cherea. She explained that she and her brothers were sleeping in their bedroom when she was awakened by Brown and Cherea, who were "fussing". According to T.S., she looked out her bedroom door and saw Cherea "laying on her back" "in the hallway" and there was blood "on her chest." Brown was standing beside Cherea's body.

Rule 602, Ala. R. Evid., provides:

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony."

A review of T.S.'s testimony establishes that T.S. had personal knowledge of the matter as to which she testified. T.S. testified about her recollection of the house she and Cherea were living in and the last time she saw Cherea. Therefore, Brown's contention that plain error occurred in the admission of T.S.'s testimony based on her lack of personal knowledge is not supported by the record.

Brown also contends that the trial court erred in admitting T.S.'s testimony because, he says, the probative value of her testimony was substantially outweighed by the danger of unfair prejudice and of misleading the jury. Brown argues that T.S.'s memory of the event was distorted by time because the event about which she testified occurred seven years before the trial when she was four years old and that her memory of the event had been corrupted by suggestion because she had discussed her testimony with the prosecutor and had been living with a lead witness for the State. In support of his argument, Brown points out that T.S. was unable to remember other events from the relevant time period and that T.S.'s recollection of seeing Cherea lying on the floor in the hallway conflicted with the forensic evidence. Brown reasons that these factors indicate that T.S.'s testimony was unreliable, and he argues that T.S.'s testimony, therefore, should have been excluded because, he says, it was unduly prejudicial and misled the jury.

Rule 403, Ala. R. Evid., provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

The record does not support a conclusion that T.S.'s testimony should have been excluded pursuant to Rule 403, Ala. R. Evid. T.S.'s testimony consisted of her recollection of the last time she saw Cherea; she testified about her recollection of simple facts, providing circumstantial evidence of Brown's guilt. T.S. testified that her last memory of Cherea was Cherea lying on the hall floor with blood on her chest and Brown standing over her body; she did not testify that she saw Brown stabbing Cherea. T.S.'s testimony did not involve an exercise of contemporaneous judgment beyond the comprehension of a child, did not indicate that she was precocious, and did not provide details beyond the simple observations of a child. Indeed, nothing in the record indicates that T.S.'s memory of the event was tainted or was the product of suggestive or biased interviews. Therefore, we conclude that the probative value of T.S.'s testimony was not substantially outweighed by the danger of unfair prejudice or of misleading the jury. Consequently, the trial court did not commit plain error in admitting T.S.'s testimony. T.S.'s testimony was properly presented to the jury for the jury to determine its weight and credibility. As the Court of Criminal Appeals held, "[T.S.'s] age at the time of the murders, the length of time between the murders and the trial, and the reliability of T.S.'s memory were considerations that went to the weight of her testimony rather than its admissibility." *Brown*, 74 So. 3d at 1006.

*Ex parte Brown*, 74 So. 3d at 1043–50.

The Court must again determine whether the Alabama court considered the merits of Brown's *federal* claim—that the admission of Tatiyana's testimony violated his rights to due process and a fair trial. The court authored a lengthy and thorough opinion considering Brown's arguments that courts should always conduct a voir for truthfulness of a child witness outside the presence of the jury and should always determine whether a child witness is reliable. In a footnote, the court stated that it considered Brown's due process argument and concluded that his rights were

not violated. *See id.* at 1049 n.1. Under the circumstances, in light of § 2254(d), *Harrington*, 562 U.S. at 101, and *Johnson*, 568 U.S. at 298, the Court finds that it should presume that the Alabama Supreme Court adjudicated Brown's federal claim on the merits. *See Johnson*, 568 U.S. at 298 ("We have no power to tell state courts how they must write opinions.") (quoting *Coleman*, 501 U.S. at 739). Thus, this Court's review is for reasonableness pursuant to § 2254(d).

Additionally, as with the preceding claim related to his confession, Brown appears to be arguing in his reply brief that this Court should review this claim under § 2254(d), as he argues that the trial court's failure to conduct an adequate inquiry into the reliability of Tatiyana's testimony was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Reply Brief, Doc. 33 at 45 (quoting 28 U.S.C. § 2254(d)(1)-(2), and citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) ("[R]eliability is the linchpin in determining the admissibility of identification testimony."); *Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("the Due Process Clause clearly requires a 'fair trial in a fair tribunal'") (quoting Withrow v. Larkin, 421 U.S. 35, 46 (1975)).

The Alabama Supreme Court's opinion was not unreasonable. Brown has not proffered any Federal authority requiring that a court conduct voir dire of a child

witness outside of the presence of the jury or that a trial court must independently satisfy itself that the child is reliable. Whether this Court views this claim *de novo* or whether it views the Alabama Supreme Court's decision for reasonableness under § 2254(d), the result is the same that Brown's claim lacks merit.

### G.    Brown's claim that prosecutorial misconduct violated his right to a fair trial

Brown's seventh claim is that the prosecutor engaged in misconduct that "so infected [his] trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Brown emphasizes three excerpts from the prosecutor's closing arguments at both the guilt and penalty phases that he says were improper. First, Brown points out that the prosecutor told the jury at the guilt phase: "I submit to you, we proved he did it. But that's the question for you. I don't get to go back there with you. My vote was cast a long time ago when I charged him with what he did." R. at 971. Brown contends that this statement was an expression of the prosecutor's personal opinion as to Brown's guilt, which impaired the reliability of the jury's verdict and tainted the jury's determination of guilt or innocence.

Brown's second point of contention with the prosecutor's closing argument is that the prosecutor referred to Brown as a "thug," R. at 960, and made allegations of prior acts of domestic violence, arguing to the jury that "It's just a shame [Brown] wasn't arrested for slapping her. It's ashamed [sic] he wasn't arrested for kicking

her. When he gets arrested for it, he's killed her." R. at 958. He argues that these statements aroused hostility and were not supported by the evidence at trial.

Third, Brown claims that the prosecutor speculated about the victims' final moments at the penalty phase, arguing that "I bet you there was some begging going on." R. at 1226. Brown points out that the prosecutor then asked the jury to "give [Brown's] sympathy and the result of their begging the same way he gave it to Dotty Jemison and Cherea Jemison and sentence him to death." *Id.*

Before addressing the merits, the Court will consider Respondent's argument that this claim fails to comply with Rule 2(c) of the Rules Governing Habeas Corpus Cases and should therefore be dismissed because Brown failed to mention 28 U.S.C. § 2254(d) or plead how he is due relief on this claim under § 2254(d) in his petition. Respondent's argument that Brown failed to sufficiently plead this claim is very cursory, *see* n.1, *supra*, and Respondent also addresses the claim on its merits, but in any event, Respondent is incorrect, as Brown indeed pleads that he is due relief pursuant to § 2254(d). *See* Petition for Habeas Relief, Doc. 1 at ¶ 308.

Finding that the claim is sufficiently pled, the Court turns to the merits. Brown exhausted this claim on direct appeal. Vol. 11, Tab #R-32 at 68–77; Vol. 14, at 67–75. The ACCA reviewed the alleged instances of prosecutorial misconduct on plain error review and found that none required reversal. *Brown*, 74 So. 3d at 1016–21.

The Alabama Supreme Court granted certiorari on this issue. *Ex parte Brown*, 74

So. 3d at 1042.

On certiorari review, the Alabama Supreme Court addressed specifically the

prosecutor's statement, "My vote was cast a long time ago when I charged him with

what he did." *Ex parte Brown*, 74 So. 3d at 1050. The Court wrote:

> Brown contends that a comment made during the prosecutor's rebuttal closing argument in the guilt phase of his trial constitutes plain error. Specifically, Brown argues that the prosecutor improperly injected his personal opinion of Brown's guilt when he argued: "My vote was cast a long time ago when I charged him with what he did." According to Brown, the prosecutor's statement amounted to reversible error because, he says, the prosecutor improperly expressed his personal opinion of Brown's guilt, conveyed to the jury that his personal opinion of guilt was based on information other than the evidence presented at trial, and improperly implied that his decision to charge Brown initially was indicative of Brown's guilt.

> In *United States v. Young*, 470 U.S. 1, 18, 105 S. Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court recognized the following two dangers that may occur when a prosecutor expresses his or her personal opinion concerning the guilt of the accused:

>> "[S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence."

> In this case, throughout the prosecutor's closing argument, he recited the evidence, argued his interpretation of the evidence, and stated his belief that the State's evidence proved beyond a reasonable doubt that Brown was guilty. Although we agree with Brown that the prosecutor's statement that his vote was cast when he charged Brown with the offenses constituted an improper expression of the prosecutor's personal opinion, we conclude that when that

comment is read in the context of his entire argument it does not rise to the
level of plain error. First, the comment was made during the prosecutor's
recitation of the evidence that had been presented to the jury; therefore, the
comment does not suggest that the prosecutor's opinion of Brown's guilt was
based on evidence not presented to the jury. Thus, we cannot conclude that
Brown's "right to be tried solely on the evidence presented to the jury" was
jeopardized in this regard.

Moreover, the prosecutor's statement, when viewed in the context of his
entire closing argument, does not lend itself to the conclusion that the jury
should trust the State's assessment of the evidence rather than its own. In
*Quinlivan v. State*, 579 So. 2d 1386, 1387 (Ala. Crim. App. 1991), the Court
of Criminal Appeals held that the prosecutor's argument, which included the
following statements, rendered Quinlivan's trial unfair:

> "I'm very proud to represent this case. I'm not obliged to try any
> case that I don't want to try. I'm commanded by the law of Alabama as
> a District Attorney to prosecute the guilty and protect the innocent."

In concluding that reversible error had occurred, the Court of Criminal
Appeals stated:

> "[T]he prosecutor's argument was nothing more than a blatant
> statement of his personal belief in the appellant's guilt. His comments
> expressly state that he tries only the cases that he wants to try and,
> consequently, chooses to prosecute only those defendants who are, as a
> matter of fact, guilty."

579 So. 2d at 1389.

The alleged error in this case, however, does not rise to the level of
reversible error in *Quinlivan*. Unlike the prosecutor's comments in *Quinlivan*,
which emphasized the prosecutor's duty to prosecute the guilty, the
prosecutor's statement in this case did not suggest that he, as a prosecutor,
prosecuted only the guilty. Therefore, we cannot conclude that the
prosecutor's comment improperly infected the jury in this regard.

The United States Supreme Court has stated that, when considering a
prosecutor's closing argument, the standard is whether the argument "'so
infected the trial with unfairness as to make the resulting conviction a denial

of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct.  2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct.  1868, 40 L.Ed.2d 431 (1974)). The argument is to be viewed in its entirety, and, to justify reversal, the argument must have resulted in substantial prejudice to the defendant. *Coral v. State*, 628 So. 2d 954, 985 (Ala.  Crim. App. 1992).

Although we do not condone the prosecutor's statement that "[his] vote was cast a long time ago when [he] charged [Brown] with what he did" because it is an improper expression of the prosecutor's personal opinion and was not necessary to answer defense counsel's assertions that the evidence did not support a verdict finding Brown guilty, the comment does not rise to the level of plain error. "Viewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to the miscarriage of justice." *United States v. Young*, 470 U.S. 1, 16, 105 S. Ct.  1038, 84 L.Ed.2d 1 (1985).

*Id.* at 1050–52.

And while the Alabama Supreme Court did not specifically address the other two instances of alleged prosecutorial misconduct, the ACCA addressed them, writing:

## IV.

Brown's fourth argument is that the prosecutor engaged in misconduct during his trial. Because he did not object at trial to the comments about which he now complains, we review them for plain error. *See* Rule 45A, Ala.  R. App. P. As the Alabama Supreme Court stated in *Ex parte Windsor*, 683 So. 2d 1042, 1061 (Ala.  1996):

"""While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice." *Ex parte Kennedy*, 472 So. 2d [1106,] at 1111 [ (Ala.  1985)] (emphasis in original). "This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider

the comments in question to be particularly harmful." *Johnson v. Wainwright*, 778 F.2d 623, 629 n. 6 (11th Cir. 1985), cert. denied, 484 U.S. 872, 108 S. Ct. 201, 98 L.Ed.2d 152 (1987).'"

Initially, we note that the trial court instructed the jury that the evidence in this case came from the testimony of the witnesses and the exhibits that were admitted into evidence. We presume that the jury followed the trial court's instructions. *See Taylor v. State*, 666 So. 36 (Ala.  Crim. App. 1994), aff'd, 666 So. 2d 73 (Ala.  1995). In judging a prosecutor's closing argument, the standard is whether the argument "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct.  1868, 1871, 40 L.Ed.2d 431 (1974)).

"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. *Whitlow v. State*, 509 So. 2d 252, 256 (Ala. Cr. App.1987); *Wysinger v. State*, 448 So. 2d 435, 438 (Ala. Cr. App. 1983); *Carpenter v. State*, 404 So. 2d 89, 97 (Ala. Cr.App.1980), cert. denied, 404 So. 2d 100 (Ala. 1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. *Orr v. State*, 462 So. 2d 1013, 1016 (Ala. Cr.App.1984); *Sanders v. State*, 426 So. 2d 497, 509 (Ala. Cr.App.1982)."

*Bankhead v. State*, 585 So. 2d 97, 106–07 (Ala.  Crim. App. 1989), aff'd in relevant part, 585 So. 2d 112, 127 (Ala. 1991), rev'd on other grounds, 625 So. 2d 1146 (Ala. 1993). Finally,

"'[d]uring closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' *Rutledge v. State*, 523 So. 2d 1087, 1100 (Ala. Cr.App.1987), rev'd on other grounds, 523 So. 2d 1118 (Ala. 1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. *Racine v. State*, 290 Ala. 225, 275 So. 2d 655 (1973). 'In evaluating allegedly prejudicial

remarks by the prosecutor in closing argument, . . . each case must be judged on its own merits,' *Hooks v. State*, 534 So. 2d 329, 354 (Ala. Cr.App.1987), aff'd, 534 So. 2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S. Ct.  883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting *Barnett v. State*, 52 Ala. App. 260, 264, 291 So. 2d 353, 357 (Ala. Cr.App.1974)), and the remarks must be evaluated in the context of the whole trial. *Duren v. State*, 590 So. 2d 360 (Ala. Cr.App.1990), aff'd, 590 So. 2d 369 (Ala. 1991). 'In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' *Mitchell v. State*, 480 So. 2d 1254, 1257–58 (Ala. Cr.App.1985) (citations omitted). 'To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' *Twilley v. State*, 472 So. 2d 1130, 1139 (Ala. Cr.App.1985) (citations omitted)."

*Coral v. State*, 628 So. 2d 954, 985 (Ala.  Crim. App. 1992), aff'd, 628 So. 2d 1004 (Ala. 1993).

. . .

## B.

Brown also contends that the prosecutor made comments that were not supported by the evidence and that "were intended solely to provoke a visceral reaction from the jury." (Brown's brief at p. 72.) During the State's guilt-phase rebuttal closing argument, the following occurred:

"And he talks about 7 years since this happened. Yes, it has been years. Oh, and how can she remember that after 7 years? Let me tell you something: How do you think she's ever going to forget it? I wish she could. I wish a four-year-old girl's last image of her mother was not lying in that hall with that (pointing) killer standing over her. Do you think it's—do you think it's unusual she can't remember going to Cleveland? Do you think that's unusual? I know people that remember minute details about the birth of their first child, color of their skin, how their head looked, how their hands. I bet they don't know what they were doing 30 minutes later. But they remember the look of that baby. Just like she remembers the look of her mother with *that thug* right there

(pointing) standing over her. How could she not remember that? Oh, she couldn't recall that. But she did."

(R. 959–60) (emphasis added).

"And something [defense counsel] said struck me right off the bat. He said Manuel Smith heard from his wife he had never been arrested for domestic violence and abusing her. Well, he has now. *It's just a shame he wasn't arrested for slapping her. It's [a shame] he wasn't arrested for kicking her. When he gets arrested for it, he's killed her."*

(R. 958) (emphasis added).

"But I want you to think about this—I want you to think. I want to talk about it just again. I said it. The last image for that child is seeing her mother there. But we are in the light of day now in a courtroom in a court of law for him. Right there. I want you because you believe he's guilty beyond a reasonable doubt and to a moral certainty of each and every element, I want you to give him the last image in the light of day for Dotty and Cherea Jemison, give him the last image of hearing the words: 'We the jury find the defendant guilty of capital murder of two or more persons.' *Give him the last image of saying: 'We the jury find him guilty of murder of Dotty Jemison during a robbery. We the jury find him guilty of murder during a robbery of Cherea Jemison.'* Make that the last image he hears of Dotty and Cherea Jemison. Because the last thing that he gave this little girl is to see [her] mother standing there—or see her lying there with her Daddy—or excuse me, that was Wakilii standing over her, it wasn't Daddy. I thank you."

(R. 971–72) (emphasis added). Subsequently, during the prosecutor's penalty-phase closing argument, the following occurred:

"And I tell you what, whether Rosenzweig believes in the death penalty or Goff or anybody else, we know one thing beyond a reasonable doubt, there is one person in this courtroom that does, and there (pointing) he sits. He believes in it. Because on March 9th and 10th, he acted as judge, jury, and executioner of Dotty Jemison and Cherea Jemison. And they didn't get the benefit of the light of day in the courtroom in the State of Alabama to have a sentence hearing to put on evidence to him why they should not be punished for death by death.

He believes in it. He believes in carrying it out. But he doesn't believe in the proposition that people deserve a right to have somebody beg. *I bet you there was some begging going on. I bet you there was. And I ask you to give his sympathy and the result of their begging the same way he gave it to Dotty Jemison and Cherea Jemison and sentence him the death or recommend the sentence of death as the law allows based on the proof to you."*

(R. 1225–26) (emphasis added).

Some of the prosecutor's statements were reasonable inferences based on the evidence presented at trial. However, even if the prosecutor did misstate or mischaracterize the evidence presented at trial, his statements were not of such a nature that they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden, supra*. Also, the trial court repeatedly instructed the jury that the evidence in this case came from the testimony from the witness stand and from the exhibits introduced into evidence. We presume that the jury followed the trial court's instructions. *See Taylor, supra*.

Additionally, after reviewing the comments in the context of the entire proceedings, we conclude that they were not of such a nature as to inflame the passions of the jury. Also, we view the statements of counsel in closing argument as having been made in the heat of debate, and we note that such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. *See Orr v. State*, 462 So. 2d 1013 (Ala. Crim. App. 1984).

For these reasons, we do not find any plain error in this regard.

*Brown*, 74 So. 3d at 1016–17, 1019–20.

Brown argues that the Alabama state courts' decisions were contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, under § 2254(d)(2). Specifically, Brown cites *United States v. Young*, 470 U.S. 1, 18 (1985) ("The

prosecutor's . . . expressing his personal opinion concerning the guilt of the accused . . . can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury . . . ."); *Darden*, 477 U.S. at 181 ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); and *Berger v. United States*, 295 U.S. 78, 88 (1935) (emphasizing that although a prosecutor "may prosecute with earnestness and vigor," he must "refrain from improper methods calculated to produce a wrongful conviction"). Brown argues that he has satisfied *Darden*'s requirement by showing that, viewed collectively, the comments suggested that the prosecution had superior knowledge of Brown's guilt, suggested that Brown had behaved violently toward Cherea Jemison in the past to sway the jury into believing he could have done so again, and suggested that Brown was a "thug" who inherently had violent tendencies.

The Court does not agree with Brown that the Alabama courts' decisions were contrary to or an unreasonable application of these Supreme Court cases on prosecutorial misconduct. In *Darden*, the Supreme Court instructed a reviewing court to consider any allegedly improper prosecutorial conduct or statements in the context of the particular trial, and not in a vacuum. *See* 477 U.S. at 179–81. The

Supreme Court has since described the *Darden* standard as "a very general one, leaving courts more leeway . . . in reaching outcomes in case-by-case determinations." *Parker v. Matthews*, 567 U.S. 37 (2012) (quotation omitted). Here, the Alabama Supreme Court reasonably found that Brown did not meet the *Darden* standard with regard to the prosecutor's comment that his "vote was cast long ago", noting that the comment was made during the prosecutor's recitation of the evidence that was before the jury and did not suggest that he only prosecuted cases in which he thought that the defendant was guilty. *Ex parte Brown*, 74 So. 3d at 1050–52. And the ACCA conducted a similar analysis with regard to the "thug" comment, the comments about violent behavior, and the comments about the victims begging for mercy, concluding that even if the comments were more than the prosecutor's mere inferences from the evidence presented, the trial court instructed the jury that the evidence they were to consider during deliberations consisted of only the testimony and exhibits presented. *Brown, supra*. Indeed, in *Darden*, the Supreme Court held that a closing argument more inflammatory than the comments Brown takes issue with here did not warrant habeas relief. *See* 477 U.S. at 180 n. 11 & 12 (prosecutor referred to the defendant as an "animal" and stated "I wish I could see [the defendant] with no face, blown away by a shotgun"). Ultimately, even if it could be said that the challenged comments in this case directed the jury's attention to inappropriate considerations, that would not establish that the Alabama state courts' rejection of

the *Darden* prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Habeas relief is not warranted on Brown's prosecutorial misconduct claim.

### H.   Brown's claim that the jury selection process violated his constitutional rights under *Batson v. Kentucky*, 476 U.S. 79 (1986)

Brown, who is a Black male, alleges that the prosecution impermissibly used its peremptory strikes to remove potential jurors who were Black and/or male. Specifically, Brown contends that the fact that the State used 81% of its strikes on Black individuals or males reflects a stark statistical disparity based on race and gender in the State's use of its strikes.

Before addressing the merits, the Court will consider Respondent's argument that this claim fails to comply with Rule 2(c) of the Rules Governing Habeas Corpus Cases and should therefore be dismissed because Brown failed to mention 28 U.S.C. § 2254(d) or plead how he is due relief on this claim under § 2254(d) in his petition. Respondent's argument that Brown failed to sufficiently plead this claim is very cursory, *see* n.1, *supra*, and Respondent also addresses the claim on its merits, but in any event, Respondent is incorrect, as Brown indeed pleads that he is due relief pursuant to § 2254(d). *See* Petition for Habeas Relief, Doc. 1 at ¶ 322 ("The Alabama appellate courts' contrary ruling on direct appeal were an unreasonable application of controlling Supreme Court precedent . . . .").

Turning to the merits, Brown exhausted this claim on direct appeal. Vol. 11, Tab #R-32 at 77–85; Vol. 14, at 86–88. The ACCA rejected his claim on a plain error review, finding no inference of purposeful discrimination by the prosecution when exercising its peremptory strikes. *Brown*, 74 So. 3d at 1021–24. Specifically, the ACCA stated:

> Brown's fifth argument is that we should remand this case to the trial court for a hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, he contends that the record raises an inference that the State discriminated on the basis of race and gender.
>
>> "In *Batson* the United States Supreme Court held that black veniremembers could not be struck from a black defendant's jury because of their race. In *Powers v. Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L.Ed.2d 411 (1991), the court extended its decision in *Batson* to apply also to white defendants. . . . The United States Supreme Court in *Georgia v. McCollum*, 505 U.S. 42, 112 S. Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of *Batson* were also available to defense counsel in criminal trials. The Alabama Supreme Court has held that the protections of *Batson* apply to the striking of white prospective jurors. *White Consolidated Industries, Inc. v. American Liberty Insurance, Co.*, 617 So. 2d 657 (Ala.1993)."
>
> *Grimsley v. State*, 678 So. 2d 1194, 1195 (Ala.Crim.App.1995). Brown did not raise a *Batson* objection at trial. Therefore, we review his argument only for plain error. *See* Rule 45, Ala. R. App. P.
>
> Plain error is
>
>> "error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. *Ex parte Taylor*, 666 So. 2d 73 (Ala.1995). The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant. *Taylor*."

*Ex parte Trawick*, 698 So. 2d 162, 167 (Ala.1997). "To find plain error in the context of a *Batson* or *J.E.B.* [*v. Alabama*, 511 U.S. 127, 114 S. Ct. 1419, 128 L.Ed.2d 89 (1994),] violation, the record must supply an inference that the prosecutor was 'engaged in the practice of purposeful discrimination.' *Ex parte Watkins*, 509 So. 2d 1074, 1076 (Ala.1987)." *Blackmon v. State*, 7 So. 3d 397, 425 (Ala.Crim.App.2005).

"The burden of persuasion is initially on the party alleging discriminatory use of a peremptory challenge to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider 'all relevant circumstances' which could lead to an inference of discrimination. *See Batson*, 476 U.S. at 93, 106 S. Ct. at 1721, citing *Washington v. Davis*, 426 U.S. 229, 239–42, 96 S. Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:

"1. Evidence that the 'jurors in question share[d] only this one characteristic—their membership in the group—and that in all other respects they [were] as heterogeneous as the community as a whole.' [*People v.*] *Wheeler*, 22 Cal.3d [258,] at 280, 583 P.2d [748,] at 764, 148 Cal. Rptr. [890,] at 905 [(1978)]. For instance 'it may be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,' *Wheeler*, 22 Cal. 3d at 280, 583 P.2d at 764, 148 Cal. Rptr. at 905, n. 27, indicating that race was the deciding factor.

"2. A pattern of strikes against black jurors on the particular venire; *e.g.*, 4 of 6 peremptory challenges were used to strike black jurors. *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723.

"3. The past conduct of the offending attorney in using peremptory challenges to strike all blacks from the jury venire. *Swain* [*v. Alabama*, 380 U.S. 202, 85 S. Ct. 824, 13 L.Ed.2d 759 (1965)].

"4. The type and manner of the offending attorney's questions and statements during voir dire, including nothing more than desultory voir dire. *Batson*, 476 U.S. at 97, 106 S. Ct. at 1723;

136

*Wheeler*, 22 Cal. 3d at 281, 583 P.2d at 764, 148 Cal. Rptr. at 905.

"5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. *Slappy v. State*, 503 So. 2d 350, 355 (Fla. Dist. Ct. App. 1987); *People v. Turner*, 42 Cal. 3d 711, 726 P.2d 102, 230 Cal. Rptr. 656 (1986); *People v. Wheeler*, 22 Cal. 3d 258, 583 P.2d 748, 764, 148 Cal. Rptr. 890 [905] (1978)."

"6. Disparate treatment of members of the jury venire with the same characteristics; or who answer a question in the same or similar manner; *e.g.*, in *Slappy*, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. *Slappy*, 503 So. 2d at 352 and 355.

"7. Disparate examination of members of the venire; *e.g.,* in *Slappy*, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. *Slappy*, 503 So. 2d at 355.

"8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. *Batson*, 476 U.S. at 93, 106 S. Ct. at 1721; *Washington v. Davis*, 426 U.S. [229,] at 242, 96 S. Ct. [2040,] 2049 (1976)].

"9. The offending party used peremptory challenges to dismiss all or most black jurors, but did not use all of his peremptory challenges. *See Slappy*, 503 So. 2d at 354, *Turner, supra*."

*Ex parte Branch*, 526 So. 2d 609, 622 (Ala.1987).

First, Brown argues that there was "a stark statistical disparity in the prosecution's use of its strikes." (Brown's brief at p. 81.) After excuses and challenges for cause, 44 veniremembers remained. Of those, 9 were white males, 20 were white females, 10 were black males, and 5 were black females. Thus, 29 were white and 15 were black; 25 were female and 19 were male. Each party had sixteen peremptory challenges. The State struck 3 white males,

3 white females, 7 black males, and 3 black females. Thus, the State struck 6 white people and 10 black people; 10 males and 6 females. The defense struck 4 white males, 11 white females, 1 black female, and 0 black males. Thus, the defense struck 15 white people and 1 black person; 4 males and 12 females. Finally, the jury consisted of 2 white males, 6 white females, 3 black males, and 1 one black female. There were also 2 white female alternates. Thus, the jury consisted of 8 white people and 4 black people, 5 males and 7 females, with 2 white female alternates.

An examination of the percentages of each of the categories set forth above shows that the composition of the jury is substantially similar to the composition of the venire. We also note that the defense used its first 12 strikes against white people and that it struck 4 white males and 11 white females, thus using 15 of its 16 peremptory challenges to remove white veniremembers. After examining the numbers carefully, including the defense's strikes, we conclude that they do not raise an inference of discrimination by the State on the basis of either race or gender.

*Id.* at 1023.

Brown's efforts to show that the ACCA's decision was contrary to, or an unreasonable application of, the decision in *Batson*, fail. *In Batson*, the Supreme Court held that the Equal Protection Clause prohibits prosecutors from striking potential jurors "solely on account of their race." 476 U.S. at 89. To assist courts in addressing *Batson* challenges, the Supreme Court outlined a three-step inquiry that courts must use to determine whether peremptory strikes have been used in a discriminatory manner. First, the party challenging the strike as discriminatory must set forth a prima facie case of discrimination. *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc*., 236 F.3d 629, 636 (11th Cir. 2000) (citing *Batson*, 476 U.S. at 96). "'[I]n making out a prima facie case, 'the defendant must point to more than

the bare fact of the removal of certain venire persons and the absence of an obvious valid reason for the removal.'" *Id*. at 637 (quoting *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990)). Second, if the court agrees that a prima facie case exists, the striking party must articulate a non-discriminatory (i.e., race-neutral) explanation for its strike. *Id*. at 636. "The reason given need not be a good reason; it can be irrational, silly, implausible, or superstitious, as long as it is facially race-neutral." *United States v. Lovett*, 662 F. App'x 838, 844 (11th Cir. 2016) (citing *United States v. Hill*, 643 F.3d 807, 837 (11th Cir. 2011)). Finally, if the striking party gives a race-neutral rationale, the court must evaluate the persuasiveness of the proffered reason and determine whether the objecting party has carried its burden of proving purposeful discrimination. *See id*. (citing *Hill*, 643 F.3d at 837).

Relevant here, it is well-settled that numbers alone are insufficient to establish a prima facie case of racial discrimination in jury selection. *See, e.g., Hill*, 643 F.3d at 838-40 (11th Cir. 2011) (the prima facie case determination is not to be based on numbers but is to be made in light of the totality of the circumstances) (citing *Johnson v. California*, 545 U. S. 162, 168 (2005)). "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170. Among the factors the Eleventh Circuit has instructed reviewing courts to consider in determining whether a prima facie *Batson* claim has been established

based on statistical evidence alone are (1) whether members of the relevant racial or ethnic group served unchallenged on the jury, (2) whether the striker struck all of the relevant racial or ethnic group from the venire, or at least as many as the striker had strikes, (3) whether there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire, and (4) whether there is a substantial disparity between the percentage of jurors of one race or ethnicity struck and the percentage of their representation on the jury. *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044-47 (11th Cir. 2005), cert. denied, 549 U.S. 952 (2006).

The ACCA did not reach a conclusion contrary to *Batson*; nor was its decision an unreasonable application of that case or the cases that have applied it. As the ACCA noted, there were 15 Black individuals on the 44-member venire from which the jury was struck, and there were 19 males. Each party had 16 peremptory challenges. The State used 7 of its 16 strikes to strike Black males. Three Black males served on the jury. Thus, Black males indeed served on the jury and tried the case, and the State did not use all of its peremptory strikes to strike Black males. Under these circumstances, the ACCA did not violate clearly established Federal law in finding that Brown had not met his burden of producing evidence that would allow the trial judge to infer that racial discrimination had occurred.

I.     **Brown's claim that the trial court's jury instructions on murder during the commission of a first-degree robbery violated the constitution**

Next, Brown contends that the trial court erred when it did not instruct the jury that a robbery committed as a mere "afterthought" to the murders would not support convictions for the capital offense of murder during the commission of a first-degree robbery. A conviction for capital murder-robbery under Alabama law requires proof beyond a reasonable doubt that "the murder was committed 'in the course of or in connection with the commission of, or in the immediate flight from the commission of' the robbery." *Connolly v. State,* 500 So. 2d 57, 62 (Ala. Crim. App. 1985), *aff'd* 500 So. 2d 68 (Ala. 1986) (quoting Ala. Code § 13A-5-39(2)). Brown argues that the State failed to present evidence that the robberies charged in this case—the theft of Cherea Jemison's car and the withdrawing of money from bank accounts of Cherea and Dotty Jemison the day after the murders—was anything more than a "mere afterthought" of the killings. Thus, Brown contends that the trial court's jury instructions failed to protect him from being convicted upon proof lower than a reasonable doubt in violation of his due process rights.

Before addressing the merits, the Court must consider Respondent's argument that this claim fails to comply with Rule 2(c) of the Rules Governing Habeas Corpus Cases and should therefore be dismissed because Brown failed to mention 28 U.S.C. § 2254(d) or plead how he is due relief on this claim under § 2254(d) in his petition.

Respondent's argument that Brown failed to sufficiently plead this claim is very cursory, *see* n.1, *supra*, and Respondent also addresses the claim on its merits, but in any event, the Court again finds that Respondent is incorrect. Brown sufficiently apprised this Court that he is making "a § 2254(d) argument" in his petition. *See* Petition for Habeas Relief, Doc. 1 at ¶ 322. Thus, the claim was adequately pled, and this Court will consider its merits.

Brown exhausted this claim on direct appeal. Vol. 11, Tab #R-32 at 86–89; Vol. 14, at 89–92. The ACCA found that no plain error occurred because "the trial court adequately instructed the jury that the murders had to take place during a robbery and thoroughly instructed the jury on the term 'during.'" *Brown*, 74 So. 3d at 1028. The Alabama Supreme Court granted certiorari on this issue, *Ex parte Brown*, 74 So. 3d at 1042. The Alabama Supreme Court wrote:

> Brown also contends that plain error occurred when the trial court failed to instruct the jury that a robbery committed as a "mere afterthought" of the killing is not sufficient to support a conviction for murder made capital because the murder was committed during the course of a first-degree robbery or an attempt thereof. Specifically, he argues that the trial court's instruction that the murder must occur "in the course of or in connection with the commission of or in the immediate flight from the commission of the robbery" did not adequately instruct the jury that "a robbery committed as a 'mere afterthought' . . . will not sustain a conviction under § 13A–5–40(a)(2)[, Ala. Code 1975,] for the capital offense of murder-robbery." *Connolly v. State*, 500 So. 2d 57, 63 (Ala.Crim.App.1985).
>
> A review of the trial court's instructions, however, fails to establish that plain error occurred. The trial court specifically instructed the jury that "the intent to rob and the intent to kill would have to coexist in the defendant's mind in order for the capital offense to occur." Although the trial court did not

state specifically that for the jury to find Brown guilty of capital murder-robbery the taking of the property could not be a mere afterthought of the murder, the trial court's instruction adequately communicated the law by instructing the jury that the robbery had to occur 'during' the course of the murder and that the intent to murder and the intent to rob had to coexist. Plain error did not occur in this regard. *See Ex parte Windsor,* 683 So. 2d 1042, 1058–60 (Ala. 1996); *Reeves v. State,* 807 So. 2d 18, 42–44 (Ala.Crim.App.2000); and *Woods v. State,* 789 So. 2d 896, 932–33 (Ala.Crim.App.1999) (recognizing that although the taking of property as a mere afterthought will not support a capital-murder conviction based on an underlying robbery, the trial court does not have to use the term 'mere afterthought' in its jury instructions on the robbery element of the capital murder).

*Ex parte Brown*, 74 So. 3d at 1054.

Brown argues that this decision was contrary to, or an unreasonable application of, Supreme Court precedent under § 2254(d)(1), citing *In re Winship*, 397 U.S. 358, 364 (1970) (the government must prove beyond a reasonable doubt every element of a charged offense), *Victor v. Nebraska*, 511 U.S. 1, 6 (1994) (a defendant's constitutional due process rights are violated if "there is a reasonable likelihood that the jury understood the instruction to allow conviction based on proof insufficient to meet the *Winship* standard"), and *Cage v. Louisiana*, 498 U.S. 39, 41 (1990) (per curiam) (when "it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause," relief is required). But the Alabama Supreme Court's decision that the trial court did not plainly err in its jury instruction

is not violative of these principles. With regard to Count II, the charge for capital

murder-robbery of Dotty Jemison, the trial court instructed the jury as follows:

> You've heard the word "during" used. When I said the law states intentional murder committed during a robbery in the first degree is capital murder. Now, during means in the course of or in connection with the commission of or in the immediate flight from the commission of the robbery in the first degree or attempt thereof.

> Now, during, again necessarily implies some mental connection or some connection of purpose in the defendant's mind. And the intent to rob and the intent to kill would have to coexist in the defendant's mind in order for the capital offense to occur. In order for the killing to occur during the course of a robbery, it would not make any difference which was committed first. Whether the taking of property first or the killing was committed first. Nor would a minor lapse of time necessarily indicate that the purpose was not there. You have to look at the entirety of the circumstances and determine that the State has proved beyond a reasonable doubt that the defendant killed Dotty Jemison. And if so, that he also intended to rob Dotty Jemison or Cherea Jemison before you could find the defendant guilty of the capital offense of the murder of Dotty Jemison during robbery.

*Brown*, 74 So. 3d at (quoting R. 1001–02). The trial court instructed the jury in the

same way with regard to Count III, the murder-robbery of Cherea Jemison. *See id.*

(quoting R. 1016–18). The Alabama Supreme Court recognized that the trial court

adequately communicated the law by instructing the jury that the robbery had to

occur "during" the course of the murder and that the intent to murder and the intent

to rob had to "coexist." It cannot be said that the state courts allowed Brown to be

convicted on less than a reasonable doubt on every element of a capital murder-

robbery charge.

Additionally, Brown argues that the state court's decision was an unreasonable determination of the facts based on the evidence presented. Although he argues that the trial court's instructions were faulty, Brown's argument actually focuses on an excerpt from the prosecutor's closing argument to support his claim. *See* Petition for Habeas Relief, Doc. 1 at ¶ 320. Brown points out that in closing, the prosecutor stated: "I suppose you could find that [Brown] intentionally killed Cherea and that he robbed her, and that it was somehow magically separate and far apart. But if you find both of those, it's going to be capital murder." *See* R. 939–40. Brown argues that this was an inaccurate description of the law and, because the State failed to present evidence that the robberies charged were anything more than an afterthought, the prosecutor's statement likely had an impact on the jury's deliberations. First, Brown underscores the connection between the murders and the robberies. The evidence showed that Brown withdrew money from bank accounts owned by Dotty and Cherea Jemison the day after the murders occurred and drove Cherea Jemison's car to Cleveland with the children later that day. In any event, even if the prosecutor misstated the law during closing arguments, this does not overcome the presumption that jurors follow the instructions of the trial court. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."). The Alabama Supreme Court found that the jury was instructed that the robbery had to occur during the course of the murder, and Brown has not

demonstrated that this result was based on an unreasonable determination of the evidence. Thus, this claim warrants no relief.

**J.    Brown's claim that his Sixth and Fourteenth Amendment rights were violated by Juror B.W.'s responses during voir dire**

Next, Brown claims that that jury misconduct occurred when juror B.W. failed to disclose during voir dire that her uncle was murdered when she was younger.

Before addressing the merits, the Court will consider Respondent's argument that this claim fails to comply with Rule 2(c) of the Rules Governing Habeas Corpus Cases and should therefore be dismissed because Brown failed to mention 28 U.S.C. § 2254(d) or plead how he is due relief on this claim under § 2254(d) in his petition. Respondent's argument that Brown failed to sufficiently plead this claim is very cursory, *see* n.1, *supra*, and Respondent also responds to this claim on the merits. Although Brown mentions in his petition that this claim was addressed during his Rule 32 proceedings, *see* doc. 1 at ¶ 327, he does not specifically plead that the state courts' decisions were contrary to or an unreasonable application of Federal law or based on an unreasonable determination of the facts under § 2254(d) and Rule 2(c). *See generally id.* at ¶¶ 323–28. Still, Brown references Supreme Court cases in support of this claim. *See id.* As such, the Court finds that Brown adequately pleaded this claim.

Turning to the merits, Brown exhausted this claim during Rule 32 proceedings. *See* Vol. 21, Tab #R-52 at 103–06 (Third Amended Rule 32 Petition);

Vol. 30, Tab #R-65 at 18–34 (brief to the ACCA); Vol. 33, Tab #R-71, at 59–70 (certiorari petition to the Alabama Supreme Court). The circuit court conducted an evidentiary hearing and denied relief. The ACCA affirmed on appeal, quoting extensively from the circuit court's order, as follows:

> Brown asserts that the circuit court erred in denying his claim that he is entitled to a new trial based on juror B.W.'s failure to answer truthfully during voir dire. In Claim IV(D) of his third amended petition, Brown asserted that he was denied due process by empaneled jurors' untruthful responses during voir dire. Brown pleaded that the venire was asked whether anyone had a family member who had been murdered. B.W. did not answer this question affirmatively, despite the fact that her uncle was murdered during the course of a robbery. The circuit court granted Brown an evidentiary hearing to prove this claim. Brown presented the testimony of B.W.; his trial counsel, the Honorable Jeb Fannin, who now serves as a Talladega District Judge; William Willingham; and Allison Mollman, an attorney who interviewed B.W. about her uncle's murder in preparation for Brown's postconviction petition.

> At the evidentiary hearing, B.W. described the circumstances of her uncle's murder:

>> "Well, when I was about ten,[FN]3 my uncle by marriage, he was murdered. He worked downstairs in a bar, and my aunt and their three kids lived upstairs. And some people came in with some guns, and he went to get his boss, and they shot him. I guess he was unarmed. I mean, I don't really know that."

>>> [FN]3 B.W. was "76, 8 [years old], something like that" at the time of the hearing. B.W. admitted, "I can't keep up with it." (R. 123-24.)

(R. 126.) B.W. acknowledged, though, that she did not "know anything about it really. I just know he was murdered, and, you know, they -- mother helped them a lot." (R. 128.) B.W. thought that the murder may have occurred in Detroit, but she was uncertain on that fact. B.W. also could not recall the type of gun used, the race of her uncle's assailants, or how she learned of her uncle's murder. B.W. testified flatly, "I didn't know anything about it," and

that her family "was not really close to [her aunt or uncle]." (R. 131.) With respect to voir dire, B.W. did not recall being asked whether a relative had been murdered or whether she had responded to such a question. B.W. testified that during her life she had not thought much about her uncle's murder and did not think about it during Brown's trial.

Judge Fannin, who asked the question at issue, stated that the question "may have been the most important" under the facts of the case. (R. 172.) In his opinion, a juror with a murdered family member could not be impartial. When Judge Fannin was told that B.W.'s uncle had been murdered in a robbery and asked whether she would have been a desirable juror, he answered, "Well, I don't think I would have wanted her on it." Judge Fannin presumed that knowledge of the murder of B.W.'s uncle "probably would have had an effect on the strikes and the way we struck." (R. 189.) Judge Fannin testified that he would have discussed the issue with Willingham, and, that if Willingham agreed, he would have struck B.W.

Willingham stated that in selecting jurors, he and Judge Fannin were more concerned about the penalty phase as opposed to the guilt phase. Willingham specifically stated that he would have viewed prospective jurors that had been victims of violent crime or that had family members who had been victims of violent crime as less favorable in the selection process. Willingham added, though, that he would "[n]ot automatically" strike a prospective juror with such a background. (R. 217.) Willingham said he would also consider factors such as a prospective juror's race, age, and experience with the district attorney's office. Willingham did not specifically recall B.W., but stated that had he known about her uncle's murder, it "would have moved her probably high on our priority of people to strike," and that it is "likely we would have struck her." (R. 228-29.) Willingham conceded on cross examination, however, that factors such as the length of time that had passed since the crime and the closeness of the relationship between the victim and the prospective juror could factor into his weighing process.

This Court addressed a juror's failure to respond truthfully in voir dire in *Tomlin v. State*, 695 So. 2d 157 (Ala. Crim. App. 1996):

> "'We start with the basic constitutional premise that every person is entitled to an impartial jury [pursuant to the Sixth Amendment to the United States Constitution].' *Knight v. State*, 675 So. 2d 487, 493–94 (Ala. Cr. App. 1995), cert. denied, 675 So. 2d 502 (Ala. 1996). 'It is

fundamental to our system of impartial justice that "'[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes.'"' *State v. Freeman*, 605 So. 2d 1258, 1259 (Ala. Cr. App. 1992) (quoting *Ex parte O'Leary*, 438 So. 2d 1372, 1373 (Ala. 1983), quoting in turn *Ex parte O'Leary*, 417 So. 2d 232, 240 (Ala. 1982)). 'Voir dire' is an ancient phrase which literally means 'to speak the truth.' W. LaFave & J. Israel, Criminal Procedure § 22.3(a) (2d. ed. 1992). "'Where the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right of challenge for cause, and is deceived into foregoing his right of peremptory challenge."' *Ex parte Ledbetter*, 404 So. 2d 731, 733 (Ala. 1981) (quoting *Leach v. State*, 31 Ala. App. 390, 18 So. 2d 285, cert. denied, 245 Ala. 539, 18 So. 2d 289 (1944)). 'Failure to enforce the right to elicit from prospective jurors truthful answers to material questions renders hollow the right of peremptory challenge.' *Knight v. State*, 675 So. 2d at 494 (quoting *Mitchell v. State*, 458 So. 2d 819, 821 (Fla. Dist. Ct. App. 1984)).

"In addressing the issue whether a defendant was deprived of the right to exercise peremptory strikes based on truthful answers from prospective jurors, the Alabama Supreme Court recently reiterated the test to be 'whether the defendant might have been prejudiced by a veniremember's failure to make a proper response.' *Ex parte Stewart*, 659 So. 2d 122, 124 (Ala. 1993) (emphasis added). This test casts a 'light burden' on the defendant. Cf. *Ex parte Lasley*, 505 So. 2d 1263, 1264 (Ala. 1987) (stated in regard to the test of whether juror misconduct might have influenced the verdict).

"'Although the factors upon which the trial court's determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about.'"

*Johnson v. State*, 536 So. 2d 957, 958 (Ala. Cr. App. 1987), cert. denied, 490 U.S. 1046, 109 S. Ct. 1955, 104 L. Ed. 2d 424 (1989) (quoting

*Smithson v. State*, 50 Ala. App. 318, 320–21, 278 So. 2d 766 (1973)).
*See also Campbell v. Williams*, 638 So. 2d 804, 813 (Ala. 1994), cert.
denied, 513 U.S. 868, 115 S. Ct. 188, 130 L. Ed. 2d 121 (1994). 'Thus,
the facts in each case must be considered individually and much will
remain in the discretion of the trial judge.' *Parish v. State*, 480 So. 2d
29, 30 (Ala. Cr. App. 1985)."

*Tomlin*, 695 So. 2d at 169-70. Additionally,

"The form of prejudice that would entitle a party to relief for a
juror's nondisclosure or falsification in voir dire would be its effect, if
any, to cause the party to forgo challenging the juror for cause or
exercising a peremptory challenge to strike the juror. *Ex parte
Ledbetter*, 404 So. 2d 731 (Ala. 1981); *Warrick v. State*, 460 So. 2d 320
(Ala. Crim. App. 1984); and *Leach v. State*, 31 Ala. App. 390, 18 So.
2d 285 (1944). If the party establishes that the juror's disclosure of the
truth would have caused the party either to (successfully) challenge the
juror for cause or to exercise a peremptory challenge to strike the juror,
then the party has made a prima facie showing of prejudice. *Id.* Such
prejudice can be established by the obvious tendency of the true facts
to bias the juror, as in *Ledbetter, supra*, or by direct testimony of trial
counsel that the true facts would have prompted a challenge against the
juror, as in *State v. Freeman*, 605 So. 2d 1258 (Ala. Crim. App. 1992)."

*Ex parte Dobyne*, 805 So. 2d 763, 772-73 (Ala. 2001).

Here, the circuit court found that Brown failed to prove that he might have
been prejudiced by B.W.'s non-disclosure of her uncle's murder:

"25.   Brown did not show that the fact that B.W.'s uncle was killed
fifty years before Brown's trial gave B.W. an obvious tendency for bias.

"26.   This Court finds that there was no possibility of prejudice where
B.W.'s uncle was killed so long ago that she did not recall information
about the killing, and where she clearly testified that she did not think
about the incident, including during Brown's trial. An analysis of the
*Dobyne* factors weighs against Brown and confirms that he has failed
to meet his burden of proof.

"27.    First, this Court finds that the 'temporal remoteness of the matter inquired about' strongly weighs against a finding of probable prejudice. *Dobyne*, 805 So. 2d at 772. B.W. testified that at some point in the early 1950s, her uncle was shot and killed. (Tr. 21, 26, 38.) She explained that the event occurred so long ago that she could not recall the exact year, but she believed that she was between ten and twelve years of age. (Tr. 38.) The event occurred so long ago that B.W. did not recall how she found out that her uncle had been killed or who told her, and she had no personal knowledge about the murder. (Tr. 38-39.)

"28.    The extreme remoteness of B.W.'s uncle's death places this case within the type of claim that the Court of Criminal Appeals has held is too temporally remote to satisfy the 'might-have-been-prejudiced' standard. In *Marshall v. State*, 182 So. 3d 573, 609 (Ala. Crim. App. 2014), a Rule 32 petitioner alleged that a juror failed to truthfully answer a question about whether any juror had been the victim of a crime. During the evidentiary hearing, the juror testified that she married her first husband in 1968, that he verbally and physically abused her, and that the abuse had a 'serious effect' on her, but that she divorced her husband in 1971 and had been happily remarried for thirty seven years. *Id.* at 610. In affirming the denial of the juror misconduct claim, the Court of Criminal Appeals held that the matter was temporally remote, given that it occurred thirty-five years before the petitioner's trial. *Id.*

"29.    Likewise, in *McWhorter*[ *v. State*, 142 So. 3d 1195 (Ala. Crim. App. 2011)], a Rule 32 petitioner alleged that a juror failed to disclose information about her father's death in response to a question about whether any juror had a family member who was the victim of a crime. 142 So. 3d at 1212. The Court of Criminal Appeals held that even if the juror committed misconduct by not responding, the petitioner failed to establish that he might have been prejudiced because, among other things, the juror's father's death was temporally remote. *Id*. at 1219-21. The court noted that the juror was eleven years old when her father died, which was nearly thirty years before the petitioner's trial. *Id.* at 1221.

"30.    This Court finds that Brown's case presents far less of a chance of prejudice than the facts presented in either *Marshall* or *McWhorter*. Here, B.W.'s uncle's death, which occurred over fifty years before Brown's trial was much more remote than the incidents in *Marshall* and

151

*McWhorter* (thirty-five and thirty years, respectively). Moreover, B.W.'s connection to crime-victim status was much more attenuated than in *Marshall*, where the juror personally suffered physical abuse from her prior husband that had a 'serious effect' on her, 182 So. 3d at 610, or than in *McWhorter*, where the juror's father was killed. 142 So. 3d at 1221. By contrast, B.W. testified that she was not close to her uncle, did not spend a great deal of time with him, and did not have personal knowledge about the facts of his death outside of what she was told. (Tr. 39-40.)

"31.   Regardless, the facts in B.W.'s case, much like those in *Marshall* and *McWhorter*, are a far cry from cases such as *Tomlin v. State*, 695 So. 2d 157, 170 (Ala. Crim. App. 1996), wherein the Court of Criminal Appeals held that a juror's failure to disclose that he had been arrested and pled guilty to misdemeanor criminal mischief charges sixteen years before trial was not temporally remote. The sixteen-year difference in *Tomlin* simply does not compare to the half-century gap in Brown's case. Given the particular circumstances of this case, this Court find that the extremely remote nature of B.W.'s uncle's death establishes that Brown failed to show that he might have been prejudiced.

"32.   Second, this Court finds that the factor concerning 'the prospective juror's inadvertence or willfulness in falsifying or failing to answer' also weighs against a finding of probable prejudice. *Dobyne*, 805 So. 2d at 772. There is absolutely no evidence that B.W. willfully intended not to answer the question. Rather, her testimony reflected that she simply did not remember an event that occurred over fifty years before Brown's trial when she was a child. B.W. testified that she was not trying to hide the fact that her uncle was killed, but that she 'just never thought about it[.]' (Tr. 42.) She also testified that her uncle's death was not something that she thought about, and she was not thinking about it when she served as a juror during Brown's trial. (Tr. 40-41.)

"33.   This Court finds that Brown's case is distinguishable from the facts in *Tomlin*, wherein the Court of Criminal Appeals stated that it was particularly concerned with this factor in finding that juror misconduct had occurred. 695 So. 2d 172. In *Tomlin*, the juror's repeated failure to answer multiple questions truthfully dispelled any claim that the failure to answer was inadvertent, and the court held that

the record reflected 'conscious disregard and disrespect for the importance of truthful responses to questioning in a judicial forum.' By contrast, B.W.'s testimony made it clear that she was not consciously disregarding the importance of truthful responses; rather, she simply did not recall a remote event. Thus, this Court finds that this factor does not support a finding of probable prejudice.

"34.   Third, this Court finds that 'the failure of the juror to recollect' factor also weighs heavily against the finding of probable prejudice. *Dobyne*, 805 So. 2d at 772. B.W. testified that she did not recall being asked during voir dire whether she had a family member who had been murdered. (Tr. 36.) She also testified that she did not recall the exact year that her uncle was killed, did not recall who told her, had not thought about her uncle in a long time, and did not have personal knowledge about what happened to her uncle. (Tr. 38-39; *see also* Tr. 32 ('I mean, I didn't know anything about it, then or now, really.').) Thus, it was clear from B.W.'s testimony that she did not think about her uncle frequently, did not recall many details concerning his death, and did not remember the incident at the time of trial.

"35.   Finally, this Court finds that the factor concerning 'the materiality of the matter inquired about' further weighs against a finding of prejudice. *Dobyne*, 805 So. 2d at 772. Under the unique facts of this case, the materiality of the question concerning whether any juror had a family member who was murdered, particularly when applied to B.W. was not significant. Though probable injury could result from a juror's failure to disclose any experience as a crime victim, *see Tomlin*, 695 So. 2d at 172, this Court finds that Brown's case is different because B.W. herself was not a victim of a crime, thereby lessening the materiality of this subject.

"36.   Regardless, the materiality of nondisclosed information, even information relating to crime-victim status, is lessened when a juror who did disclose such information remains on the jury. *See Brownfield v. State*, [266 So. 3d 777, 794 (Ala. Crim. App. 2017)] ('Although rarely is the answer to a single question during voir dire dispositive when selecting a jury, the fact that the information not disclosed by the juror in question had been disclosed by another juror who was not struck by defense counsel certainly undermines any claim that the nondisclosed information was material to counsel when selecting the

jury.'). Here, the materiality of the subject inquired about was lessened by the fact that Brown's counsel left a juror on the jury who responded that he had a family member who was murdered. (Tr. 78, 117.)

"37.   Further, the particular circumstances surrounding B.W. also lessened the materiality of the matter. Both Judge Fannin and Mr. Willingham testified that they would have considered the length of time that had elapsed between the time B.W.'s uncle was killed and the time of Brown's trial when determining whether they would strike B.W. (Tr. 89-91, 126-28.) As Judge Fannin explained, 'it would have been more important if the person had answered that it happened a month ago or two weeks ago.' (Tr. 89.) This Court finds that the fact that B.W.'s uncle was killed over fifty years before Brown's trial significantly lessened the materiality of that subject for B.W.

"38.   For all the above reasons, this Court finds that the *Dobyne* factors weigh heavily against a finding of probable prejudice and that Brown has failed to prove that the fact that B.W.'s uncle was killed had an obvious tendency for bias.

"39.   Brown failed to show that the disclosure of information about B.W.'s uncle would have prompted a challenge against her.

"40.   This Court further finds that Brown failed to establish that he might have been prejudiced because he failed to present direct testimony that his trial counsel would have struck B.W. had they known that her uncle was murdered. Counsel's testimony was equivocal. Though Judge Fannin and Mr. Willingham testified that in theory, they would not have wanted B.W. on the jury if she had a family member who had been murdered, neither testified that they absolutely would have struck her. Rather, they admitted that there was a possibility that B.W. might have remained on the jury.

"41. Judge Fannin stated, '[i]f we had known it about [B.W.,] we may have left her on. I don't know. I can't look back and say yes or no.' (Tr. 87.) Indeed, though he said that he would not have wanted B.W. on the jury and would have discussed striking her with Mr. Willingham, Judge Fannin admitted that they might have left B.W. on the jury, given the unusually high number of venire members who responded that they had a family member who had been murdered. (Tr. 85, 87.) Judge Fannin

testified that he would not have automatically struck B.W. or any other venire member who had a family member who had been murdered. (Tr. 86.) He reiterated that he would need to consider the entire panel and all of their responses; thus, Judge Fannin could not 'say with one-hundred percent [certainty that he] would have struck [B.W.] or left her on.' (Tr. 87, 90.)

"42. Mr. Willingham likewise stated that he would not automatically strike a venire member who had a family member who had been murdered. (Tr. 112-13.) He testified that the fact that B.W.'s uncle had been killed in the 1950s would have lessened the priority that counsel would have placed on striking her. (Tr. 128.)

"43. This Court finds that counsel's testimony did not establish that counsel would have struck B.W. had she revealed that her uncle had been killed fifty years earlier. On the contrary, counsel's testimony presented the possibility that B.W. still would have served on the jury. Counsel's decision would have required balance between the fact that a large number of venire members respond that they had family members who had been murdered (eleven responded affirmatively), and the fact that the importance of striking B.W. was lessened by the passage of time between her uncle's death and Brown's trial, coupled with the difficulty of deciding who would have been left in B.W.'s place. At best, counsel's testimony revealed that they could not say one way or the other whether they would have struck B.W. (Tr. 87.)

"44. Indeed, this Court finds that the possibility that B.W. would have been left on the jury is strengthened by the fact that counsel did leave a juror on who responded during voir dire that he had a family member who was murdered. (Tr. 88, 298.) The equivocal nature of counsel's testimony, along with the fact that a juror who disclosed similar information was left on the jury, distinguishes Brown's case from prior cases wherein relief was granted.

"45. In *Ex parte Dixon*, 55 So. 3d 1257 (Ala. 2010), the Alabama Supreme Court held that a defendant established that he might have been prejudiced based on direct, unequivocal testimony from trial counsel that the challenged juror would have been struck had the nondisclosed information been revealed. The court noted that 'Dixon's trial counsel testified at the evidentiary hearing that, had he known of

the pending charges, he would have challenged L.A. for cause or exercised one of his peremptory challenges to remove her.' *Id.* at 1263. Such is not the case here. Brown failed to establish that he might have been prejudiced because neither of his trial counsel testified that they would have absolutely struck B.W. in the clear manner described in *Dixon*.

"46. Finally, this Court finds that Brown failed to establish that B.W. would have been struck because the evidence presented during the evidentiary hearing demonstrated that B.W. might have been a helpful juror for the defense. After all, B.W. testified, 'I don't really like judging other people.' (Tr. 45.) Mr. Willingham explained that the focus of the defense's presentation during voir dire was on the penalty phase: he and Judge Fannin concentrated on finding jurors who would be more sympathetic or helpful to the defense's case at sentencing. (Tr. 103.) He testified that if a juror stated that she did not liking judging people, he would consider this to be a characteristic of a juror more favorable to the defense during the penalty phase. (Tr. 129.) Thus, this Court finds that even if B.W. had revealed that she had an uncle killed in the 1950s, additional questioning might have uncovered helpful facts that would have supported the possibility that trial counsel would have left her on the jury. For these reasons, this Court finds that Brown failed to show that his counsel would have struck B.W. and that he did not meet his burden of establishing that he might have been prejudiced."

(C. 1720-29.)

The circuit court's detailed findings of fact are supported by the record. Further, this Court finds no error in the circuit court's application of the law to the facts. As such, this issue does not entitle Brown to any relief.

Vol. 32, Tab #R-69 at 15–26.

Brown argues that the ACCA's affirmance of the circuit court's decision on this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law and was based on an unreasonable determination of the facts based on the evidence presented, § 2254(d). The only

federal case he cites is *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). In that case, the Supreme Court held that "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial"). The ACCA's decision was in compliance with, rather than contrary to, *McDonough*. As explained in detail by the ACCA, quoting the circuit court, Brown failed to demonstrate that he was prejudiced by B.W.'s nondisclosure of her uncle's murder for several reasons: the murder of B.W.'s uncle occurred over fifty years before Brown's trial and was thus too temporally remote to satisfy the "might have been prejudiced" standard; B.W. testified that she was not close to her uncle and did not have personal knowledge about the facts of his death; there was no evidence that B.W. willfully intended not to answer the question posed during voir dire or that she even remembered the question being asked; Brown's counsel's testimony was equivocal as to whether they would have struck B.W. had she testified about her uncle's murder, as they testified that they would have considered the extreme length of time and neither stated that they absolutely would have struck her; Brown's counsel left another juror on the jury

who responded that he had a family member who was murdered. Brown has not shown that the state courts' decisions unreasonably applied federal law.

### K.     Brown's claim that his death sentence violates *Ring v. Arizona*, 536 U.S. 584 (2002)

Next, Brown alleges that his death sentence violates *Ring v. Arizona*, 536 U.S. 584 (2002), because a judge, and not a jury, determined his sentence.

Before addressing the merits, the Court will consider Respondent's argument that this claim fails to comply with Rule 2(c) of the Rules Governing Habeas Corpus Cases and should therefore be dismissed because Brown failed to mention 28 U.S.C. § 2254(d) or plead how he is due relief on this claim under § 2254(d) in his petition. Respondent's argument that Brown failed to sufficiently plead this claim is very cursory, *see* n.1, *supra*, and Respondent also addresses the claim on its merits, but in any event, the Court finds that Respondent is incorrect that the claim is insufficiently pled. Brown indeed pleads in his petition that he is due relief pursuant to § 2254(d). *See* Petition for Habeas Relief, Doc. 1 at ¶ 338.

Turning to the merits, Brown exhausted this claim on direct appeal. Vol. 11, Tab #R-32, at 108–114; Vol. 14, at 99–106. The ACCA found that no *Ring* violation occurred, explaining as follows:

> Brown's tenth argument is that his death sentence violates the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L.Ed.2d 556 (2002). In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L.Ed.2d 435 (2000), the United States Supreme Court held that any fact that increases a sentence above the statutory maximum must be

presented to a jury and proven beyond a reasonable doubt. In *Ring*, the Court extended its holding in *Apprendi* to death penalty cases.

. . .

First, Brown contends that Alabama's capital sentencing scheme is unconstitutional because the jury does not make all of the findings that are necessary to support the imposition of the death penalty. However, in *Ex parte Waldrop*, 859 So. 2d 1181, 1187–88 (Ala.2002), the Alabama Supreme Court explained:

> "It is true that under Alabama law at least one statutory aggravating circumstance under Ala.Code 1975, § 13A–5–49, must exist in order for a defendant convicted of a capital offense to be sentenced to death. *See* Ala.Code 1975, § 13A–5–45(f) ('Unless at least one aggravating circumstance as defined in Section 13A–5–49 exists, the sentence shall be life imprisonment without parole.'); *Johnson v. State*, 823 So. 2d 1, 52 (Ala.Crim.App.2001) (holding that in order to sentence a capital defendant to death, the sentenced ' "must determine the existence of at least one of the aggravating circumstances listed in [Ala.Code 1975,] § 13A–5–49" ' (quoting *Ex parte Woodard*, 631 So. 2d 1065, 1070 (Ala.Crim.App.1993))). Many capital offenses listed in Ala.Code 1975, § 13A–5–40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A–5–49:
>
> > " 'For example, the capital offenses of intentional murder during a rape, § 13A–5–40(a)(3), intentional murder during a robbery, § 13A–5–40(a)(2), intentional murder during a burglary, § 13A–5–40(a)(4), and intentional murder during a kidnapping, § 13A–5–40(a)(1), parallel the aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged . . . [in a] rape, robbery, burglary or kidnapping," § 13A–5–49(4).'
>
> "*Ex parte Woodard*, 631 So. 2d at 1070–71 (alterations and omission in original).
>
> "Furthermore, when a defendant is found guilty of a capital offense, 'any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial

shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.' Ala. Code 1975, § 13A–5–45(e); *see also* Ala.Code 1975, § 13A–5–50 ('The fact that a particular capital offense as defined in Section 13A–5–40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A–5–49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'). This is known as 'double-counting' or 'overlap,' and Alabama courts 'have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.' *Ex parte Trawick*, 698 So. 2d 162, 178 (Ala.1997); *see also Coral v. State*, 628 So. 2d 954, 965 (Ala.Crim.App.1992).

"Because the jury convicted Waldrop of two counts of murder during a robbery in the first degree, a violation of Ala.Code 1975, § 13A–5–40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A–5–49(4), was 'proven beyond a reasonable doubt.' Ala.Code 1975, § 13A–5–45(e); Ala.Code 1975, § 13A–5–50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A–5–45(f). Thus, in Waldrop's case, the jury, and not the trial judge, determined the existence of the 'aggravating circumstance necessary for imposition of the death penalty.' *Ring*, 536 U.S. at 609, 122 S. Ct. at 2443. Therefore, the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all *Ring* and *Apprendi* require."

(Footnote omitted.)

Because the jury convicted Brown of the capital offense of robbery-murder and of killing two or more people pursuant to one scheme or course of conduct, those statutory aggravating circumstances were proven beyond a reasonable doubt. Therefore, in this case, the jury, and not the judge, determined the existence of the "aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609, 122 S. Ct. at 2443. Further, because the jury found the existence of at least one aggravating circumstance, Brown was exposed to or eligible for the death penalty, and "[t]he trial court's subsequent determination that the murder [was] especially

160

heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances." *Waldrop*, 859 So. 2d at 1190. Accordingly, there was not a *Ring* violation in this case, and Brown's arguments to the contrary are without merit.

*Brown*, 74 So. 3d at 1034–35.

Because the ACCA rejected Brown's *Ring* claim on the merits, this Court is limited to reviewing the ACCA's decision under § 2254(d). "The holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury." *Lee v. Comm'r, Alabama Dep't of Corr.*, 726 F.3d 1172, 1198 (11th Cir. 2013). Here, as recognized by the ACCA, the jury unanimously found at least two aggravating circumstances when it found Brown guilty as charged in the indictment, thereby making him death eligible.

Brown argues that *Waldrop*, the Alabama Supreme Court cases relied upon by the ACCA in deciding his claim, is contrary to and an unreasonable application of *Ring*, but that argument fails because Brown hasn't set forth any federal precedent stating as much. Brown also argues that the ACCA's decision amounts to an unreasonable determination of the facts because two jurors found that the presence of mitigating factors outweighed any aggravating factors, such that the death penalty was not appropriate, but again, Brown has not set forth precedent indicating that a jury vote of 10-2 for the death penalty contravenes *Ring*.

As such, Brown has not shown that the state courts' decision was an unreasonable application of, or contrary to, the decision in *Ring* or that the state courts' decision was based on an unreasonable application of the facts based on the evidence presented. Thus, this claim warrants no relief.

**L.  Brown's claim that Alabama's capital-sentencing statute fails to narrow the universe of defendants eligible for the death penalty**

Next, Brown claims that the use of aggravating circumstances that duplicate one of the elements of the underlying capital offense (commonly referred to as "double counting") fails to narrow the class of cases eligible for the death penalty and subjected him to multiple punishments for the same offense, citing *Zant v. Stephens*, 462 U.S. 862 (1983).

Brown exhausted this claim on direct appeal. Vol. 11, Tab #R-32, at 114–15; Vol. 14, at 106–08. The ACCA rejecting the claim, writing:

> Brown's eleventh argument is that "Alabama's capital-sentencing statute fails to narrow the universe of defendants eligible for the death penalty." (Brown's brief at p. 114.) Specifically, he appears to contend that the trial court improperly treated robbery and the killing of two or more people pursuant to one scheme or course of conduct as both elements of the capital offenses and as aggravating circumstances. He also appears to contend that this "double counting" punishes him twice for the same offense. We addressed and rejected similar arguments in *Jackson v. State*, 836 So. 2d 915, 958–59 (Ala.Crim.App.1999), as follows:
>
> > "'The fact that a particular capital offense as defined in Section 13A–5–40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A–5–49 shall not be construed to preclude the finding and consideration of that relevant circumstances or circumstances in determining sentence.'

"Accordingly, under § 13A–5–50, Ala.Code 1975, a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A–5–49, Ala.Code 1975, as an aggravating circumstance. Further, this court has held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense. *Burton v. State*, 651 So. 2d 641 (Ala.Cr.App.1993), aff'd, 651 So. 2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S. Ct. 1973, 131 L.Ed.2d 862 (1995).

"'This practice, known as "double counting" or "overlapping," has been upheld. *Haney v. State*, 603 So. 2d 368 (Ala.Cr.App.1991), aff'd, 603 So. 2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S. Ct. 1297, 122 L.Ed.2d 687 (1993); *Kuenzel* [*v. State*, 577 So. 2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So. 2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S. Ct. 242, 116 L.Ed.2d 197 (1991)].

"'Section 13A–5–50, Code of Alabama 1975, states, in part, as follows:

"'"The fact that a particular capital offense as defined in Section 13A–5–40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A–5–49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."

"'Clearly, § 13A–5–50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A–5–49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. *Kuenzel, supra*; *see also Ex parte Kennedy*, 472 So. 2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S. Ct. 340, 88 L.Ed.2d 325 (1985).

"'"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy."

"*Kuenzel*, 577 So. 2d at 488, quoting *Fortenberry v. State*, 545 So. 2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So. 2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S. Ct. 1937, 109 L.Ed.2d 300 (1990).'

"*Burton*, 651 So. 2d at 657–58."

*Hutcherson v. State*, 677 So. 2d 1174, 1201 (Ala.Crim.App.1994), rev'd on other grounds, 677 So. 2d 1205 (Ala.1996). Also, in *Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S. Ct. 546, 98 L.Ed.2d 568 (1988), the United States Supreme Court held:

"Here, the 'narrowing function' was performed by the jury at the guilt phase when it found defendant guilty of three counts of murder under the provision that 'the offender has a specific intent to kill or to inflict great bodily harm upon more than one person.' The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more."

Therefore, Brown's arguments are without merit.

*Brown*, 74 So. 3d at 1036–37.

Brown cannot establish that the ACCA's decision is contrary to or an unreasonable application of federal law. Although Brown points to the decision in *Zant*, as well as those in *Gregg v. Georgia*, 428 U.S. 153 (1976), and *North Carolina v. Pearce*, 395 U.S. 711 (1969), these decisions do not support his claim. Rather, as the ACCA's decision recognized, an aggravating circumstance may duplicate an

element of the capital offense when, as is the case here, the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself. *See Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988). Brown has not offered any Federal authority to the contrary. Accordingly, this claim is without merit.

**M.    Brown's claim that the trial court's penalty-phase jury instructions denied the jury the power to reconsider the applicability of the aggravating circumstance during the penalty phase**

This claim is similar to the claim in the previous section, as Brown argues here that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated because the trial court's jury instructions divested from the jury its power to reconsider the applicability of the aggravating factors in its sentencing recommendation. Brown specifically takes issue with the trial court's instruction, "If you find beyond a reasonable doubt that one or both of the aggravating circumstances . . . exist in this case, and *both of them do exist* . . . then you *must* proceed to consider and determine the mitigating circumstances."  Vol. 9 at R. 1232–33, 1235–36 (emphases added). Brown claims that this instruction violated his constitutional entitlement to a jury, not a judge, making the determination of the facts that underlie his death sentence, citing *Ring*, 536 U.S. 584, and improperly "diminish[ed] the jury's sense of responsibility," citing *Caldwell v. Mississippi*, 472 U.S. 320, 342 (1985) (O'Connor, J., concurring in part and concurring in the judgment).

Before addressing the merits, the Court must consider Respondent's argument that this claim is procedurally defaulted from review by this Court because Brown raised it on direct appeal solely on state law grounds, and it was decided by the state courts solely on state law grounds—specifically, the applicability of state court precedent set forth in *Haney v. State*, 603 So. 2d 368 (Ala. Crim. App. 1991). The Court does not agree with Respondent. Brown did in fact raise a constitutional claim in his direct appeal brief to the ACCA, writing:

XI.   THE   TRIAL   COURT'S   PENALTY-PHASE   JURY INSTRUCTIONS DENIED THE JURY ITS POWER TO RECONSIDER THE APPLICATBILITY OF THE AGGRAVATING FACTORS IN ITS SENTENCING RECOMMENDATION.

In its penalty phase jury instruction, the trial court repeatedly suggested that the jury had no discretion as to aggravating circumstances because those circumstances had already been found beyond a reasonable doubt in the guilt phase: [quoting trial court's jury instructions] . . .

Mr. Brown is aware of this Court's holding in *Haney v. State*, 503 So. 2d 358, 379 (Ala. Crim. App. 1991), aff'd, 603 So. 2d 42 (Ala. l992), but nonetheless contends that this instruction improperly divested the jury of its discretion at sentencing, and *violated Mr. Brown's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution*, and under Alabama state law.[FN]23

[Footnote]23 In addition, the jurors were instructed during the sentencing phase that their sentencing verdict was only a "recommendation." (R. 1229.) These instructions improperly "diminish[ed] the jury's sense of responsibility." *Caldwell v. Mississippi*, 472 U.S. 320, 342 (1985) (O'Connor, J., concurring in part and concurring in the judgment).

Vol. 11, Tab #R-32, at 115–16 (emphasis added). Brown also raised the claim in his petition for certiorari before the Alabama Supreme Court, *see* Vol. 14, at 108–10, thus exhausting the claim.

The ACCA reviewed and rejected this claim, writing:

> Twelfth, Brown argues that the trial court erred when it instructed the jury, during its penalty phase instructions, that it "had no discretion as to aggravating circumstances because those circumstances had already been found beyond a reasonable doubt in the guilt phase." (Brown's brief at p. 115.) Although he acknowledges caselaw to the contrary, he still argues that "this instruction improperly divested the jury of its discretion at sentencing." (Brown's brief at p. 116.) However, as we explained in Part XI, the practice of "double counting" has repeatedly been upheld. Therefore, the trial court's instruction was not improper, and Brown's argument to the contrary is without merit.

*Brown*, 74 So. 3d at 1037–38. By referring back to its analysis in the previous section, *see* the section quoted above in part IV.L., *supra*, the ACCA indicated that it was considering, and rejecting, the constitutional element of Brown's claim. Thus, the claim was not decided purely on state law grounds, and this Court must examine it under the restrictions of § 2254(d).

However, although Brown asserts that the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court precedent, he has not identified any Supreme Court precedent that holds the practice of "double counting" as unconstitutional, as discussed in the previous section. Thus, he has not met his burden under § 2254(d), and this claim lacks merit.

### N.   Brown's claim that Alabama's method of execution is unconstitutional

Finally, Brown challenges Alabama's method of execution as unconstitutional because he claims that "Alabama's underdeveloped procedures for lethal injection create a substantial risk of inflicting unnecessary harm in contravention of the Eighth and Fourteenth Amendments." Petition for Habeas Relief, Doc. 1 at 124.

Brown exhausted this claim on direct appeal. Vol. 11, Tab #R-32, at 116–17; Vol. 14, at 110–11. The ACCA rejected the claim, writing:

> Brown's thirteenth argument is that that Alabama's method of execution violates the United States Constitution and the Alabama Constitution. However, in *Ex parte Belisle*, 11 So. 3d 323, 339 (Ala.2008), the Alabama Supreme Court addressed the United States Supreme Court's decision in *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L.Ed.2d 420 (2008), and "conclude[d] that Alabama's use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution." Also, this court has previously rejected claims that Alabama's method of execution violates the Alabama Constitution. *See Dotch v. State*, 67 So. 3d 936 (Ala.Crim.App.2010); *Morris v. State*, 60 So. 3d 326 (Ala.Crim.App.2010). Therefore, Brown's argument is without merit.

*Brown*, 74 So. 3d at 1038.

Brown cannot establish that the ACCA's decision is contrary to law because there is no Supreme Court precedent that has held that Alabama's procedures for administering lethal injection violate the Eighth and Fourteenth Amendments. Alternatively, this claim is not cognizable under § 2254 because a § 1983 lawsuit is the proper means by which to challenge lethal injection procedures. *See Tompkins*

*v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009). Thus, this claim warrants no relief.

## V.   CONCLUSION

For all of the reasons set forth herein, Brown's petition for writ of habeas corpus is due to be dismissed, or in the alternative denied.

Rule 11(a) of the Rules Governing § 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted). This Court finds Brown's claims do not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be denied.

A separate order in accordance with this opinion will be issued.

**DONE** and **ORDERED** on September 27, 2024.

_____
L. Scott Coogler
United States District Judge

160704